No. 22-55685

# United States Court of Appeals
### FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

$1,152,366.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX5.280, HELD IN THE NAME OF GOLDEN CASTLE TECHNOLOGY LIMITED; $53,020.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX3.200, HELD IN THE NAME OF YOUNES NASRI
DEFENDANTS

AND

YOUNES NASRI,
CLAIMANT-APPELLANT

*On Appeal from the United States District Court for the Southern District of California*
*21CV1134-WQH*

**PETITION FOR REHEARING EN BANC**

ANDREW R. HADEN
  *Acting United States Attorney*

DANIEL E. ZIPP
  *Assistant U.S. Attorney*
  *Chief, Appellate Section*
  *Criminal Division*

  *880 Front St., Rm. 6293*
  *San Diego, CA 92101*
  *(619) 546-8463*

TABLE OF CONTENTS

Page

Introduction.................................................................... 1

Question Presented .............................................. 3

Statement .................................................................. 4

Discussion.................................................................. 8

Certificate of Compliance

Addendum

TABLE OF AUTHORITIES

Cases:

*The Brig Ann.,*
13 U.S. 289 (1815) ........................................... 17, 18, 19

*Contents of Acct. No. 03001288 v. United States,*
344 F.3d 399 (3d Cir. 2003).................................... 2, 12

*Elk Grove Unified Sch. Dist. v. Newdow,*
542 U.S. 1 (2004) .......................................................... 16

*Hanson v. Denckla,*
357 U.S. 235 (1958) .............................................. 18, 19

*Kowalski v. Tesmer,*
543 U.S. 125 (2004) ..................................................... 15

*Mullane v. Central Hanover Bank & Trust Co.,*
339 U.S. 306 (1950) .............................................. 13, 14

*Powers v. Ohio,*
499 U.S. 400 (1991) ..................................................... 15

*Republic Nat'l Bank of Miami v. United States,*
506 U.S. 80 (1992) ....................................................... 19

*United States Dep't of Lab. v. Triplett*,
   494 U.S. 715 (1990) ...................................................15

*United States v. All Funds in Acct. Nos. 747.034/278,*
   *747.009/278, & 747.714/278 in Banco Espanol de*
   *Credito, Spain,*
   295 F.3d 23 (D.C. Cir. 2002) ......................................12

*United States v. All Funds on Deposit in any Accts.*
   *Maintained in Names of Meza or De Castro,*
   63 F.3d 148 (2d Cir. 1995).....................................12, 16

*United States v. Approximately $1.67 Million,*
   513 F.3d 991 (9th Cir. 2008) ........................2, 6, 7, 8, 11

*United States v. Batato,*
   833 F.3d 413 (4th Cir. 2016) ......................................12

*United States v. Certain Funds Contained in Acct.*
   *Numbers 600-306211-006,600-306211-011 & 600-*
   *306211-014 Located at Hong Kong & Shanghai*
   *Banking Corp.,*
   96 F.3d 20 (2d Cir. 1996)...........................................12

*United States v. Davenport,*
   668 F.3d 1316 (11th Cir. 2012) ...................................17

*United States v. James Daniel Good Real Prop.,*
   510 U.S. 43 (1993) ...........................................6, 14, 17

*United States v. Nasri,*
   119 F.4th 1172 (9th Cir. 2024)............................ passim

*United States v. Obaid,*
   971 F.3d 1095 (9th Cir. 2020) .............................2, 6, 19

*United States v. PetroSaudi Oil Servs. (Venezuela) Ltd.,*
   70 F.4th 1199 (9th Cir. 2023)........................2, 8, 10, 11

*United Student Aid Funds, Inc. v. Espinosa,*
   559 U.S. 260 (2010) ..............................................14, 15

Constitution and Statutes:

Fourth Amendment ............................................................ 11

Fifth Amendment ............................................ 5, 6, 14, 19

28 U.S.C. § 1355 .................................................... passim

28 U.S.C. § 2466 .............................................................. 5

Due Process Clause ................................................... 13, 14

Rules:

Fed. R. App. P. 40(b) ........................................................ 8

Other Authorities:

Convention Against Illicit Traffic In Narcotic Drugs and
    Psychotropic Substances, 28 I.L.M. 493, 493, 28 I.L.M.
    493 (1989), 493 ................................................................ 9

Supplemental Rules for Admiralty or Maritime Claims
    and Asset Forfeiture Actions ..................................... 16-17

United Nations Convention against Transnational
    Organized Crime, G.A. Res. 55/25, U.N. GAOR, 55th
    Sess., Supp. No. 49, Vol. I, at 43, U.N. Doc. A/55/49
    (2001) ............................................................................... 9

United Nations Convention Against Corruption,
    43 I.L.M. 37, 37, 43 I.L.M. 37 (2004), 37 ......................... 9

U.S. Dep't of Just., Asset Forfeiture Policy Manual
    (2025), Ch. 9, Sec. 2 ......................................................... 9

No. 22-55685

# United States Court of Appeals

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

PLAINTIFF-APPELLEE

*v.*

$1,152,366.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX5.280, HELD IN THE NAME OF GOLDEN CASTLE TECHNOLOGY LIMITED; $53,020.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX3.200, HELD IN THE NAME OF YOUNES NASRI

DEFENDANTS

AND

YOUNES NASRI,

CLAIMANT-APPELLANT

*On Appeal from the United States District Court for the Southern District of California 21CV1134-WQH*

## INTRODUCTION

For decades, when the United States identified the proceeds of criminal activity hidden abroad, it has been able to successfully seek an order of forfeiture from the district court where any of the acts giving rise to the illicit proceeds occurred. Congress expressly provided jurisdiction for district courts to issue such orders in 28 U.S.C. § 1355, and this Court has repeatedly confirmed that

1

jurisdiction is proper regardless of whether the district court has "control or constructive control" of the property. See *United States v. Approximately $1.67 Million*, 513 F.3d 991, 996 (9th Cir. 2008); *United States v. Obaid*, 971 F.3d 1095, 1099 (9th Cir. 2020); *United States v. PetroSaudi Oil Servs. (Venezuela) Ltd.*, 70 F.4th 1199, 1210 (9th Cir. 2023). Of course, Courts have recognized that a lack of control or constructive control might determine the *effectiveness* of any forfeiture order, *Contents of Acct. No. 03001288 v. United States*, 344 F.3d 399 (3d Cir. 2003), but under the plain language of the statute, it did not affect the courts' underlying jurisdiction to issue orders in the first place.

The panel majority opinion upends this established jurisprudence. At least under one reading of the opinion, the courts can no longer exercise jurisdiction under § 1355 unless the government *already* has control or constructive control over the foreign assets it wants to seize. In so holding, the majority imposes a circular impediment to the exercise of jurisdiction. The United States is a party to numerous bilateral and multilateral treaties that obligate other countries to execute requests for forfeiture assistance. Pursuant to those treaties, the United States typically obtains process from a U.S. court, which it then uses to trigger the assistance of foreign authorities in seizing the assets. But if seizure

of the assets abroad is a prerequisite to the courts even asserting jurisdiction in the first place, it could create a potential Catch 22 in which the government must request foreign assistance without first obtaining judicial authorization for such a restraint.

In addition to these negative practical consequences—which alone provide a question of "exceptional importance" for rehearing en banc—the panel majority also effectively overturned several earlier published decisions and "evade[d] the en banc process required" to do so. 119 F.4th 1172, 1210 (Bennett, J., dissenting). The majority opinion is also in clear tension with the decisions of at least three other Circuits. And, as the dissent explains, the opinion is "wrong on the merits," since due process requires only notice and an opportunity to be heard, and it is undisputed that Nasri received both here. *Id*. For all these reasons, this Court should order the opinion withdrawn and order rehearing en banc.

## QUESTION PRESENTED

Whether, for *in rem* jurisdiction to lie in a civil forfeiture action against an asset located abroad, a district court must, as a matter of due process, have at least constructive control over the property in question?

**STATEMENT**

Phantom Secure, a Canada-based company, sold encrypted blackberry devices to criminal organizations, with the promise that they were unbreakable and could be remotely "wiped" if they fell into the hands of law enforcement. Excerpts of Record (ER)-34-35. Clients of the company engaged in a range of criminal activity using the phones, including importing and distributing cocaine in the Southern District of California. ER-109. Younes Nasri, a Canadian citizen living in Dubai, was an employee of Phantom Secure, who laundered proceeds from the company through a series of shell corporations. ER-33, 118-19. Over the course of several years Nasri transferred more than $20 million in illicit proceeds to two bank accounts in Lichtenstein. ER-123.

In 2018, the United States indicted Nasri on RICO and drug-trafficking conspiracy charges in the Southern District of California. ER-29-41. After learning of the indictment, the bank in Lichtenstein froze the approximately $1.2 million in proceeds remaining in Nasri's accounts. ER-20-22. A magistrate judge issued a seizure warrant for the funds, which the United States served on the bank. ER-26. The United States also filed a verified civil forfeiture complaint with the district court. ER-94; 117. The complaint outlined the facts of the conspiracy and noted that

4

jurisdiction was proper, under 28 U.S.C. § 1355, because "some of the acts and omissions" giving rise to the forfeiture occurred in the district. ER-93.

Nasri, through local counsel, responded to the civil forfeiture complaint by filing a verified claim to the funds. ER-173. After Nasri failed to appear by videoconference, the court ordered him to appear in person. SER-40-41. In response, his attorney filed a declaration explaining that Nasri "will not be able to appear before this Court," and was "asserting the Fifth Amendment and therefore 'cannot explain[ ] his failure to appear.'" SER-60.

The United States filed a motion to strike Nasri's claim to the funds under the fugitive disentitlement statute, 28 U.S.C. § 2466. SER-31. The United States noted that it "timely published notice and provided direct notice of this forfeiture action to all persons who reasonably appear to be a potential claimant." ER-21-30. It explained that Nasri was aware of the forfeiture motion and aware of his outstanding arrest warrant, and that he was deliberately refusing to enter the United Stats to avoid prosecution. SER-31-57.

On June 30, 2022, the district court issued a written order granting the United States' motion to strike. ER-3-13. After concluding that the requirements for fugitive disentitlement were satisfied, the court determined that the forfeiture statute "does not

require the government to establish constructive control of the [property] to sustain jurisdiction." ER-11 (quoting *$1.67 Million*, 513 F.3d at 996). With respect to due process, the court stated that the "Fifth Amendment establishes 'the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property.'" *Id*. at 10 (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993)). The court also cited *Obaid*, 971 F.3d 1095, for the proposition that "the personal jurisdiction minimum contacts analysis is inapplicable to pure in rem actions," and stated that it was "satisfied that the due process and jurisdictional requirements have been satisfied." *Id*. at 12.

Nasri filed an appeal, arguing that the district court's exercise of jurisdiction violated due process, but he did so solely on the grounds that the court failed to undertake a minimum contacts analysis—which he acknowledged was an argument foreclosed by caselaw. Appellant's Opening Brief (AOB)-11. The panel submitted the case on the briefs without argument, but four months later ordered the parties to file supplemental briefing on whether due process requires the district court to have actual or constructive control over property and whether Nasri waived the argument by not raising it in his briefs.

6

A divided panel reversed and remanded for further proceedings. The majority held that "due process requires a district court to establish control or constructive control over property in a forfeiture action to exercise *in rem* jurisdiction over the property." 119 F.4th 1172. The opinion explained that "notice is the touchstone of due process in in rem proceedings, and constructive control has long been the notice required by the Constitution." *Id*. at 1180. The majority noted that the "scope of the notice provided by the government in this case is unclear," and while it is undisputed that Nasri himself received notice, the Court could not be sure whether other potential claimants received notice absent control of the property. *Id*. at 1179. The majority acknowledged that this Court, and several other Circuits, had previously upheld jurisdiction without control or constructive control, but it noted those earlier cases failed to "address the constitutional issue" and "engaged in a purely textual interpretation of the statute." *Id*. at 1178.

Judge Bennett dissented, noting that Nasri never raised the "control or constructive control" argument before the district court or in his briefs on appeal, and the issue was waived. *Id*. at 1206-07. Next, he pointed out that this Court has already held that *in rem* jurisdiction was proper under these circumstances in *$1.67 Million*. The holding in that case "was clear, broad, and without any

7

qualification," and a three-judge panel could not simply overrule it because it did not address a specific argument. *Id*. at 1207. Finally, Judge Bennet explained why the majority was "wrong on the merits," since due process only required the United States to provide notice to potential claimants, and it is undisputed that Nasri "had both actual notice and an actual opportunity to be heard." *Id*.

### DISCUSSION

This case presents a question of "exceptional importance" warranting *en banc* review. Fed. R. App. P. 40(b). Thirty years ago, Congress amended section 1355 of the civil forfeiture statute to extend jurisdiction to assets located abroad—so long as the acts giving rise to the forfeiture occurred in a district in the United States. In a series of published opinions, this Court confirmed that the "plain language and legislative history of the … amendments makes clear that Congress intended § 1355 to lodge jurisdiction in the district courts without reference to constructive or actual control of the res." *$1.67 Million*, 513 F.3d at 997. That is, while traditionally in rem forfeiture required the court to have "actual or constructive control" of the property, Congress "relaxed this requirement" and "[c]onstructive or actual control of the *res* is no longer necessary." *PetroSaudi Oil*, 70 F.4th at 1210. For decades

the United States has relied on this authority and used civil forfeiture actions to target funds abroad; disrupt transnational criminal organizations; and recover assets to compensate victims of fraud and corruption.

The majority opinion calls this all into question. For the first time, this Court now holds that district courts cannot exercise jurisdiction, consistent with due process, unless they establish "control or constructive control" over the assets. *Nasri*, 119 F.4th at 1173. If read to require control irrespective of notice, this creates a significant practical problem. While some countries may "restrain" assets in advance of civil forfeiture proceedings, as Lichtenstein did here, that will not always be the case. The extent of assistance provided by each country will "vary greatly depending upon the applicable treaty obligations and foreign laws," U.S. Dep't of Just., Asset Forfeiture Policy Manual (2025), Ch. 9, Sec. 2.

The United States is party to numerous multilateral treaties covering requests for forfeiture assistance.[1] It is also party to

---

[1]     These include, for example, the Convention Against Illicit Traffic In Narcotic Drugs and Psychotropic Substances, 28 I.L.M. 493, 493, 28 I.L.M. 493 (1989), 493; the United Nations Convention against Transnational Organized Crime, G.A. Res. 55/25, U.N. GAOR, 55th Sess., Supp. No. 49, Vol. I, at 43, U.N. Doc. A/55/49 (2001); and the United Nations Convention Against Corruption, 43 I.L.M. 37, 37, 43 I.L.M. 37 (2004), 37.

numerous bilateral mutual legal assistance treaties and agreements covering requests for forfeiture assistance. Although the specifics of these treaties vary, the restraint and seizure of foreign assets normally require a formal treaty request.

For instance, in *PetroSaudi*, it was only after the United States obtained a seizure warrant that the High Court in the United Kingdom recognized its "Treaty obligation of mutual assistance" and ordered the disputed property seized. 70 F.4th at 1205. But the United States was only able to obtain the seizure warrant after the district court found it had jurisdiction "pursuant to 28 U.S.C. § 1355 because the Government plausibly alleged that 'acts or omissions giving rise to the forfeiture' took place in the Central District of California." *Id*. at 1204. If the courts of the United States do not have jurisdiction over foreign assets abroad, it creates a sort of Catch-22: The United States obtains constructive control of foreign assets by presenting court process to foreign officials, but according to the majority opinion, the U.S. courts might not have jurisdiction to issue that process. This circular practical result, while perhaps unintentional, presents a question of "exceptional importance" warranting further review.[2]

---

[2] Even if foreign authorities were willing to cooperate and restrain assets *without* a court order, the current practice of involving U.S. courts in the process ensures judicial oversight and

2. In addition to the practical problems it creates, the majority opinion is also difficult to reconcile with this Court's existing caselaw. As outlined above, this Court has issued several published opinions that explicitly held that "control or constructive" control is *not* required for a court to exercise jurisdiction under §1355. See *$1.67 Million*, 513 F.3d at 996; *PetroSaudi Oil*, 70 F.4th at 1210. While these cases focused on the statutory language and did not address the specific due process argument raised by the majority here, they are still hard to square with the majority's decision. As the dissent points out, "[i]t cannot simultaneously be true that a 'district court possesses jurisdiction over the forfeiture action regardless of its control over the res,'" under *$1.67 Million*, but "[s]uch an exercise of jurisdiction is contrary to our most fundamental principles of due process," under the majority opinion. 119 F.4th at 210. As a result, the majority's holding "has the functional effect of overturning *$1.67 Million*," and "evades the en banc process required" to do so. *Id*.

---

helps protect the Fourth Amendment rights of potential claimants. Requiring the government to go outside the courts and ask for restraint would appear to be more intrusive of individual rights rather than less. Moreover, if the United States lacks jurisdiction over an asset, it is far from clear what authority would even justify a request to a foreign country to restrain the assets.

For similar reasons, the majority opinion is also in clear tension with the decisions of at least three other Circuits. Specifically, the D.C., Third, and Fourth Circuits have all explicitly held that district courts can exercise *in rem* jurisdiction, under § 1355, even without control or constructive control over the assets. See *United States v. All Funds in Acct. Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain*, 295 F.3d 23, 27 (D.C. Cir. 2002); *Contents of Acct. No. 03001288*, 344 F.3d 399, 405 (3d Cir. 2003); *United States v. Batato*, 833 F.3d 413, 420 (4th Cir. 2016). And while the Second Circuit reached the opposite conclusion, in *United States v. All Funds on Deposit in any Accts. Maintained in Names of Meza or De Castro*, 63 F.3d 148, 149 (2d Cir. 1995), one year later, the Court issued another decision calling the validity *Meza* into doubt. See *United States v. Certain Funds Contained in Acct. Numbers 600-306211-006,600-306211-011 & 600-306211-014 Located at Hong Kong & Shanghai Banking Corp.*, 96 F.3d 20, 26 (2d Cir. 1996). While, again, none of these cases addressed the specific due process argument at issue here, the outcome of each case would still be "contrary to our most fundamental principles of due process" under the majority reasoning. *Nasri*, 119 F.4th at 1210 (Bennet, J., dissenting). This

Circuit now stands alone in effectively "striking down [§1355(b)(2)] as unconstitutional." *Id*.

3.     Finally, the majority opinion on due process is simply "wrong on the merits." *Id*. at 1212. As an initial matter, while the majority opinion states that due process "requires a district court to establish control or constructive control" over property to exercise jurisdiction, that holding centers entirely on the notice required by the Due Process Clause. 119 F.4th at 1179-1180. In ordering remand, the majority invoked the due process notice standard from *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 316 (1950), and explained that the Court could not evaluate whether that standard was satisfied "without seizure of the property or further information about the published notice." 119 F.4th at 1179. This could be read to suggest that either control *or* proper notice could be sufficient to satisfy due process. Similarly, although the opinion states that "interested parties lack sufficient notice" "when the court has not seized or constructively seized the property," it also states that "if property is not capable of being seized, proper notice requires personal notice to known claimants and publication to the world." *Id*. And, if actual or constructive control of a res were *always* required to provide sufficient notice, the opinion's discussion about the "uncl[arity]" surrounding "[t]he scope of the notice

provided by the government in this case" would have been irrelevant to the panel's analysis. *Id.* at 1180. If the majority opinion could be construed to require control of the res only when the United States does not otherwise provide sufficient notice, that would substantially limit the practical impact of the opinion.

But if the majority opinion requires "control or constructive control" even if proper notice has been provided, that holding finds no support in the caselaw of this Circuit or the Supreme Court. The Fifth Amendment's Due Process Clause embodies "the general rule" that "individuals must receive notice and an opportunity to be heard before the Government deprives them of property," a rule that generally applies to civil forfeiture proceedings. *James Daniel Good Real Prop.*, 510 U.S. at 48. Under the familiar due process notice standard of *Mullane*, notice must simply be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314. And even where a plaintiff fails to serve the defendant with the summons and complaint normally required to provide fair notice of a civil action, a defendant who nevertheless learns of the action will have "actual notice," which "more than satisfie[s] [his] due process rights." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010). Here,

14

as the majority recognizes, "Nasri *received* actual notice" of the action. 119 F.4th at 1179 (emphasis added). As a result, he promptly filed a notice of claim to the property in the forfeiture action. *Id.* at 1212. As such, it is hard to see how Nasri possessed a due process right to notice that was violated. See *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) (receipt of "*actual* notice of the filing … more than satisfied United's due process rights.").

The majority emphasized that it did "not know whether other potential claimants [other than Nasri] received notice of the action." 119 F.4th at 1179. But it is hard to see why that would matter. As the dissent noted, "[t]here simply cannot be a violation of due process 'in the air.'" *Id.* at 1212. Nasri cannot rely on the rights of other, possibly nonexistent, third parties who might also have a claim to the funds. A litigant must ordinarily assert "his own legal rights and interests," and this rule applies "even when the very same allegedly illegal act that affects the litigant also affects a third party." *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990) Moreover, to assert such third-party rights, the litigant "must," among other things, "have a close relation to the third party" whose rights are at issue. *Powers v. Ohio*, 499 U.S. 400, 411 (1991); see *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

Here, even if some hypothetical third-party may have had claims to the funds in Nasri's bank account in Lichtenstein, the interests of that party and Nasri would still be "potentially in conflict," and the case law does not permit the assertion of such third-party rights. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004). Indeed, the record shows that Narsi was "the only authorized representative" on the bank account held in the name of Golden Castle, which was a shell company that Nasri established, and that the other bank account subject to forfeiture was held in Nasri's own name. ER-159. The record therefore reflects that no other owner of the relevant bank accounts exists. And even if a third party might have a claim to the bank-account funds, that claim would be a claim entirely adverse to Nasri's. Any violation of the due-process rights of such a third party could not result in any harm to Nasri.

Furthermore, even if Nasri had not received notice and an opportunity to respond, it is not clear why "control or constructive" control would be required to provide notice. The Government provides notice in civil forfeiture cases by transmitting direct notice to known potential claimants and by notifying the world by publication of notice online. See Rule G(4)(a)(iv), G(4)(b)(i) and (v) of the Supplemental Rules for Admiralty or Maritime Claims and

16

Asset Forfeiture Actions. These notice provisions "codify and restate prevailing due process requirements governing adequate notice." *United States v. Davenport*, 668 F.3d 1316, 1322 (11th Cir. 2012). Certainly, a court's actual or constructive control of intangible property might increase the *likelihood* that a claimant would receive actual notice of the proceeding, but it has never been a necessary requirement for constitutionally sufficient notice.

To support its due process holding, the majority cites to the Supreme Court's ruling in *James Daniel Good Real Prop.*, 510 U.S. at 57-58, for the proposition that, historically, *in rem* jurisdiction required at least constructive control over an asset and that complying with these requirements "ensures proper notice." 119 F.4th at 1180. However, as the Supreme Court explained in *James Daniel Good Real Prop.*, seizure made it possible to ascertain the competent forum for the action. 510 U.S. at 57. The Court went on to explain that in the case of real property, "the appropriate judicial forum may be determined without actual service."

As the dissent notes, the principle of control or constructive control as a requirement for in rem jurisdiction comes from admiralty law, and specifically Justice Story's 1815 decision in *The Brig Ann*. 119 F.4th 1209, n. 7. That case held that, "[i]n order to institute and perfect proceedings in rem, … the thing should be

actually or constructively within the reach of the Court." 13 U.S. 289, 291 (1815). But *The Brig Ann*'s holding had nothing to do with notice (that word does not even appear in the opinion). Furthermore, as the dissent notes, *The Brig Ann*'s holding is one of statutory interpretation, not constitutional law. *Id.* at 1209. ("The Supreme Court nowhere implied that this 'prerequisite' is a *constitutional* requirement.") (emphasis in original). Rather, the control requirement was purely a creature of the legislature's invention, meaning Congress remained free to alter the rule "by enlarging or narrowing the district courts' jurisdiction via a subsequent Act of Congress." *Id*. And that is precisely what Congress "did … in 1992, via the amended [Section] 1355," which affords district courts in rem jurisdiction over property located in a foreign country without any consideration of the district court's control over the property. *Id*.

The majority opinion offers no case suggesting that *The Brig Ann* or its progeny impose a constitutional, rather than statutory, rule. Instead, the majority's conclusion that constitutionally sufficient notice requires actual or constructive control of the res appears to rest largely on *Hanson v. Denckla*, 357 U.S. 235 (1958). But that case, which involved a dispute over inheritance rights in Florida to intangible property in Delaware, never addressed what

"notice" was required to satisfy due process under the Fifth Amendment. In fact, there was "no suggestion that the court failed to employ a means of notice reasonably calculated to inform nonresident defendants of the pending proceedings." *Id*. at 245. The due process claim turned on the question of "minimum contacts," required for personal jurisdiction, a question which does not apply in this context. *Obaid*, 971 F.3d at 1105. The Court certainly never held, as the majority suggests, that a federal court "acts without authority over property," and "violates due process" when it fails to secure property in an *in rem* proceeding. 119 F.4th at 1175.

The majority's reliance on *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 85 (1992), likewise does not support a "control as notice" due process standard. That case held that, as a matter of traditional admiralty law, "it long has been understood that a valid seizure of the res is a prerequisite to the initiation of an in rem civil forfeiture proceeding." *Id*. at 85. But the Court noted that Congress changed that rule, shortly before the decision, when it amended § 1355, and the Court affirmatively declined to "interpret that statute or determine the issue of its retroactive application." *Id*. at 102, n.5. Otherwise, the Court acknowledged the rule of *The Brig Ann*, which as noted, never found any constitutional dimension. *Id*. at 87. Finally, as the dissent notes,

the "string of cases" cited by the majority to support its position all predated the amendment to § 1355, and none dealt with civil forfeiture actions against assets abroad. 119 F.4th at 1214.

In short, the law is clear that due process requires only notice and an opportunity to be heard. It is undisputed that Nasri received both here. None of the cases cited by the majority support application of a new due process standard that would require a finding of "control or constructive control," regardless of whether notice was received. Because the majority is wrong on the merits, and because that error could have profound practical effects on "the government's ability to fight crime, including organized crime, both here and abroad," this Court should order rehearing en banc. *Id.* at 1214.

Respectfully submitted,

ANDREW R. HADEN
  *Acting United States Attorney*

s/DANIEL E. ZIPP
  *Assistant U.S. Attorney*
  *Chief, Appellate Section*
  *Criminal Division*

FEBRUARY 26, 2025.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)**  | 22-55685 |

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is (*select one*):

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words**: | 4,196 | .

*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/Daniel E. Zipp |  **Date** | Feb 26, 2025 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 11**        *Rev. 12/01/2021*

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-55685 |
| *Plaintiff-Appellee*, | D.C. No. 3:21-cv-01134-WQH-BLM |
| v. | |
| YOUNES NASRI, | |
| *Claimant-Appellant*, | OPINION |
| v. | |
| $1,152,366.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX5.280, Held in The Name of Golden Castle Technology Limited; $53,020.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX3.200, Held in The Name of Younes Nasri, | |
| *Defendants*. | |

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Submitted October 4, 2023[*]
Pasadena, California

Filed October 29, 2024

Before:  Jay S. Bybee, Mark J. Bennett, and Roopali H.
Desai, Circuit Judges.

Opinion by Judge Desai;
Concurrence by Judge Bybee;
Concurrence by Judge Desai;
Dissent by Judge Bennett

---

## SUMMARY[**]

---

### Civil Forfeiture / In Rem Jurisdiction

In a civil forfeiture action brought by the United States to recover ill-gotten gains from fugitive Younes Nasri, the panel held that the district court's exercise of in rem jurisdiction violated due process and vacated the district court's order granting the government's motion to strike Nasri's claim of innocent ownership over the assets.

The government brought a civil forfeiture action, pursuant to 28 U.S.C. § 1355, against Nasri's assets in a foreign bank account.  Nasri, a Canadian citizen residing in

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Dubai, challenged the court's jurisdiction over the assets because allegedly neither he nor the assets had ties to the United States.

The panel held that due process requires a court to have control or constructive control over the property in a forfeiture action in order to establish in rem jurisdiction over the property. In this case, the panel held that the scope of notice provided by the government is unclear and the United States lacks sufficient indicia of control or possession over the assets. The district court's purported exercise of in rem jurisdiction over property located abroad, over which it apparently had no connection, possession, or control, was contrary to the most fundamental principles of due process.

Accordingly, the panel remanded for the district court to assess in the first instance whether the court has control or constructive control over the assets to satisfy due process when asserting in rem jurisdiction.

Concurring, Judge Bybee joined in full the majority's conclusion that the in rem proceeding violated the Due Process Clause. He also wrote that because the United States does not hold the property, the proceeding was premature and nonjusticiable, and the district court's opinion was advisory.

Concurring, Judge Desai wrote that a requirement that the district court have control or constructive control over the assets satisfied Article III's redressability requirements. She disagreed with Judge Bybee's concurring opinion that suggested redressability was lacking in some instances. She also wrote that constructive control avoided the risk of the court issuing an advisory opinion. Despite her view that constructive control cured the problems identified by Judge Bybee's concurrence, she agreed with the view that

a better path forward was treating these actions as quasi in rem actions.

Dissenting, Judge Bennett wrote that the majority's holding—that due process requires a district court to establish control or constructive control over property in a forfeiture action to exercise in rem jurisdiction over the property, including in rem jurisdiction over foreign property—improperly addressed a due process issue that Nasri waived, reached a conclusion opposite to what was required by both the plain language of the relevant statute and this court's precedent, and was wrong on the merits. The majority's concern about the lack of notice had no basis in case law, and was contrary to the facts where Nasri had both actual notice and an actual opportunity to be heard. In addition, the majority decision intruded into matters committed to the legislative and executive branches of government, and interfered in foreign relations and the government's ability to fight crime, both here and abroad.

---

## COUNSEL

John C. Lemon, II, Law Offices of John C. Lemon, San Diego, California, for Claimant-Appellant.

Daniel E. Zipp, Assistant United States Attorney, Chief, Appellate Section, Criminal Division; David Rawls, Assistant United States Attorney; Randy S. Grossman, United States Attorney; United States Department of Justice, Office of the United States Attorney, San Diego, California; for Plaintiff-Appellee.

## OPINION

DESAI, Circuit Judge:

The United States seeks to recover ill-gotten profits from a fugitive, Younes Nasri. After indicting Nasri on criminal racketeering and drug conspiracy charges, the government brought a civil forfeiture action against Nasri's assets in a foreign bank account. Nasri filed a claim of innocent ownership over the assets, and the United States moved to strike the claim under the fugitive disentitlement statute. Nasri responded, challenging the court's jurisdiction over the assets. He claimed that neither he nor the assets had ties to the United States. The district court, purporting to exercise in rem jurisdiction over the assets, granted the government's motion to strike Nasri's claim.

We hold that due process requires a district court to establish control or constructive control over property in a forfeiture action to exercise in rem jurisdiction over the property.

## BACKGROUND

Younes Nasri is a Canadian citizen residing in Dubai. The Department of Justice indicted Nasri and four others on RICO and drug trafficking conspiracy charges. The government alleged that Nasri led a Canada-based company, Phantom Secure, which sold encrypted Blackberry phones to criminals. The phones were marketed as uncrackable by law enforcement and could be wiped remotely to hide or destroy evidence.

According to the complaint, Phantom Secure operated across the world, including in the Southern District of California. Several of Nasri's alleged co-conspirators also

operated in the Southern District. The complaint stated that Nasri was a "significant worldwide distributor" of Phantom Secure devices and laundered the enterprise's profits through foreign shell companies. Nasri opened a personal bank account and an account for one such shell company, Golden Castle Technology, in Bendura Bank AG in Liechtenstein to house Phantom Secure's proceeds. Nasri has purportedly never entered the United States.

When the CEO of Phantom Secure, Vincent Ramos, was arrested in the United States, he entered into a plea agreement in which he agreed to turn over $80 million in illegal profits, and implicated Nasri in the Phantom Secure conspiracy. The government indicted Nasri and initiated a civil forfeiture action against the assets pursuant to 18 U.S.C. § 981 and 21 U.S.C. § 881.

In response, Nasri filed a verified claim asserting innocent ownership of the assets. The government and Nasri sought a global resolution of the criminal and civil claims, and the district court granted a stay during the negotiations. Negotiations failed, and the district court lifted the stay and ordered the parties to appear. But Nasri failed to appear, stating that he was "exercising his Fifth Amendment right against self-incrimination." Nasri also failed to surrender in his criminal case.

The government moved to strike Nasri's claim to the assets under the fugitive disentitlement statute, 28 U.S.C. § 2466.[1] Nasri opposed the motion, arguing that the court lacked jurisdiction over the assets because neither he nor the

---

[1] The fugitive disentitlement statute allows the government to move to strike an individual's claim to ownership in a civil forfeiture proceeding when he intentionally evades a criminal action against him related to the forfeiture. 28 U.S.C. § 2466.

assets had any ties to the United States. He also asserted the
fugitive disentitlement statute violates due process or, in the
alternative, does not apply to him. The district court granted
the government's motion, finding that (1) it had in rem
jurisdiction over the assets, (2) the fugitive disentitlement
statute does not violate due process, and (3) Nasri qualified
as a fugitive under the statute even if avoiding prosecution
was not the "sole reason" he remained outside the United
States. Nasri timely appealed.

## STANDARD OF REVIEW

A district court's rulings on personal jurisdiction are
reviewed de novo. *United States v. Obaid*, 971 F.3d 1095,
1098 (9th Cir. 2020) (citing *Myers v. Bennett L. Offs.*, 238
F.3d 1068, 1071 (9th Cir. 2001)).

## ANALYSIS

## I.  The district court's exercise of in rem jurisdiction violated due process.

To evaluate whether the district court's exercise of in
rem jurisdiction violated due process, we first review the
history of in rem jurisdiction. We then address the
development of in rem jurisdiction in cases brought pursuant
to the civil forfeiture statute, 28 U.S.C. § 1355. Last, we
explain how due process requires district courts to establish
control or constructive control over property in an in rem
civil forfeiture action.[2]

---

[2] The government argues that Nasri waived these arguments by failing
to raise them in the district court and on appeal. *See Smith v. Marsh*, 194
F.3d 1045, 1052 (9th Cir. 1999). But Nasri argued—both in the district
court and on appeal—that the district court's exercise of jurisdiction over

### A. Historically, in rem jurisdiction required seizure or constructive control over the property.

In rem jurisdiction allows parties to file actions and courts to enter judgments against property. *United States v. Ten Thousand Dollars ($10,000.00) in U.S. Currency*, 860 F.2d 1511, 1513 (9th Cir. 1988). When exercising in rem jurisdiction, a court can exercise control over the defendant property itself regardless of whether the property owner has ties to the forum. *See Shaffer v. Heitner*, 433 U.S. 186, 205 (1977). This is because, for most of American legal history, the basis for in rem jurisdiction has been "the presence of the subject property within the territorial jurisdiction of the forum [s]tate." *Hanson v. Denckla*, 357 U.S. 235, 246 (1958); *see Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 722 (1877) ("[E]very State possesses exclusive jurisdiction and sovereignty over persons and property within its territory."). The property's presence in the forum ensured that the court had exclusive power to adjudicate rights to the property. *Hanson*, 357 U.S. at 246–47. In circumstances where the property cannot be seized, such as actions against real or intangible property, courts have found constructive possession sufficient to establish in rem jurisdiction. *Miller v. United States*, 78 U.S. 268, 296 (1870) ("An assertion of control, with a present power and intent to exercise it, is

---

the assets violated due process because both he *and the assets* lacked connection with the United States. And in any event, although personal jurisdiction may be waived, this court has not held that in rem jurisdiction in a civil forfeiture case, which concerns the rights of the rest of the world to the property, can be waived. *Cf. Scott v. McNeal*, 154 U.S. 34, 46 (1894) ("[A] judgment in proceedings strictly in rem . . . . is wholly void if a fact essential to the jurisdiction of the court did not exist."); *see* Dissent at 72 n.6.

sufficient."); *Tyler v. Defrees*, 78 U.S. 331, 349 (1870) (writ of attachment for real estate).

The Supreme Court has repeatedly held that when a sovereign fails to secure property in an in rem proceeding, the resulting judgment is void. *See Cooper v. Reynolds*, 77 U.S. (10 Wall.) 308, 319 (1870) ("[T]he seizure of the property . . . is the one essential requisite to jurisdiction, as it unquestionably is in proceedings purely *in rem*. Without this the court can proceed no further."); *Scott v. McNeal*, 154 U.S. 34, 46 (1894) ("[A] judgment in proceedings strictly in rem . . . . is wholly void if a fact essential to the jurisdiction of the court did not exist."); *Elliott v. Peirsol's Lessee*, 26 U.S. (1 Pet.) 328, 340 (1828) ("Where a Court has jurisdiction, it has a right to decide every question which occurs in the cause . . . . But if it act[s] without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void."); *Hanson*, 357 U.S. at 249–50. Its precedent is clear that when courts act without authority over property, the resulting judgment is void and violates due process.**[3]** *Hanson*, 357 U.S. at 250.

These jurisdictional rules were initially matters of state law. *Hanson*, 357 U.S. at 249–50. But shortly after the passage of the Fourteenth Amendment, the Supreme Court clarified that the rules were tethered to the Constitution's Due Process Clause. *Pennoyer*, 95 U.S. (5 Otto) at 733–34;

---

[3] The dissent minimizes the applicability of these cases because they predated the civil forfeiture statute, 28 U.S.C. § 1355, and do not address civil forfeiture actions against assets in a foreign country. Dissent at 87–88. The dissent's criticism highlights the very reason these cases are instructive. They illustrate the longstanding requirements for in rem jurisdiction, which, as we explain below, courts appear to have abandoned after the § 1355 amendments without analyzing the constitutional implications.

*Hanson*, 357 U.S. at 249–50. In *Pennoyer*, the Court explained that the exercise of jurisdiction over persons which a court has no power violates due process. 95 U.S. (5 Otto) at 733. Decades later, in *Hanson v. Denckla*, the Supreme Court confirmed the same principle applies to in rem jurisdiction. 357 U.S. at 250 ("Since a State is forbidden to enter a judgment attempting to bind a person over whom it has no jurisdiction, it has even less right to enter a judgment purporting to extinguish the interest of such a person in property over which the court has no jurisdiction.").

In the several decades following *Pennoyer*, the Supreme Court expanded in personam jurisdiction, first holding due process was satisfied so long as the individual had minimum contacts with the forum state. *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945). Then, in *Shaffer v. Heitner*, the Supreme Court expanded that rationale to quasi in rem cases, holding that quasi in rem jurisdiction—which really amounts to an exercise of jurisdiction over a person's interest in property— also requires a showing of minimum contacts. 433 U.S. at 212. These developments, however, did not disturb the requirements for in rem jurisdiction. In *Shaffer*, the court noted that although in personam jurisdiction had been expanded significantly since *Pennoyer*, "[n]o equally dramatic change ha[d] occurred in the law governing jurisdiction in rem." *Id.* at 205. And we have since expressly recognized that *Shaffer*'s minimum contacts requirement does not extend to in rem actions. *United States v. Obaid*, 971 F.3d at 1105 (holding that *Shaffer* applied only to quasi in rem actions).

Against this backdrop, we turn to civil forfeiture cases. The Supreme Court has long recognized that civil forfeiture

actions are in rem proceedings. *The Palmyra*, 25 U.S. (12 Wheat.) 1, 12–13 (1827); *see also United States v. Bajakajian*, 524 U.S. 321, 330 (1998) ("The theory behind such forfeitures was the fiction that the action was directed against 'guilty property,' rather than against the offender himself."). And, as with all in rem proceedings, the Court required control or constructive control over the defendant property. *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 87 (1992) ("[T]he court must have actual or constructive control of the res when an *in rem* forfeiture suit is initiated."); *Ten Thousand Dollars*, 860 F.2d at 1513 ("A forfeiture action is *in rem*. . . . [T]he court's jurisdiction is predicated on its control over an item of property or *res*."). In the past three decades, however, courts interpreting civil forfeiture statutes have often overlooked this essential constitutional requirement.

**B. Recently, courts have conducted strict textual analyses of the civil forfeiture statute without considering fundamental due process principles.**

Several statutes authorize the government to bring civil forfeiture actions. *See* 28 U.S.C. § 1355; 21 U.S.C. § 881. Among them is 28 U.S.C. § 1355, the statute used by the government here to bring an action against Nasri's assets. Prior to 1992, the statute "simply provided that district courts had subject matter jurisdiction over forfeiture proceedings." *United States v. All Funds on Deposit in Any Accts. Maintained in the Names of Meza or De Castro* ("*Meza*"), 63 F.3d 148, 151 (2d Cir. 1995). In 1992, Congress amended the statute to make it easier to bring civil forfeiture actions

by providing for nationwide venue and service of process. In
its current form, the statute provides:

> **(a)** The district courts shall have original
> jurisdiction, exclusive of the courts of the
> States, of any action or proceeding for the
> recovery or enforcement of any fine, penalty,
> or forfeiture, pecuniary or otherwise,
> incurred under any Act of Congress, except
> matters within the jurisdiction of the Court of
> International Trade under section 1582 of
> this title.
>
> **(b)(1)** A forfeiture action or proceeding may be
> brought in—
>
>> **(A)** the district court for the district in
>> which any of the acts or omissions
>> giving rise to the forfeiture occurred,
>> or
>>
>> **(B)** any other district where venue for the
>> forfeiture action or     proceeding is
>> specifically provided for in section
>> 1395 of this title or any other statute.
>
>> **(2)** Whenever property subject to forfeiture
>> under the laws of the United States is
>> located in a foreign country, or has been
>> detained or seized pursuant to legal
>> process or competent authority of a
>> foreign government, an action or
>> proceeding for forfeiture may be brought
>> as provided in paragraph (1), or in the

> United States District court for the
> District of Columbia.

28 U.S.C. § 1355.

Section 1355(a) establishes subject matter jurisdiction over forfeiture actions. *Id.* § 1355(a). Section 1355(b) addresses where such an action may be brought, and § 1355(b)(2) contemplates the circumstances presented here. On its face, § 1355(b) does not make clear whether it establishes venue, personal (in rem) jurisdiction, subject matter jurisdiction, or some combination thereof.

Several circuits have interpreted the statute, but none squarely addresses whether the statutory language comports with the fundamental due process requirements of in rem jurisdiction. The Second Circuit came the closest, finding that the statute requires constructive control because Congress did not intend to override well-settled requirements of in rem jurisdiction. *Meza*, 63 F.3d at 152. But other circuits, including ours, engaged in a rote statutory analysis without considering the constitutional requirements of in rem jurisdiction. Those decisions are binding as a matter of statutory interpretation, but the cases did not raise—nor did they claim to decide—the constitutional question presented here.

The Second Circuit interpreted the statute in harmony with traditional in rem principles. *Id.* The question in *Meza* was whether Congress's amendments to 28 U.S.C. § 1355 eliminated the requirement to establish in rem jurisdiction because the statute provided for subject matter jurisdiction and venue. *Id.* at 151. The court held that the control or constructive control requirement must survive Congress's amendment to the statute, despite the statute's silence on the

issue. *Id.* at 152. It explained that "[a]lthough Congress certainly intended to streamline civil forfeiture proceedings by amending § 1355, . . . we do not believe that Congress intended to fundamentally alter well-settled law regarding in rem jurisdiction." *Id.*

The other circuits, including ours, did not address the constitutional issue. Rather, these courts engaged in a purely textual interpretation of the statute. *See United States v. All Funds in Acct. Nos. 747.034/278, 747.009/278, & 747.714/278 Banco Espanol de Credito, Spain* (*Banco Espanol*), 295 F.3d 23, 26 (D.C. Cir. 2002); *Contents of Acct. No. 03001288 v. United States*, 344 F.3d 399, 403–05 (3d Cir. 2003); *United States v. Batato*, 833 F.3d 413, 419–20 (4th Cir. 2016); *United States v. Approximately $1.67 Million (US) in Cash, Stock and Other Valuable Assets Held by or at: 1) Total Aviation LDT.*, 513 F.3d 991, 996–98 (9th Cir. 2008).

In *$1.67 Million*, we held that the statute did not require control or constructive control over the property at issue in the civil forfeiture action. 513 F.3d at 996. There, the United States sought to recover the claimant's assets in the Cayman Islands and obtained an order from the Grand Court of the Cayman Islands freezing the funds. *Id.* at 995. When the claimant challenged the district court's jurisdiction over the forfeiture proceeding, the district court held that the Cayman's cooperation was sufficient to give the court "constructive control" over the assets. *Id.* On appeal, both the claimant and the government argued that the statutory text does not require "constructive control." We agreed, and adopted the government's theory that § 1355(b)(2) alone provided the court with jurisdiction over the accounts. *Id.* at 996. In doing so, we explained that the statute provides for personal jurisdiction—rather than merely subject matter

jurisdiction and venue—and the statute requires only that the government show an act or omission giving rise to the forfeiture occurred in the district. *Id.*; 28 U.S.C. § 1355(b)(1), (2). Notably, the parties did not raise, and we did not consider, whether such a rule comports with the constitutional requirements of in rem jurisdiction.

In subsequent cases, we repeated *$1.67 Million*'s holding, which was nothing more than an interpretation of the statute's text, without addressing the fundamental due process principles of in rem jurisdiction. In *United States v. Obaid*, for example, we noted that the statutory text of § 1355(b)(2) gives federal courts jurisdiction in forfeiture actions over property even if the property is located in a foreign country.[4] 971 F.3d at 1102. And more recently, we conclusively held that § 1355(b)(2) "relaxed" traditional in rem jurisdiction requirements and that "[r]ead together, . . . *$1.67 Million* and *Obaid* establish that a district court has *in rem* jurisdiction over property not within its actual or constructive control, even when it lacks personal jurisdiction over the property's owner." *United States v. PetroSaudi Oil Servs. (Venezuela) Ltd.*, 70 F.4th 1199, 1210 (9th Cir. 2023).

But critically, in each of these cases, we did not address whether such an exercise of in rem jurisdiction comports with due process. *See, e.g.*, *$1.67 Million*, 513 F.3d at 996. The dissent is "not sure why it would matter" whether our case law answered only the interpretive question, rather than

---

[4] In *Obaid*, we addressed a different constitutional question—whether the court was required to determine that the claimant had minimum contacts with the forum to exercise jurisdiction over the claimant's property. 971 F.3d at 1098. We held that the district court was not required to have minimum contacts with the claimant in an in rem suit. *Id.* at 1105. Although Nasri asks us to revisit this question, we have no authority to do so.

the constitutional question before us. Dissent at 73. But we must know the question *$1.67 Million* sought to answer to understand the scope of its binding holding. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc); *Tate v. United States*, 982 F.3d 1226, 1227–28 (9th Cir. 2020) (per curiam) (explaining that a court announces a "statutory, rather than a constitutional, rule," when it "fram[es] its inquiry 'as a question of congressional intent'" (quoting *Rehaif v. United States*, 588 U.S. 225, 228 (2019))). And this case squarely presents the question our prior cases did not consider nor answer: does exercising in rem jurisdiction over foreign property without establishing control or constructive control over the property violate the Due Process Clause?

## C. Due process requires a court to have control or constructive control over property to establish in rem jurisdiction.

The development of our case law in civil forfeiture actions has led to a constitutionally untenable result. Although we call civil forfeiture actions pursuant to 28 U.S.C. § 1355 "in rem" actions, they bear little resemblance to true in rem proceedings. That is, the court has not seized the property, nor has it engaged in any analysis of its constructive control over the property. This arrangement may have been Congress's intended result, as we recognized in *$1.67 Million*, but it violates the Due Process Clause for several reasons.

For starters, when the court has not seized or constructively seized the property, the interested parties lack sufficient notice. Notice is particularly important in an in rem suit because it is an action "against the world" to determine title to the property. 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 1070 (4th

ed. 2023). When property is seized for an in rem action, theoretically anyone who claims an interest in the property will realize that someone else is currently possessing the property until the question of title is resolved. *See Greene v. Lindsey*, 456 U.S. 444, 452 (1982); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 316 (1950). And if property is not capable of being seized, proper notice requires personal notice to known claimants and publication to the world. *See* Fed. R. Civ. P. Supp. R. G(4); *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 796 n.3 (1983) ("Our cases have required the State to make efforts to provide actual notice to all interested parties.").

The scope of the notice provided by the government in this case is unclear. The government did not serve Nasri personally, and understandably so, because he is a fugitive. Absent personal service, however, seizing the account is the best way to put potential claimants on notice of the action. And although Nasri received actual notice, we do not know whether other potential claimants received notice of the action.[5] In its motion to strike, the government asserted that it "published notice" sufficient to satisfy due process. But without seizure of the property or further information about the published notice, we cannot evaluate whether the notice was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Mullane*, 339 U.S. at 314.

Further, the upshot of our interpretive holdings in *$1.67 Million* and *Obaid* is civil forfeiture actions somehow enjoy

---

[5] The dissent focuses its argument only on whether Nasri received proper notice. But since an in rem action is an action "against the world," we are concerned with more than the notice provided to Nasri. *See* Wright & Miller, *supra*, § 1070.

special protections and are exempt from the constitutional requirements applicable to all other actions. *Shaffer* requires a minimum-contacts inquiry to satisfy due process in quasi in rem cases. 433 U.S. at 212; *Obaid*, 971 F.3d at 1098–99. But because we call forfeiture cases "in rem" actions, the minimum contacts requirement does not apply. *Obaid*, 971 F.3d at 1106. At the same time, we do not enforce the traditional rules of in rem jurisdiction based on *$1.67 Million*. 513 F.3d at 996–98. In sum, we have unwittingly created a gaping constitutional hole for civil forfeiture actions brought under 28 U.S.C. § 1355.

This case highlights why such an approach is improper. Under our binding precedent, the United States is not required to show that Nasri has minimum contacts with the Southern District of California. *Obaid*, 371 F.3d at 1106. And the United States—at least on the record before us— lacks sufficient indicia of control or possession over the assets. The district court purports to exercise in rem jurisdiction over property located abroad, over which it apparently has no connection, possession, or control. Such an exercise of jurisdiction is contrary to our most fundamental principles of due process. Congress may have written a statute that purports to "relax" the requirements for in rem jurisdiction. *PetroSaudi*, 70 F.4th at 1210. But whatever power Congress may possess to alter the historical requirements for in rem jurisdiction, we know of no principle under which Congress can evade the constitutional notice requirements by statute.

The government's arguments to the contrary are not persuasive. First, the government argues that property does not have due process rights. It cites *Shaffer v. Heitner* for the proposition that jurisdiction over a thing is merely a way of referring to jurisdiction over a person's interests in the thing.

But as noted above, we have held that *Shaffer*'s reasoning does not apply to in rem actions because "jurisdiction is premised on the res, not on the persona." *Obaid*, 971 F.3d at 1102 (quoting *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 450 (2004)). The government cannot have it both ways. It cannot evade the requirements of in rem jurisdiction by arguing that jurisdiction is premised on the person, *and* evade the minimum contacts test by arguing jurisdiction is premised on property alone.

The government also argues that when the United States moves to forfeit property, due process requires only that potential claimants receive notice and an opportunity to be heard. This argument turns the inquiry inside out. Notice does not, as the government suggests, exempt courts from complying with the fundamental in rem jurisdiction requirements. Instead, compliance with the fundamental requirements ensures proper notice. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 57–58 (1993) ("[I]n order to institute and perfect proceedings *in rem*, [the property] should be actually or constructively within the reach of the Court. . . . In the case of real property, the res may be brought within the reach of the court simply by posting notice on the property and leaving a copy of the process with the occupant." (internal citations and quotation marks omitted)). In other words, notice is the touchstone of due process in in rem proceedings, and constructive control has long been the notice required by the Constitution.

### D. The district court must evaluate in rem jurisdiction on remand.

The district court expressly declined to evaluate whether it had control or constructive control over the assets. Although the government argued in its motion to strike that

the assets are subject to a temporary restraining order, the terms of that order and the extent to which Lichtenstein is willing to assist the United States government remain unclear. We thus remand for the district court to assess in the first instance whether the court has control or constructive control over the assets to satisfy due process when asserting in rem jurisdiction.

We find instructive the analysis undertaken by the Second Circuit when engaging in this inquiry. In *Meza*, for example, the Second Circuit held that the district court had constructive control over funds abroad based on (1) a restraining order "issued solely because of a request from federal authorities," (2) a foreign court judgment affirming the restraining order, and (3) "the general cooperation of the [foreign] authorities with respect to the funds." 63 F.3d at 153. It also rejected the argument that the district court lacked any degree of control because the foreign government was not legally bound to remit the funds to the United States. *Id.* We agree that a binding obligation under a treaty or foreign law is not required to establish control or constructive control. Instead, as the *Meza* court put it, constructive control exists if the foreign government "act[s] essentially as an agent of the United States for purposes of th[e] forfeiture action." *Id.* at 154. If the district court concludes that the United States has received sufficient assurances and cooperation from Liechtenstein to constitute constructive control over the assets, it may exercise in rem jurisdiction without running afoul the Due Process Clause. If not, the action must be dismissed.[6]

_____

[6] Nasri also challenges several aspects of the fugitive disentitlement statute, but we need not reach those challenges because the district court

**CONCLUSION**

For the foregoing reasons, we hold that the district court's exercise of in rem jurisdiction without a finding that it has control or constructive control over the defendant property violates due process.

**VACATED and REMANDED.**

---

BYBEE, Circuit Judge, concurring:

Younes Nasri—a Canadian citizen now residing in exile in Dubai—is a fugitive from U.S. justice. According to the government's complaint, Nasri accrued nearly $1.2 million in proceeds traceable to illegal exchanges for controlled substances in the Southern District of California. When Nasri refused to submit to U.S. jurisdiction following his indictment on conspiracy charges, the government sought forfeiture of the $1.2 million pursuant to 21 U.S.C. § 881(a)(6), which provides that "[a]ll moneys . . . furnished by any person in exchange for a controlled substance . . . [and] all proceeds traceable to such an exchange" are forfeitable to the United States. The problem: the money is in bank accounts in Liechtenstein, not the United States. But 28 U.S.C. § 1355(b)(2) provides that, "[w]henever property subject to forfeiture under the laws of the United States is located in a foreign country . . . an action or proceeding for forfeiture may be brought" in the district in which the acts giving rise the forfeiture occurred. Relying on our court's previous construction of § 1355, the district court affirmed its jurisdiction over the $1.2 million because § 1355 "does

---

must first determine whether it can exercise in rem jurisdiction over the assets consistent with due process.

not require the government to establish constructive control of the proceeds to sustain jurisdiction." *United States v. $1,152,366.18 in Funds from Bendura Bank AG*, No. 21-CV-1134, 2022 WL 2373356, at \*5 (S.D. Cal. June 30, 2022) (citation omitted).

And therein lies the problem. An action in forfeiture is an action *in rem*, and "seizure of the res has long been considered a prerequisite to the initiation of *in rem* forfeiture proceedings." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 57 (1993). The forfeiture action before us is nominally an *in rem* proceeding, but it is unrecognizable as such in several material respects. The United States is proceeding *in rem* against property that it does not possess. That is contrary to well-established principles of general law. As Chief Justice Marshall opined while riding circuit, in an *in rem* action, "possession of the thing is necessary, as a foundation for the jurisdiction of the court . . . . There must be seizure to vest the jurisdiction." *The Little Charles*, 26 F. Cas. 979, 982 (Marshall, Circuit Justice, C.C.D. Va. 1818) (No. 15,612).

Proceeding *eo nominee in rem*, but without the property itself, creates two immediate problems. First, as Judge Desai's opinion for the majority demonstrates, it violates the Fifth Amendment's Due Process Clause. Because an action *in rem* determines title against the whole world, constitutionally adequate notice of such an action requires seizure or constructive control of the property. I join that opinion in full. Second, because the United States does not hold the property, the proceeding is premature and nonjusticiable. Without seizing the property, or, at the least, constructive control of the property, the district court lacks *in rem* jurisdiction and, thus, no way to guarantee the enforcement of its judgment; its opinion is advisory.

Whether we label this a "ripeness," "advisory opinion," or "redressability" problem, the point is that we have vitiated Article III's case-or-controversy requirement.**[1]**

In Part I, I explain my view as to why the case before us is nonjusticiable until the United States seizes or controls the defendant property, and I consider potential solutions to our current quandary. In Part II, I recount how our circuit—like several others—has abandoned first principles of personal jurisdiction through our interpretation of § 1355, and I offer an interpretive solution that would realign the statute with the general-law rules of *in rem* jurisdiction.

I

As federal courts, we have the power to decide "Cases" and "Controversies." *See* U.S. Const. art. III, § 2. "The fundamentals" of Article III's limits on federal court jurisdiction "are well-known and firmly rooted in American constitutional law." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). I start in Part I.A by describing the interlocking justiciability doctrines at issue here, including ripeness, the prohibition on issuing advisory opinions, and redressability. I explain in Part I.B why an *in rem* forfeiture proceeding is nonjusticiable until the government has seized or controlled the defendant property. I conclude in Part I.C

---

[1] Although I believe this case may be nonjusticiable for reasons I explain in Part I, I join the majority opinion because it correctly identifies a defect in the assertion of personal jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[A] court may dismiss for lack of personal jurisdiction without first establishing subject-matter jurisdiction."); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("Personal jurisdiction, too, is an essential element of the jurisdiction of a district . . . court, without which the court is powerless to proceed to an adjudication." (cleaned up)).

by offering some potential legislative solutions to these Article III problems.

A. *First Principles of Justiciability*

Article III's case-or-controversy requirement is an indispensable thread in the fabric of separation of powers. Indeed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *All. for Hippocratic Med.*, 602 U.S. at 397 (quoting *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976)); *see also Allen v. Wright*, 468 U.S. 737, 750 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Discerning the justiciability of a dispute is no easy task; the "words ['Cases' and 'Controversies'] have an iceberg quality, containing beneath their surface . . . complexities which go to the very heart of our constitutional form of government. . . . Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine." *Flast v. Cohen*, 392 U.S. 83, 94–95 (1968).

"Justiciability is itself a concept of uncertain meaning and scope." *Id.* at 95. It is "not a legal concept with a fixed content," *Poe v. Ullman*, 367 U.S. 497, 509 (1961), nor is it "susceptible of scientific verification," *id.*, or "precise definition," *Allen*, 468 U.S. at 751. But we are hardly adrift. To illustrate the outer limits of the judicial power, the Supreme Court has disaggregated the case-or-controversy requirement into several familiar doctrines, such as standing, ripeness, the prohibition against advisory opinions, the political question doctrine, and so on. Those doctrines help ensure that "some meaningful form can be given to the

jurisdictional limitations placed on federal court power," *Flast*, 392 U.S. at 99, by laying down "clarifying principles or even clear rules" from which courts can draw as they face new questions, *Allen*, 468 U.S. at 752. Helpful as they are, those doctrines present only part of the picture. *See Flast*, 392 U.S. at 95. Each doctrine is at best a metonym for the broader requirement of Article III justiciability:

> All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.

*Allen*, 468 U.S. at 750 (quoting *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178–79 (D.C. Cir. 1983) (Bork, J., concurring)). The heart of justiciability turns on "the appropriateness of the issue for decision" by federal courts. *Poe*, 367 U.S. at 509. That bedrock principle remains operative notwithstanding the particular label we ascribe to a nonjusticiable case. Whether we dismiss a case on standing or ripeness grounds, for instance, matters less than the bottom-line conclusion that the case is inappropriate as a constitutional matter for resolution by a federal court.

At least three interrelated justiciability doctrines are relevant here: ripeness, the prohibition against advisory opinions, and the redressability prong of standing. Whether this dispute falls neatly within one of those doctrines or

whether those doctrines analogically suggest that this dispute is constitutionally inappropriate for decision by this court, my conclusion is the same—the dispute before us is not justiciable.

The doctrine of ripeness "ensure[s] that courts adjudicate live cases or controversies and do not 'issue advisory opinions.'" *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1153 (9th Cir. 2017) (citation omitted). "'[T]hrough avoidance of premature adjudication,' the ripeness doctrine prevents courts from becoming entangled in 'abstract disagreements.'" *Wolfson v. Brammer*, 616 F.3d 1045, 1057 (9th Cir. 2010) (alteration in original) (citation omitted). Ripeness has both constitutional and prudential dimensions. *See id.* at 1058. In applying the constitutional dimension of the ripeness inquiry, we have reminded ourselves that "the Constitution mandates that prior to our exercise of jurisdiction . . . the issues presented [must be] 'definite and concrete, not hypothetical or abstract.'" *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (citation omitted). But even when the issues are definite and concrete, the doctrine of prudential ripeness may counsel against immediate resolution of the case. In making that assessment, we consider "the fitness of the issues for judicial decision," as well as "the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Even if the question at bar is a purely legal one, we may stay our hands when "further factual development would 'significantly advance our ability to deal with the legal issues presented.'" *Id.* at 812 (citation omitted).

"[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." *Flast*, 392 U.S. at 96 (citation omitted).

Though it has some prudential benefits, "the rule against advisory opinions implements the separation of powers prescribed by the Constitution and confines federal courts to the role assigned them by Article III." *Id.* As a consequence, we may not issue judgments that are "subject to revision by some other and more authoritative agency." *Nashville, Chattanooga & St. Louis Ry. v. Wallace*, 288 U.S. 249, 262 (1933). Instead, our judgments must be "binding and conclusive on the parties." *Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 114 (1948). We have reiterated that "to present a justiciable dispute rather than a request for an advisory opinion . . . . the court must be empowered to issue a decision that serves as more than an advisement or recommendation." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 925 F.3d 1041, 1047–48 (9th Cir. 2019).

The doctrine of redressability also safeguards against the hasty issuance of an advisory opinion. To carry its burden of establishing redressability, a plaintiff must demonstrate "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (citation omitted). A "merely 'speculative'" possibility of redress will not suffice. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Simon*, 426 U.S. at 43). "In adhering to th[e] core principle" that the injury must be redressable in federal court, we are to "examine[] history and tradition . . . as a meaningful guide to the types of cases that Article III empowers federal courts to consider." *United States v. Texas*, 599 U.S. 670, 676–77 (2023) (citation and quotation marks omitted). Importantly, we have found redressability lacking when "any prospective benefits depend on an independent actor who retains broad and legitimate

discretion the courts cannot presume either to control or predict." *Mayfield v. United States*, 599 F.3d 964, 972 (9th Cir. 2010) (citation omitted).

B. *Whether Nasri's Case Is Justiciable*

The "clarifying principles" espoused by the justiciability doctrines, *Allen*, 468 U.S. at 752, lead me to conclude that civil asset forfeiture proceedings are nonjusticiable when the district court purporting to exercise *in rem* jurisdiction has neither seized nor meaningfully controlled the property.

To start, an *in rem* proceeding is not ripe for adjudication until the executive branch has seized or exercised control over the property. The basis for *in rem* jurisdiction has historically been the court's physical control of property located within its boundaries. *See James Daniel Good*, 510 U.S. at 57 (explaining that in cases involving "the forfeiture of vessels and other movable personal property," a "seizure of the res . . . [was] a prerequisite to the initiation of *in rem* forfeiture proceedings"). As the Court opined in *Dobbins's Distillery v. United States*, "[j]udicial proceedings *in rem*, to enforce a forfeiture, cannot in general be properly instituted until the property inculpated is previously seized by the executive authority, as it is the preliminary seizure of the property that brings the same within the reach of such legal process." 96 U.S. (6 Otto) 395, 396 (1877). Justice Story, writing for the Court in *The Brig Ann*, emphasized that, to "enforce a right of forfeiture which can alone be decided by a judicial decree *in rem*," "it is necessary that the thing should be actually or constructively within the reach of the Court." 13 U.S. (9 Cranch) 289, 291 (1815); *see also*, *e.g.*, *The Rio Grande*, 90 U.S. (23 Wall.) 458, 463 (1874) ("When the vessel was seized by the order of the court and brought within its control the jurisdiction was complete."); *Taylor v.*

*Carryl*, 61 U.S. (20 How.) 583, 599 (1857) ("[T]o give jurisdiction *in rem*, there must have been a valid seizure and an actual control of the ship by the marshal of the court . . . ."); *Keene v. United States*, 9 U.S. (5 Cranch) 304, 310 (1809) ("[N]othing more is necessary to give jurisdiction in cases of this nature, than that the seizure should be within the district . . . ."). Chief Justice Marshall, sitting by designation as Circuit Justice, elaborated, "That possession of the thing is necessary, as a foundation for the jurisdiction of the court, is, in general, true. There must be seizure to vest the jurisdiction." *The Little Charles*, 26 F. Cas. at 982.

Proceeding *in rem* but before a seizure of the property therefore renders the case unripe and the court's judgment merely advisory. *See United States v. Batato*, 833 F.3d 413, 435–40 (4th Cir. 2016) (Floyd, J., dissenting). If the court does not control the property, it has no mechanism by which it can enforce its *in rem* judgment against the world. *See Gelston v. Hoyt*, 16 U.S. (3 Wheat.) 246, 313 (1818) (Story, J.) ("If its decree were not binding upon all the world upon the points which it professes to decide, the consequences would be most mischievous to the public."). "Because the *res* is a party and because the judgment purports to adjudicate rights in the *res* binding against the whole world, control of the *res* is the *sine qua non* of *in rem* actions." *Batato*, 833 F.3d at 439 (Floyd, J., dissenting). That is why the Supreme Court has repeatedly held that when a sovereign fails to secure the property in an *in rem* proceeding, the judgment is void *ab initio*, not merely voidable. *See Scott v. McNeal*, 154 U.S. 34, 46 (1894) ("[A] judgment in proceedings strictly *in rem* . . . . is wholly void if a fact essential to the jurisdiction of the court did not exist."); *Windsor v. McVeigh*, 93 U.S. (3 Otto) 274, 282 (1876) ("The

judgments mentioned, given in the cases supposed, would not be merely erroneous: they would be absolutely void; because the court in rendering them would transcend the limits of its authority in those cases."); *Cooper v. Reynolds*, 77 U.S. (10 Wall.) 308, 319 (1870) ("[T]he seizure of the property . . . is the one essential requisite to jurisdiction, as it unquestionably is in the proceedings purely *in rem*. Without this the court can proceed no further . . . ."); *Elliott v. Peirsol's Lessee*, 26 U.S. (1 Pet.) 328, 340 (1828) ("Where a Court has jurisdiction, it has a right to decide every question which occurs in the cause . . . . But, if it act without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void . . . ."); *see also Hanson v. Denckla*, 357 U.S. 235, 249–50 (1958); *Voorhees v. Jackson, ex rel. Bank of the United States*, 35 U.S. (10 Pet.) 449, 477 (1836).**[2]**

For that reason, an *in rem* judgment issued without a prior seizure of the property violates the redressability doctrine. The Supreme Court historically acknowledged that a court's *in rem* jurisdiction based on constructive control alone was defective if the court was unlikely to be able to

---

[2] We are accustomed to thinking that personal jurisdiction can be waived such that a judgment rendered without proper jurisdiction is voidable, but not void. *See* Fed. R. Civ. P. 12(h); *see also Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704 (1982) ("In sum, the requirement of personal jurisdiction may be intentionally waived, or for various reasons a defendant may be estopped from raising the issue."). That logic holds for jurisdiction *in personam* or *quasi in rem*. In those instances, the defendants are a limited, identifiable group who may waive their own rights. An *in rem* proceeding, however, is to settle property rights against the world. In this case, who would have the right to waive personal jurisdiction? Not Nasri. Even if he wished to waive his own rights, Nasri has no privilege to waive the rights of the rest of the world.

enforce the judgment. *See Gelston*, 16 U.S. (3 Wheat.) at 13; *The Brig Ann*, 13 U.S. (9 Cranch) at 291 (holding that the enforceability of an *in rem* judgment requires "that the thing should be actually or constructively within the reach of the Court"). Chief Justice Marshall noted that *in rem* jurisdiction could be lost if "the thing could neither be delivered to the libellants, nor restored to the claimants . . . ." *The Little Charles*, 26 F. Cas. at 982. In such cases, the judgment "would be useless, and courts will not render judgments which can operate on nothing." *Id.* In *The Brig Ann*, the Court reiterated this enforceability requirement for constructive control cases: "[Property] is constructively [possessed], when, by a seizure, it is held to ascertain and enforce a right of forfeiture which can alone be decided by a judicial decree *in rem*." 13 U.S. (5 Cranch) at 291. Stated differently, constructive possession existed when a right of forfeiture could be enforced by judicial decree. *See*, *e.g.*, *Tyler v. Defrees*, 78 U.S. (11 Wall.) 331, 349 (1870) ("[W]hile the general rule in regard to jurisdiction *in rem* requires the actual seizure and possession of the *res* by the officer of the court, such jurisdiction may be acquired by acts which are of equivalent import, and which stand for and represent the dominion of the court over the thing, and in effect subject it to the control of the court." (citation omitted)). In cases involving "movable personal property, capable of actual manucaption," a court's judgment "would be ineffectual" "[u]nless [the property was] taken into actual possession by an officer of the court." *Miller v. United States*, 78 U.S. (11 Wall.) 268, 294 (1870). As the Supreme Court has more recently noted, the "traditional, theoretical concerns of jurisdiction" *in rem* turn principally on the "enforceability of judgments." *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 87 (1992).

The "rule [is] that the court must have actual or constructive control of the res when an *in rem* forfeiture suit is initiated." *Id.* A change in the status of the property during the suit may affect the power of the court to enforce the judgment, and "a court might determine that judgment would be 'useless.'" *Id*. But that fact would not necessarily deprive court of jurisdiction. *See MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 295–96, 301–03 (2023); *Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 424 F.3d 852, 861–62 (9th Cir. 2005); *J. Lauritzen A/S v. Dashmont Shipping, Ltd.*, 65 F.3d 139, 141 (9th Cir. 1995). A "continuous-control requirement" assures the enforceability of any judgment, but it is not itself a jurisdictional requirement. *Stevedoring Servs. of Am. v. Ancora Transport, N.V.*, 59 F.3d 879, 882–83 (9th Cir. 1995). But a court that does not control the property—actually or constructively—at the outset of the suit cannot afford relief to the parties and, accordingly, cannot be exercising *in rem* jurisdiction. *See All Funds Distributions to, or o/b/o Weiss*, 345 F.3d 49, 56–58 & n.11 (2d Cir. 2003) (court cannot exercise jurisdiction over funds that may become subject to forfeiture in the future).**[3]**

---

[3] The majority opinion does not decide what constitutes "constructive control." In the admiralty context, arrest of the vessel was sufficient, even without taking physical control of the vessel, and the arrest could be waived by the parties. The filing of a bond was also sufficient to constitute constructive control. *See Salvors, Inc. v. Unidentified Wrecked & Abandoned Vessel*, 861 F.3d 1278, 1286–88 (11th Cir. 2017); *Dluhos v. Floating and Abandoned Vessel, Known as New York*, 162 F.3d 63, 69 (2d Cir. 1998). I would leave to the district court to determine in the first instance what "constructive control" means with respect to assets held in a foreign bank. *See United States v. James*

Those justiciability problems are potentially fatal here. The court today remands for further findings by the district court regarding the Executive Branch's constructive control over Nasri's accounts in Liechtenstein and it does so— properly, in my view—out of concern for Nasri's due process rights. But the same concern should animate an Article III inquiry as well. Absent U.S. control of the accounts, any judgment issued by the Southern District of California depends on an act of comity by the government of Liechtenstein and, at least on this record, its cooperation is far from guaranteed. Without control of the property, the district court has no means to enforce its judgment. *See Batato*, 833 F.3d at 439 (Floyd, J., dissenting) ("Simply put, the *res* in this case is beyond the United States' sovereign territory and our courts cannot—absent control of the *res*— declare rights in it that are binding against the world."). Although we have entered into various treaties, mutual assistance pacts, and executive agreements that pledge cooperation in securing the forfeiture of drug proceeds,[4]

---

*Daniel Good Real Prop.*, 510 U.S. 43, 58 (1993) ("The Government's legitimate interests at the inception of the forfeiture proceedings are to ensure that the property not be sold, destroyed, or used for further illegal activity prior to the forfeiture judgment. These legitimate interests can be secured without seizing the subject property."); *see also $46,588.00 in U.S. Currency and $20.00 in Canadian Currency*, 103 F.3d 902, 904– 05 (9th Cir. 1996).

[4] *See*, *e.g.*, Treaty Between the United States of America and the Principality of Liechtenstein on Mutual Legal Assistance in Criminal Matters, art. XVII, LI-U.S., July 8, 2002, T.I.A.S. No. 03-801 ("Each party shall assist the other . . . in proceedings relating to the forfeiture of the proceeds and instrumentalities of offenses . . . ."); Agreement Between the Government of the United States of America and the Government of the Principality of Liechtenstein on Enhancing

there is no international equivalent of the Full Faith and Credit Clause.  And even if there were such a clause, under the historical rules of comity, a judgment from one state could always be challenged for defects in personal jurisdiction in the courts of the state being asked to recognize the judgment.  *See Ins. Corp. of Ir.*, 456 U.S. at 706; *Baldwin v. Iowa State Traveling Men's Ass'n*, 283 U.S. 522, 524–25 (1931); *Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 722–23 (1877); Restatement (First) of Judgments § 2 (Am. L. Inst. 1942) ("[I]f the court had no jurisdiction over the property . . . . the judgment is open to collateral attack."); 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 3536 (4th ed. 2023) ("Historically . . . a party could attack a judgment collaterally on the ground that the court rendering the judgment had lacked either personal or subject matter jurisdiction.").

The government has assured us that Liechtenstein has cooperated with the United States by issuing a restraining order on the funds.  But restraining the funds and recognizing the judgment of a foreign court are very different things.  We know of no assurance that Liechtenstein will acquiesce in a U.S. judgment declaring the United States to be the only lawful owner of the funds.  *See Batato*, 833

---

Cooperation in Preventing and Combatting Serious Crime, LI-U.S., June 27, 2012, T.I.A.S. No. 18-309; Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, July 27, 1970, 23 U.S.T. 2555 (entered into force for United States Oct. 7, 1972); Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, Feb. 21, 1971, 32 U.S.T. 543 (entered into force for United States July 15, 1980); 28 U.S.C. § 1781 (covering the transmittal of letters of rogatory or request by the Department of State to a foreign tribunal); *see also* William J. Snider, *International Cooperation in the Forfeiture of Illegal Drug Proceeds*, 6 Crim. L.F. 377, 383–84 & nn. 9–11 (1995) (collecting international agreements).

F.3d at 439 (Floyd, J., dissenting) ("Absent control, the court's judgment cannot bind the property but, instead, merely advises the foreign sovereign that *does* control the property as to how the United States believes the rights in the property should be settled."). I recognize that the enforceability in a foreign court of a judgment of U.S. courts does not, for that reason alone, make the matter nonjusticiable. What is unique about this case is that we know from the outset that our assertion of personal jurisdiction is infirm. Because there is an obvious defect in the judgment, it is quite conceivable that someone—Nasri is certainly an obvious possibility, but there may be other claimants—will challenge the U.S. judgment in the courts in Liechtenstein. How Liechtenstein will treat the judgment is just speculation, but we know that Liechtenstein has entertained such challenges in the past.[5] *See*, *e.g.*, *United States v. Collins*, 503 F.3d 616, 617 (7th Cir. 2007) (per curiam) ("Collins instead retained counsel in Liechtenstein to oppose the government's recovery efforts. . . . Several years of legal proceedings ensued in Liechtenstein, culminating in the Liechtenstein court ultimately returning the money to Collins after ruling that it was not the product of illegal transactions."). Thus, Liechtenstein may well treat

---

[5] We should expect no better treatment in the courts of Liechtenstein than we are willing to afford foreign judgments in our courts. We will recognize judgments of foreign courts in forfeiture proceedings, but we will decline to give effect where the foreign court proceeded under "procedures incompatible with the requirements of due process of law," "lacked personal jurisdiction over the defendant," "lacked jurisdiction over the subject matter," or "did not take steps in accordance with the principles of due process, to give notice of the proceedings to a person with an interest in the property." 28 U.S.C. § 2467(d)(1)(A)–(D). We can only imagine how well we would receive a foreign judgment that purported to declare title to property within U.S. jurisdiction.

a U.S. judgment regarding the funds its banks hold as exactly what it is—an advisory opinion; it is an announcement that this is what we would decide assuming *arguendo* that we actually had jurisdiction over the property. And this is not a phenomenon unique to Liechtenstein. *See Batato*, 823 F.3d at 418 (noting that, notwithstanding the district court's restraining orders, courts in New Zealand had allowed the claimant access to his accounts); *id.* at 437 n.3 (Floyd, J., dissenting) (noting that a New Zealand court had issued an order enjoining the registration of the U.S. forfeiture judgment); Courtney J. Linn, *International Asset Forfeiture and the Constitution: The Limits of Forfeiture Jurisdiction over Foreign Assets Under 28 U.S.C. § 1355(b)(2)*, 31 Am. J. Crim. L. 251, 273–74 (2004) (discussing extensive litigation in Costa Rican courts over a U.S. forfeiture action and noting that the Costa Rican courts refused to uphold the requests of the Costa Rican government on behalf of the United States).**[6]**

Moreover, even if Liechtenstein were willing to afford some deference to the United States's claim to Nasri's accounts, because Liechtenstein holds the funds, it is under no obligation to recognize the United States as the exclusive owner of the funds. In effect, Liechtenstein can revise the

---

[6] In *United States v. PetroSaudi Oil Services (Venezuela) Ltd.*, 70 F.4th 1199 (9th Cir. 2023), we acknowledged that "PetroSaudi may refuse to comply with the order and that the district court may have difficulty enforcing compliance. But limitations on the ability of the court to enforce compliance 'determines [*sic*] only the effectiveness of the forfeiture orders of the district courts, not their jurisdiction to issue those orders.'" *Id.* at 1211 (citation omitted). That stray statement, however, was a reference to our interpretation of 28 U.S.C. § 1355's purported jurisdiction-conferring provisions. It was not a statement about justiciability; indeed, the opinion does not mention Article III whatsoever.

district court's judgment as to who holds title. Who else might have claim on the funds? Nasri is a Canadian citizen. Is he subject to a tax lien in Canada? The funds have been parked in Liechtenstein for some time. Does the bank in Liechtenstein have some claim to the funds? Nasri currently resides in Dubai. Is there a secured creditor in Dubai or somewhere else? Nasri's connection to the Southern District of California is based on the allegation that Nasri was a member of a criminal organization known as the Phantom Secure Enterprise, whose members engaged in drug trafficking "throughout the world, including Australia, Thailand, Canada, United Arab Emirates, and in the United States, within the State of California in the Counties of Los Angeles, Orange, and San Diego." Might Australia, Thailand, Canada, and the U.A.E. have similar forfeiture claims based on their own laws? *See United States v. Federative Republic of Braz.*, 748 F.3d 86, 87–91 (2d Cir. 2014) (describing competing claims by U.S. and Brazil and entities in the British Virgin Islands and Cayman Islands). Even assuming that those countries and entities received notice of the forfeiture proceedings in the Southern District of California, did we really expect that those jurisdictions would appear in San Diego to press their claims to money held by banks in Liechtenstein?

Additional consequences follow from the current state of affairs. For one, the current situation risks running afoul of the doctrine of exclusive jurisdiction—which really drives home the whole redressability problem. From time to time, we encounter a situation where two sovereigns claim jurisdiction over the same property. The classic example of such a conflict is a consequence of our system of dual sovereignty. Even when the two jurisdictions are the United States and the state where the property is located, both can

properly lay claim to the property because it is within their sovereign territory. *See*, *e.g.*, *Penn Gen. Cas. Co. v. Pennsylvania*, 294 U.S. 189 (1935); *United States v. One 1985 Cadillac Seville*, 866 F.2d 1142 (9th Cir. 1989). The rule of decision in such cases is instructive:

> Where the judgment sought is strictly *in personam* . . . both a state court and a federal court having concurrent jurisdiction may proceed with the litigation, at least until judgment is obtained in one court which may be set up as res adjudicata in the other. But if the two suits are *in rem* or *quasi in rem*, requiring that the court or its officer have possession or control of the property which is the subject of the suit in order to proceed with the cause and to grant the relief sought, the jurisdiction of one court must of necessity yield to that of the other.

*Penn Gen.*, 294 U.S. at 195 (citations omitted); *see Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939). The doctrine thus avoids "unseemly and disastrous conflicts." *Penn Gen.*, 294 U.S. at 195. If the United States were to disagree with how Liechtenstein decides to distribute the proceeds, we would have no claim under the doctrine of exclusive jurisdiction, because we don't have jurisdiction over the property at all, much less exclusive jurisdiction. Because only Liechtenstein enjoys exclusive jurisdiction over Nasri's bank accounts, we know at this instant that the courts of the United States "must of necessity yield to [those] of [Liechtenstein]." *Id.* When the judgment "would be useless," we lack Article III jurisdiction because "courts will not render judgments which can operate on nothing." *The*

*Little Charles,* 26 F. Cas. at 982. The district court here is operating on nothing.

Our justiciability doctrines are a consequence of our separation of powers principles. *See All. for Hippocratic Med.*, 602 U.S. at 378 ("Article III . . . . is 'built on a single basic idea—the idea of separation of powers.'" (citation omitted)). When Congress ostensibly assigns us the power to issue a judgment *in rem* without seizure or control of the property, it raises serious separation-of-powers concerns. Our Constitution vests the Executive with considerable foreign affairs powers, including "the power to open diplomatic channels simply by engaging in direct diplomacy with foreign heads of state and their ministers." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 13–14 (2015); *see Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("[T]he historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring))); *see also* Amy M. Schaldenbrand, *The Constitutional and Jurisdictional Limitations of* In Rem *Jurisdiction in Forfeiture Actions: A Response to International Forfeiture and the Constitution: The Limits of Forfeiture Jurisdiction over Foreign Assets Under 28 U.S.C. § 1355(b)(2)*, 38 Syracuse J. Int'l L. & Com. 55, 83 (2010) ("If the United States attempts to obtain jurisdiction over property that it does not have active or constructive control over, it may offend officials in foreign countries that have conflicting laws with those of the United States."). We must be especially wary of claiming this power for ourselves, especially when doing so transgresses Article III and encroaches on Article II. "Judicial aggrandizement is as

pernicious to the separation of powers as any aggrandizing action from either of the political branches." *SEC v. Jarkesy*, 144 S. Ct. 2117, 2176 (2024) (Sotomayor, J., dissenting). And Congress may not deputize federal judges as agents of the Executive Branch, nor may the Executive ask the Judiciary to do by judicial fiat that which the Executive is bound to do by diplomacy. The foreign affairs issues raised by the present case "are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility . . . ." *Waterman*, 333 U.S. at 111.

There is nothing inappropriate about the United States, through the appropriate Executive Branch channels, asking Liechtenstein to turn over Nasri's accounts to us; indeed, the Executive Branch has done exactly that in the past. *See*, *e.g.*, *United States v. $4,224,958.57*, 392 F.3d 1002, 1003 (9th Cir. 2004) (noting that the United States requested—and a Liechtenstein magistrate agreed to—repatriation of funds prior to a domestic forfeiture proceeding). But if Congress or the Executive Branch believes a judicial decree would aid the U.S. forfeiture efforts abroad, it must find an appropriate vehicle within the "judicial Power" to do so. When the Executive asks us to support it in violation of all general principles regarding *in rem* jurisdiction, it is an invitation to join the Executive and leave the confines of the "judicial Power" conferred by Article III. We are neither the State Department nor the Department of Justice, and given the lack of judicial mechanisms for enforcing a judgment that

purports to be *in rem*, we should stay out of this and let the Executive Branch do its job. *See Kiobel v. Royal Dutch Petrol. Co*., 569 U.S. 108, 116 (2013) (noting the "danger of unwarranted judicial interference in the conduct of foreign policy").

C. *Potential Solutions*

The justiciability problems I have just articulated are not incurable. The foregoing Article III difficulties derive from the form of the present action. This is nominally a proceeding *in rem*, for which the forfeiture laws contemplate a declaration of *title* in the United States. *See* 21 U.S.C. § 881(h). In true *in rem* proceedings, neither the Full Faith and Credit Clause nor principles of international comity have ever had to be invoked. That is because a judgment *in rem*, by definition, does not require enforcement outside of the jurisdiction because the property had to be seized within the court's jurisdiction before the suit was commenced. Judgments obtained *in personam* may have to be enforced in other jurisdictions, but not a judgment *in rem*. *See Hilton v. Guyot*, 159 U.S. 113, 167 (1895) ("A judgment *in rem* . . . is treated as valid everywhere. . . . 'No court of coordinate jurisdiction can examine the sentence.'" (quoting *Williams v. Armroyd*, 11 U.S. (7 Cranch) 423, 432 (1813))). And that will bring me to this fundamental point: This really doesn't look like an action *in rem*. It is unrecognizable as such, in law or fact. To call a forfeiture action involving property located in a foreign country an "action *in rem*" is an error in category. It is an action, but it is not an action *in rem*, at least by any traditional understanding of that phrase. It is much closer in form to an action *quasi in rem*, in which a court may

declare, as between a limited number of claimants, who owns the property, even if the property is located elsewhere.**[7]**

Congress could cure many of the defects in jurisdiction I have described here by recognizing that civil asset forfeitures involving property outside of our territory are really *quasi in rem* proceedings in which we are asking a foreign government to secure the property, subject to our forfeiture proceedings and any competing claims to the property. In an action *quasi in rem*, the winning party does not take title—only a claim superior to the other parties to the suit. *Cf. Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 200 (2014) ("[T]he declaratory judgment suit . . . provide[s] 'an immediate and definitive determination of the legal rights *of the parties*.'" (emphasis added) (citation omitted)). But the winning claimant's judgment is not superior to claims to title that may be asserted by nonparties. *See* Restatement (First) of Judgments, *supra*, § 3 ("In the case of a proceeding *quasi in rem*, as distinguished from a proceeding *in rem*, interests of persons other than the parties and their privies are not affected by the judgment."). If the present action proceeded as a *quasi in rem* suit, the United States could obtain a declaration of superior title in the $1.2 million against Nasri, but the forfeiture would not purport to decide the United States's rights against other potential claimants. The

---

[7] Assuming it could solve the proper notice and service of process problems, the United States could always proceed *in personam*. Historically, actions *in personam* were actions in equity, while actions *in rem* were actions at law. So although State A could not settle title to real estate in State B, it could, in an action in equity, order the defendant, for example, to convey good title to the plaintiff. *See* Fleming James, Jr., Geoffrey C. Hazard, Jr. & John Leubsdorf, *Civil Procedure*, § 1.10, at 28–29 (5th ed. 2001).

Executive Branch would have its judicial declaration, but it would be up to Liechtenstein to determine whether and to what extent to honor the judgment. So long as the United States satisfies the *quasi in rem* due process standard—including the minimum contacts test, *see Shaffer v. Heitner*, 433 U.S. 186, 211–22 (1977)—the government would not need to possess the property before seeking forfeiture.

There may be other, creative solutions to the problems I have raised here, and I have suggested a couple of modest steps that Congress might take. Those potential solutions are not before us, and the details matter. The point is simply that the form of the action makes a difference. The action as currently constituted cannot be squared with Article III.

II

There is one more jurisdictional issue that looms in this case. The Supreme Court has long suggested in dicta that Congress may alter the general-law rules of personal jurisdiction (subject, of course, to the Fifth Amendment Due Process Clause's notice rules). The lower federal courts, however, have never actually considered *how* Congress may alter those rules. In Part II.A, I review the Court's statements and conclude that Congress's power to change general-law principles may be invoked only by a clear statutory statement. In Part II.B, I provide an overview of the forfeiture statute at issue here, 28 U.S.C. § 1355. In Part II.C, I address the case law interpreting § 1355, and I explain how we came to depart from our general-law principles. And in Part II.D, I explain why—notwithstanding our prior cases—§ 1355 does not contain the necessary clear statement to depart from the seizure-or-control requirement of the general law.

A.  *General Law and the Clear Statement Rule*

Contemporaneously with the development of the seizure-or-control rules for *in rem* jurisdiction, the Supreme Court repeatedly suggested in dicta that the general-law rules of personal jurisdiction were not immutable and could perhaps be altered by Congress—at least with respect to federal courts.  *See*, *e.g.*, *Toland v. Sprague*, 37 U.S. (12 Pet.) 300, 330 (1838) ("If, indeed, it be assumed that [C]ongress acted under the idea that the process of the circuit courts could reach persons in a foreign jurisdiction, then the restrictions might be construed as operating only in favour of the inhabitants of the United States[.] . . . [But] [C]ongress had not those in contemplation at all, who were in a foreign jurisdiction, it is easy to perceive why the restriction in regard to the process was confined to inhabitants of the United States."); *Hollingsworth v. Barbour*, 29 U.S. (4 Pet.) 466, 472 (1830) ("[B]y the general law of the land, no court is authorised to render a judgment or decree against any one, or his estate until after due notice by service of process, to appear and defend.  This principle is dictated by natural justice; and is only to be departed from in cases expressly warranted by law, and excepted out of the general rule."); *The Nereide*, 13 U.S. (9 Cranch) 388, 423 (1815) ("Till such an act be passed, the Court is bound by the law of nations which is a part of the law of the land.").  Justice Story, riding circuit, framed the inquiry this way:  "If [C]ongress had prescribed such a rule [departing from general-law principles], the court would certainly be bound to follow it, and proceed upon the law.  The point of difficulty is, whether such a rule ought to be inferred from so general a legislation . . . ."  *Picquet v. Swan*, 19 F. Cas. 609, 615 (Story, Circuit Justice, C.C.D. Mass. 1828) (No. 11,134); *see also Ex parte Graham*, 10 F. Cas. 911, 913 (Washington, Circuit

USA v. NASRI                                          45

Justice, C.C.E.D. Pa. 1818) (No. 5,657) ("[S]hould it be the will of [C]ongress to vest in the courts of the United States an extra-territorial jurisdiction . . . , over persons and things found in a district other than that from which the process issued, it would seem to be proper . . . to prescribe the mode of executing the process."); Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703, 1709–10 (2020) (arguing that Congress may alter the general-law rules of personal jurisdiction)*.*  More recently, in *Bristol-Myers Squibb Co. v. Superior Court of California*, the Court "[left] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court" as the Fourteenth Amendment imposes on state courts.  582 U.S. 255, 269 (2017).

Congress's potential authority to alter these rules does not excuse it from complying with other constitutional requirements.  *See The Mary*, 13 U.S. (9 Cranch) 126, 144 (1815) (Marshall, C.J.).  But, consistent with that constraint, Congress's power to change the terms by which general-law principles are applied to foreign persons or states is subject to a clear-statement rule.  Justice Story opined that "[s]uch an intention" to depart from the general-law rules is "so repugnant to the general rights and sovereignty of other nations, [that it] ought not to be presumed, unless it is established by irresistible proof."  *Picquet*, 19 F. Cas. at 613; *see also id.* at 614 ("But when the circuit courts are called upon to adopt the same rule, it ought to be seen, that [C]ongress have, in an unambiguous manner, made it imperative upon them."); *cf. Toland*, 37 U.S. (12 Pet.) at 328 (describing Justice Story's opinion in *Picquet* "as having great force").

46 USA v. Nasri

A clear-statement rule is particularly apt in this context. "Typically, we find clear-statement rules appropriate when a statute implicates historically or constitutionally grounded norms that we would not expect Congress to unsettle lightly," *Jones v. Hendrix*, 599 U.S. 465, 492 (2023), such as in cases involving abrogation of state sovereign immunity, *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234 (1985), or the extraterritorial application of federal statutes, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). The general-law rules have for over two hundred years limited federal courts in their exercise of personal jurisdiction. These rules reflect historical and constitutional principles that constituted the background for the Constitution, including Law and Equity, *see* U.S. Const. art. III, § 2, cl. 1; the Law of Nations, *see id.* art. I, § 8, cl. 10; the rules of the common law, *id.* amend. VII; and due process, *see* amend. V. Even if these rules are not constitutionally compelled, we would expect Congress to speak unambiguously before abrogating them.

B. *28 U.S.C. § 1355*

I now turn to the statute in question. Congress has crafted a capacious forfeiture regime, one that sprawls across many titles and sections of the U.S. Code and has its own set of procedural rules.[8] In Title 18, Congress has provided the substantive rules for forfeiture. *See* 18 U.S.C. §§ 981–87. In Title 21, Congress has set forth the basics of forfeiture related to the drug trade. Section 881 provides: "All

---

[8] There are special Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions ("Supp. R.") appended to the Federal Rules of Civil Procedure. The Supplemental Rules cover forfeitures *in rem*, including actions for property located outside the United States. *See* Supp. R. G(3)(c)(iv), (4)(a)(iv)(B).

USA V. NASRI 47

moneys . . . furnished . . . in exchange for a controlled substance . . . , all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any [such] violation" are "subject to forfeiture to the United States." 21 U.S.C. § 881(a)(6). "[U]pon commission of the act giving rise to forfeiture," "[a]ll right, title, and interest . . . shall vest in the United States[.]" *Id.* § 881(h). In Title 28, Congress has set out the procedural rules for recovering fines, penalties, and forfeitures. Section 2461 provides that a "civil fine, penalty or pecuniary forfeiture . . . may be recovered in a civil action." 28 U.S.C. § 2461(a).

A different section, 28 U.S.C. § 1355, provides for subject matter jurisdiction and venue for forfeiture proceedings in U.S. district courts. The statute reads, in relevant part:

> (a) The district courts shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress . . . .
> (b)(1) A forfeiture action or proceeding may be brought in—
> > (A) the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred, or
> > (B) any other district where venue for the forfeiture action or proceeding is specifically provided for in

> > > section 1395 of this title or any
> > > other statute.
> >
> > (2) Whenever property subject to
> > forfeiture under the laws of the
> > United States is located in a foreign
> > country, or has been detained or
> > seized pursuant to legal process or
> > competent authority of a foreign
> > government, an action or proceeding
> > for forfeiture may be brought as
> > provided in paragraph (1), or in the
> > United States District court for the
> > District of Columbia.
>
> . . . .
>
> (d) Any court with jurisdiction over a
> forfeiture action pursuant to subsection (b)
> may issue and cause to be served in any other
> district such process as may be required to
> bring before the court the property that is the
> subject of the forfeiture action.

28 U.S.C. § 1355.

There are a number of interpretive challenges in § 1355. Subsection (a) confers subject matter jurisdiction over forfeiture proceedings to U.S. district courts. *See id.* § 1355(a). The next subsection, § 1355(b), is a venue provision. It is divided into two subparagraphs. Subparagraph (b)(1) is the general venue rule: "A forfeiture action or proceeding may be brought in . . . the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred." *Id.* § 1355(b)(1)(A). Subparagraph (b)(2) is a special venue rule for cases involving property in foreign countries: "Whenever

property subject to forfeiture under the laws of the United States is located in a foreign country . . . an action or proceeding for forfeiture may be brought as provided in paragraph (1), or in the United States District court for the District of Columbia." *Id.* § 1355(b)(2). So far, so good. Read together, the foregoing subsections make clear that U.S. district courts have subject matter jurisdiction over forfeiture actions, and that when the property subject to forfeiture is located in another country, the action may be brought in either "the district court for the district in which any acts of the acts or omissions giving rise to the forfeiture occurred," *id.* § 1355(b)(1)(A), or in the federal district court in Washington, D.C., *id.* § 1355(b)(2).

Before 1992, § 1355 only provided for subject matter jurisdiction over forfeiture actions (what is now subsection (a)); it detailed nothing else. Venue was addressed under the general venue rule in 28 U.S.C. § 1395(b) ("A civil proceeding for forfeiture of property may be prosecuted in any district where the property is found."). That system proved unworkable in a certain subset of cases. When the forfeiture action was brought in the district where the acts or omissions giving rise to the forfeiture occurred, but the property was located in another U.S. district, the district court presiding over the action had no means by which it could obtain control over the property. *See United States v. One 1978 Piper Cherokee Aircraft*, 91 F.3d 1204, 1207 (9th Cir. 1996) ("Prior to October 1992, federal courts struggled with the questions whether a district court other than that in which the property was located could exercise jurisdiction over the subject of a forfeiture and could effectuate process against the property."). This obstacle arose because, "[p]rior to 1992, § 1355 . . . . did not . . . authorize a district court to issue process against property not

within its district." *United States v. All Funds on Deposit in Any Accts. Maintained in the Names of Meza or De Castro* ("*Meza*"), 63 F.3d 148, 151 (2d Cir. 1995).

So, concurrent with the rest of its amendments in 1992, Congress enacted § 1355(d) to address these difficulties and give district courts the ability to effectuate process against property located in other U.S. districts. *See One 1978 Piper Cherokee Aircraft*, 91 F.3d at 1207. Section 1355(d) clarifies that "[a]ny court with jurisdiction over a forfeiture action pursuant to subsection (b) may issue and cause to be served in any other district such process as may be required to bring before the court the property that is the subject of the forfeiture action." 28 U.S.C. § 1355(d). Section 1355(d) thus authorized one federal district court to exercise jurisdiction over property physically located within the boundaries of another district court.[9] Effectively, § 1355(d) treats the seizure by the government anywhere within the United States as if it had been conducted in the district that otherwise has proper subject matter jurisdiction and venue. *See Meza*, 63 F.3d at 152 ("This national service of process provision clearly conferred *in rem* jurisdiction on district

---

[9] *See United States v. 51 Pieces of Real Prop., Roswell, N.M.*, 17 F.3d 1306, 1309–12 (10th Cir. 1994) (holding that a district court could seize property within its district and that, although § 1355(d) altered this rule, this section was not retroactive); *United States v. Contents of Accounts Nos. 3034504504 and 144-07143 at Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 971 F.2d 974, 983 (3d Cir. 1992) (holding that a forfeiture could only be filed under 28 U.S.C. § 1395(b) in the district where the property was located and recognizing that this might require filing multiple forfeiture actions); *see also* Supp. R. C advisory committee's note to 2000 amendment ("Section 1355(d) allows a court with jurisdiction under § 1355(b) to cause service in any other district of process required to bring the civil proceeding for forfeiture in the district where the forfeitures accrues or . . . the property is found . . . .").

courts in forfeiture proceedings with respect to property located within another judicial district in the United States.") (citations omitted). The addition of subsection (d) effected a minor change, more venue than jurisdiction, because the property was within the territory of the United States as a whole. *See One 1978 Piper Cherokee Aircraft*, 91 F.3d at 1206 (noting that the aircraft was seized within the United States, but not within the Eastern District of California, where the forfeiture action was brought; upholding the district court's jurisdiction over the aircraft).

Nestled in § 1355(d) is a cross-reference to § 1355(b)— one that ultimately paved the way for courts across the country to abandon first principles of *in rem* jurisdiction. Section 1355(d) allows a "court with *jurisdiction* over a forfeiture action *pursuant to subsection (b)*" to issue certain kinds of process. 28 U.S.C. § 1355(d) (emphasis added). This should strike a careful reader as odd. After all, § 1355(b) is a venue provision and says nothing about jurisdiction. It is subsection (a), not subsection (b), that vests courts with subject matter jurisdiction over forfeiture actions. The reference in § 1355(d) to "[a]ny court with jurisdiction over a forfeiture action pursuant to subsection (b)" could be read to mean that any court— having subject matter jurisdiction as provided in subsection (a) and venue as provided in subsection (b)— may issue process to "any other *district*" to seize the property that is the subject of the forfeiture action. Such a reading would honor the rules regarding *in rem* proceedings, not alter them.

Unfortunately, that is not how most courts of appeals have understood the relationship between § 1355(b)(2) and § 1355(d). As we will see, the Second Circuit reconciled the relationship between the provisions by agreeing that

§ 1355(b)(2) did not effect a fundamental shift in the rules of *in rem* jurisdiction. Then, the other circuits to address the question reversed course—including ours.

## C. *Case Law Interpreting § 1355*

The Second Circuit was the first court to address the new amendments to § 1355. In *Meza*, the court considered whether § 1355(d) relieved district courts from the historical requirements of *in rem* jurisdiction. The government argued to the panel that "*in rem* jurisdiction is no longer required in actions seeking forfeiture of property located in a foreign country . . . because subject matter jurisdiction and venue [we]re appropriate in the Eastern District of New York" under § 1355(d). *Meza*, 63 F.3d at 151 (quotation marks omitted). The Second Circuit disagreed. It explained, "Although Congress certainly intended to streamline civil forfeiture proceedings by amending § 1355, even with respect to property located in foreign countries, we do not believe that Congress intended to fundamentally alter well-settled law regarding *in rem* jurisdiction." *Id.* at 152. It recognized that § 1355(d) was enacted to "provide[] districts [*sic*] courts with the required control over property located within the United States," not to abrogate the seizure-or-control requirement. *Id.* The court continued, "Absent any degree of control over property located in a foreign country, however, a district court's forfeiture order directed against such property would be wholly unenforceable." *Id.* So, it held that "in order to initiate a forfeiture proceeding against property located in a foreign country, the property must be within the actual or constructive control of the district court in which the action is commenced." *Id.* at 153.

The D.C. Circuit took a different path just a few years later. It held that § 1355 abrogated the general-law seizure-

USA v. Nasri                                   53

or-control requirement because § 1355(d) expressly references "jurisdiction . . . pursuant to subsection (b)[.]" *See United States v. All Funds in Acct. Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain* ("*Banco Espanol*"), 295 F.3d 23, 26 (D.C. Cir. 2002). The lynchpin for the court was not § 1355(b)(2) itself, but § 1355(d). As the court put it, "[i]t would make little sense for Congress to provide venue in a district court" under § 1355(b)(2) "if there were no means for that court to exercise jurisdiction." *Id.*[10] The Third and Fourth Circuits

[10] The D.C. Circuit addressed *Meza* by pointing to a subsequent Second Circuit case. *See Banco Espanol*, 295 F.3d at 26–27 (citing *United States v. Certain Funds Located at the Hong Kong & Shanghai Banking Corp.* ("*Hong Kong Banking*"), 96 F.3d 20, 22 (2d Cir. 1996)). The D.C. Circuit excerpted and agreed with language from that decision describing § 1355 as "provid[ing] district courts with *in rem* jurisdiction over a *res* located in a foreign country." *Id.* at 26–27 (quoting *Hong Kong Banking*, 96 F.3d at 22). Following *Banco Espanol*, the Fourth Circuit also treated *Meza* as having been overruled by *Hong Kong Banking*. *See Batato*, 833 F.3d at 419 n.2 (treating *Hong Kong Banking* as "abrogat[ing] *Meza* in the Second Circuit"). The Third and Ninth Circuits also expressed doubt about the status of *Meza* in light of *Hong Kong Banking*. *See Approximately $1.67 Million*, 513 F.3d at 997 n.3 ("It is unclear whether *Meza* remains good law . . . ."); *Contents of Acct. No. 03001288 v. United States*, 344 F.3d 399, 404 n.3 (3d Cir. 2003).

The D.C. Circuit—and the courts that followed—misread *Hong Kong Banking*. *Hong Kong Banking* had nothing to do with whether § 1355(b)(2) is a jurisdiction-conferring provision. Instead, the question there was whether the 1992 amendments to § 1355 could "be applied to an action begun before the effective date of the amendment." *Id. Meza* was not even mentioned in *Hong Kong Banking*, although it had been thoroughly briefed to, and discussed by, the district court. *See United States v. Certain Funds Located at the Hong Kong & Shanghai Banking Corp.*, 922 F. Supp. 761, 776–78 (E.D.N.Y. 1996). *Hong Kong Banking* did not cite *Meza* because the government waived its appeal of that

eventually followed the D.C. Circuit's lead.  *See Batato*, 833 F.3d at 419–20; *Contents of Account No. 03001288 v. United States*, 344 F.3d 399, 403–05 (3d Cir. 2003).

We first considered § 1355 in *United States v. Approximately $1.67 Million (US) in Cash, Stock, and Other Valuable Assets Held by or at: (1) Total Aviation Ldt.* ("*Approximately $1.67 Million*"), 513 F.3d 991 (9th Cir. 2008).   The district court had concluded that it had constructive control over the assets subject to forfeiture, which were in bank accounts in the Cayman Islands.  *See id.* at 995.  On appeal, both the government and the claimant agreed that the "constructive control" theory was erroneous. *Id.* at 996.  Instead, both parties agreed that the "correct test . . . derive[d] from a plain reading of the jurisdictional statute in question, 28 U.S.C. § 1355(b)."  *Id.*  We block-quoted the statute but did no statutory interpretation of our own. Without discussing the statute's text or structure, we found "ourselves in agreement with the analysis of the D.C. and Third Circuits" that § 1355(b) deals with personal jurisdiction because "[t]he plain language and legislative history of the 1992 amendments makes [*sic*] clear that Congress intended § 1355 to lodge jurisdiction in the district courts without reference to constructive or actual control of the res."  *Id.* at 998.  Although we acknowledged the "traditional paradigm" that a court must have actual or constructive control over the property, *id.* at 996, we treated § 1355(b)(2) not as a venue provision, but as one granting federal courts personal jurisdiction over property outside the

---

portion of the district court's order.  *See* Brief for Plaintiff-Appellant at 9 n.3, *Hong Kong Banking*, 96 F.3d 20.  *Hong Kong Banking*'s dicta about § 1355(b) cannot be read as silently overruling *Meza*.  On my read, there remains a circuit split on the meaning of § 1355.

United States, irrespective of whether we had seized the property, in fact or constructively, *id.* at 996–98. We held that § 1355(b) "does not require the government to establish constructive control of the proceeds to sustain jurisdiction." *Id.* at 996.

We reinforced that holding in *United States v. Obaid*, 971 F.3d 1095 (9th Cir. 2020). There, we rejected the argument that *Shaffer* applied *International Shoe*'s minimum-contacts standard to all true *in rem* proceedings, including forfeiture actions. *See Obaid*, 971 F.3d at 1100–01, 1105. Instead, we concluded that "*Shaffer* is limited to *quasi in rem* actions and does not extend to *in rem* actions," *id.* at 1105, and that the Supreme Court "did not sweep away traditional *in rem* principles in *Shaffer*," *id.* at 1102. But we reconciled "traditional *in rem* principles" with § 1355 by concluding that § 1355 creates a legal fiction that the property is located within the district, thereby giving federal courts jurisdiction in forfeiture actions over property "even if the property is located in a foreign country." *Id.* at 1102.

We addressed § 1355 most recently in *United States v. PetroSaudi Oil Services (Venezuela) Ltd*, 70 F.4th 1199 (9th Cir. 2023). We again acknowledged the traditional rule of actual or constructive control over the asset, but we repeated that, in light of § 1355, "[c]onstructive or actual control of the *res* is no longer necessary." *Id.* at 1210. We explained that § 1355(b)(2) "relaxed this requirement," and that "[r]ead together, *Approximately $1.67 Million* and *Obaid* establish that a . . . court has *in rem* jurisdiction over property not within its actual or constructive control, even when it lacks personal jurisdiction over the property's owner." *Id.* Even though we recognized that PetroSaudi "may refuse to comply with the order and that the district court may have difficulty enforcing compliance," we upheld

the district court's *in rem* jurisdiction over the funds held in the United Kingdom. *Id.* at 1211.

In all three cases, as the majority opinion explains, Maj. Op. at 15–16, we reached our decision on only statutory grounds. We have left unanswered several questions, including the proper due process standard for true *in rem* cases, whether Congress possesses the power to alter the general-law rules of personal jurisdiction, and whether § 1355 contains a clear statement abrogating the control-or-seizure requirement for *in rem* cases.

## D. *Whether § 1355 Contains a Clear Statement*

We have never addressed whether § 1355 contains the necessary clear statement departing from the general-law rules governing *in rem* jurisdiction. It does not.

Recall that when dealing with a statute purportedly about personal jurisdiction, it "ought not to be presumed" that Congress intended to depart from the settled general-law rules "unless it is established by irresistible proof." *Picquet*, 19 F. Cas. at 613. We must look at the text of the statute to see whether Congress has, "in an unambiguous manner," fundamentally altered these rules. *Id.* at 614. "Congress need not incant magic words, but the traditional tools of statutory construction must plainly show" that Congress has deviated from the general-law rules of personal jurisdiction. *Boechler, P.C. v. Comm'r*, 596 U.S. 199, 203 (2022) (citation and quotation marks omitted). An interpretation of the statute as abrogating the general-law rules that is "better[] than . . . alternatives," without more, is not sufficient. *MOAC*, 598 U.S. at 298 (citation and quotation marks omitted). Notwithstanding our interpretation of § 1355 in *Approximately $1.67 Million* and its progeny, § 1355 hardly contains the necessary clear statement to conclude that

Congress dispensed with the seizure-or-control requirement of *in rem* jurisdiction.

1. *Text*. On its face, § 1355(b)(2) says nothing about jurisdiction—subject matter or otherwise. It is a venue rule. It deals only with *where* venue is proper when the property is outside the United States. Section 1355(b)(2) dictates that when the property is located abroad—whether it is held by the United States or "detained or seized" by a foreign government—a forfeiture action must be brought in either one of the venues listed in § 1355(b)(1) or in the District of Columbia.

Instead, the jurisdictional reading of subsection (b)(2) turns exclusively on § 1355(d)'s cross-reference to § 1355(b). "This is not the stuff of which clear statements are made." *MOAC*, 598 U.S. at 299. As I have explained, there is an alternative reading of the cross-reference in § 1355(d). *See* Part II.B, *supra.* Subsection (d) could be read to mean that any court that has subject matter jurisdiction under subsection (a) and proper venue under subsection (b) may issue process to "any other *district*" in the United States. 28 U.S.C. § 1355(d) (emphasis added); *see Meza*, 63 F.3d at 152 ("[Section] 1355(d) clearly provides districts [*sic*] courts with the required control over property located within the United States."). We would not expect Congress to effectuate a radical change to the law of personal jurisdiction through an "oblique or elliptical" cross-reference that is entirely silent on the question of control or possession. *Cf. West Virginia v. EPA*, 597 U.S. 697, 723 (2022).

Reading § 1355(b)(2) as conferring *in rem* jurisdiction without a prior seizure also violates the rule against superfluity. *See Fischer v. United States*, 144 S. Ct. 2176,

2189 (2024) ("[S]urplusage is nonetheless disfavored, and our construction that creates substantially less of it is better than a construction that creates substantially more." (citation and quotation marks omitted)); *Clark v. Rameker*, 573 U.S. 122, 131 (2014) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." (citation omitted)). Section 1355(b)(2) applies in one of two circumstances: first, whenever the property subject to forfeiture "is located in a foreign country," or second, whenever the property subject to forfeiture "has been detained or seized pursuant to legal process or competent authority of a foreign government." 28 U.S.C. § 1355(b)(2). If a U.S. court could exercise *in rem* jurisdiction over property "located in a foreign country" without having seized the property, there would be no need for Congress to separately provide for *in rem* jurisdiction over property that has been seized by a foreign government. The mere fact that the property subject to forfeiture is located abroad would automatically confer jurisdiction, whether or not the foreign government has seized the property. The first clause of § 1355(b)(2) would swallow the second. In *Approximately $1.67 Million*, we effectively held that we had jurisdiction over the bank proceeds in the Cayman Islands, notwithstanding that there was no evidence that we had seized the funds and there *was* evidence that the proceeds had been "detained or seized" by the Caymans. Under our reading of § 1355, the detention or seizure by a foreign government was irrelevant because the property was outside the United States. *Approximately $1.67 Million*, 513 F.3d at 998. We have read the second clause out of § 1355(b)(2). But if we read the provision in light of the background seizure rule, we can give effect to both provisions. Section 1355(b)(2) acknowledges *in rem*

jurisdiction only where the foreign property has been properly seized, either by the United States[11] or by a foreign government cooperating with the United States.[12] This reading construes "each provision to fit harmoniously as part of 'a symmetrical and coherent' statutory scheme." *Rodriguez v. Holder*, 619 F.3d 1077, 1079 (9th Cir. 2010) (per curiam) (citation omitted).

2. *Structure*. There are other compelling reasons for not reading "jurisdiction" in § 1355(d) to refer to *in rem* jurisdiction. Even if one could find clarity in the text taken in isolation, the structure of the broader statutory scheme undermines the notion that § 1355(d) unambiguously converts § 1355(b)(2) into a personal-jurisdiction provision superseding the general-law rules of *in rem* actions. It would be odd to find such a claim to *in rem* jurisdiction in Part IV of Title 28, where § 1355 is located. Part IV is entitled "Jurisdiction and Venue." Chapter 85, which comprises §§ 1330–69, is devoted to the *subject matter* jurisdiction of the district courts. *See*, *e.g.*, *id.* § 1330(a) (conferring subject matter jurisdiction over actions against foreign states); *id.* § 1331 (federal question jurisdiction); *id.* § 1332 (diversity jurisdiction); *id.* § 1333 (admiralty jurisdiction); *id.* § 1334 (bankruptcy jurisdiction). Importantly, because the chapter primarily covers subject matter jurisdiction, Congress

---

[11] There are circumstances in which we can seize property outside the United States. *See*, *e.g.*, *Maul v. United States*, 274 U.S. 501, 504 (1927) (holding that the governing statute "plainly recognizes that seizures for forfeitures may be made on the high seas"); 18 U.S.C. § 981(k)(1)(A) (providing that funds in a foreign financial institution with an interbank account in the United States are subject to seizure *in rem* "up to the value of the funds deposited into the account at the foreign financial institution").

[12] *See supra* note 3.

explicitly uses the phrase "personal jurisdiction" when it articulates rules addressing personal jurisdiction. *See*, *e.g.*, *id.* § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title."); *id.* § 1330(c) ("[A]n appearance by a foreign state does not confer personal jurisdiction . . . ."). Section 1355(a), which confers original and exclusive subject matter jurisdiction over forfeitures on the district courts, is consistent with this pattern. A claim that § 1355(b)(2) means that the district courts can exercise *in rem* jurisdiction over property located in foreign countries is not an issue of subject matter jurisdiction, but of personal jurisdiction. It would require us to read "jurisdiction" in § 1355(a) to mean "subject matter jurisdiction," but "jurisdiction" in § 1355(d) to mean "personal jurisdiction." Not only would that be a dramatic change in the law of *in rem*, but it would also be a jump shift in what Congress has done elsewhere in Title 28 when it uses the word "jurisdiction."

3. *Statutory History*. Finally, § 1355(d)'s statutory history shows that it was enacted to address a purely domestic problem. *See supra* Part II.B. Section 1355(d) addressed difficulties that had arisen in cases where the district court had subject matter jurisdiction and venue but where the property subject to forfeiture was located in a different U.S. jurisdiction. The new provision allowed district courts to issue "process as may be required to bring before the court the property" subject to forfeiture, even when that property is located in "any other *district*." 28 U.S.C. § 1355(d) (emphasis added). So long as the government has seized the property within the United States, § 1355(d) allows one district court to treat the seizure as if it

had been conducted in that district. *See Meza*, 63 F.3d at 152 ("This national service of process provision clearly conferred *in rem* jurisdiction on district courts in forfeiture proceedings with respect to property located within another judicial district *in the United States*." (emphasis added)). The provision was not intended to upend the seizure-or-control requirement.**[13]**

*Approximately $1.67 Million* does not control the outcome on this issue for several reasons. For one, it said nothing about whether § 1355 is a clear statement. There is a world of difference between the opinion's repeated use of the phrase "plain reading" and a conclusion that the statute has abrogated the general-law rules in an unambiguous manner. A "plain reading" is not the same as a "clear statement." *See MOAC*, 598 U.S. at 298 ("Congress's statement must indeed be clear; it is insufficient that a jurisdictional reading is 'plausible,' or even 'better,' than . . . alternatives." (citation omitted)). Moreover, our "plain reading" followed from a single senator's statement in the legislative history and the mistaken holdings of the D.C. and Third Circuits. *See Approximately $1.67 Million*, 513 F.3d at 996–98. That method of analysis sheds little light on whether § 1355 contains the requisite clear statement,

---

[13] *Approximately $1.67 Million* relied on a statement included by the bill's sponsor. *See* 513 F.3d at 997 (explaining that under § 1355(b)(2), it would "no longer [be] necessary to base in rem jurisdiction on the location of the property if there have been sufficient contacts with the district in which the suit is filed." (citation omitted)). Senator Alfonse D'Amato sponsored the bill proposed by the Department of Justice. The bill included a section-by-section analysis, which is where the quoted statement came from. *See* 137 Cong. Rec. 21595, 21998 (Aug. 2, 1991). But that statement does not even mention § 1355(d)—and for good reason: The bill as introduced did not have a § 1355(d). That is not a clear statement of intent to change the general law of *in rem* jurisdiction.

because the modern clear-statement "inquiry trains on statutory text rather than legislative history." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 49 (2024); *cf. id.* at 58 ("[I]t is error to grant sovereign immunity based on inferences from legislative history in the face of clear statutory direction . . . . [S]uch notions are relic[s] from a bygone era of statutory construction." (citations and quotation marks omitted) (final alteration in original)).

In the end, to decide that Congress has relaxed the general-law rules of *in rem* jurisdiction, we need an unambiguous statement that Congress has fundamentally altered the seizure-or-control requirement. *Cf. Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388 (2023) ("This clear-statement rule is a demanding standard. If 'there is a plausible interpretation of the statute' that preserves [the general-law rules] . . . , Congress has not unambiguously expressed the requisite intent." (citation omitted)). Only then can we consider whether it is "warranted by law, and excepted out of the general rule." *Hollingsworth*, 29 U.S. (4 Pet.) at 472. Today we hold that the government's application of our broad reading of § 1355 violates the Due Process Clause in this case, at least without evidence of U.S. control of the property in Liechtenstein. It remains for future cases to see whether our forced reading of § 1355 can survive in other circumstances. None of our prior cases interpreting § 1355 have addressed whether the statute contains the necessary clear statement. In an appropriate case, we should definitively answer that question in the negative. Unambiguous, § 1355 is not.

\* \* \*

Nasri is not a sympathetic figure. "But that should not obscure what is at stake in his case or others like it." *Jarkesy*, 144 S. Ct. at 2154 (Gorsuch, J., concurring). In response to the challenges of international crime and the ease with which criminals can move money from country to country, we have wandered from the basic principles of *in rem* jurisdiction. Along the way, we have assumed to ourselves increasingly sprawling authority inconsistent with the constitutional limits on the judicial power and "repugnant to the general rights and sovereignty of other nations[.]" *Picquet*, 19 F. Cas. at 613. Today's decision is a laudable step in the right direction. It recognizes that constitutionally adequate notice in true *in rem* proceedings requires a seizure of the property. That alone is enough to remand this case to the district court, so the majority understandably goes no farther. But this case is about much more than just the Due Process Clause. Article III and general-law principles also supply robust limits on the exercise of *in rem* jurisdiction. We should heed those limits, too.

With these observations, I am pleased to concur.

DESAI, Circuit Judge, concurring:

Our precedent has long used control or constructive control as the touchstone for jurisdiction in in rem cases. *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 87 (1992). A requirement that the district court have control or constructive control over the assets satisfies Article III's justiciability requirements.

To start, if the court has constructive control over the assets, the United States's injury is redressable. A plaintiff satisfies the redressability standard by proving it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38 (1976)). But redressability does not require certainty; a plaintiff "must show only that a favorable decision is *likely* to redress his injury, not that a favorable decision *will inevitably* redress his injury." *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010) (quoting *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994)). Here, if the foreign government offers sufficient assurances of cooperation, then it is more than speculative that an order vesting title in the United States will remedy its alleged injury. *See United States v. Batato*, 833 F.3d 413, 422 (4th Cir. 2016) ("[T]his case meets the test articulated in *Lujan*—the foreign sovereigns have cooperatively detained the res by issuing orders restraining the defendant property pursuant to this litigation."). Judge Bybee's concurrence points to cases concluding that redressability is lacking when "any prospective benefits depend on an independent actor who retains broad and legitimate discretion the courts cannot presume either to control or predict." *Mayfield v. United States*, 599 F.3d 964, 972 (9th Cir. 2010) (quoting *Glanton*

*ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006)). But nothing more is needed if the district court constructively controls the property based on cooperation and assurances from a foreign government.

Constructive control over the property also avoids the risk of the court issuing an advisory opinion, which is generally prohibited. *See Flast v. Cohen*, 392 U.S. 83, 95–96 (1968). To ensure that we do not provide an advisory opinion, a case must satisfy two requirements: (1) "the case must present an honest and actual antagonistic assertion of rights by one party against another" and (2) "the court must be empowered to issue a decision that serves as more than an advisement or recommendation." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 925 F.3d 1041, 1047–48 (9th Cir. 2019) (cleaned up). Put another way, a "party does not seek an advisory opinion where valuable legal rights would be directly affected to a specific and substantial degree by a decision from the court." *Id.* at 1048 (cleaned up).

Control or constructive control over the assets ensures that these requirements are satisfied. First, there does not appear to be any doubt that the United States has an "actual and antagonistic assertion of rights" over the assets. And second, a decision from the court would serve as more than a mere advisement precisely because the court has assurances that the foreign government would treat it as binding.

The concurrence makes much of the fact that the United States may ultimately not succeed in obtaining the funds. But difficulty enforcing compliance does not make a judgment "subject to revision." *Cf. Nashville, C. & St. L. Ry. v. Wallace*, 288 U.S. 249, 262 (1933). The Supreme Court has

held that a court's judgment is subject to revision when another entity is obligated to review and decide the same subject matter. *See Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 110 (1948). For instance, in *Waterman*, the Supreme Court concluded it did not have jurisdiction to review the denial of an application to engage in overseas and foreign air transportation because the orders were, by statute, subject to approval or denial by the president. *Id.* Because "the decision of the Board . . . grant[ed] no privilege and denie[d] no right" until the president approved it, the Court's judgment on the decision would have "only the force of a recommendation to the President." *Id.* at 112–13.

A civil forfeiture judgment does not suffer the same unenforceability because a judgment in civil forfeiture results in an order vesting title in the United States. 21 U.S.C. § 881(h). Such an order is binding, unlike the order in *Waterman*, which had no effect on any party until the President approved or denied it. 333 U.S. at 113. And a civil forfeiture judgment is conclusive because, assuming potential claimants are given proper notice, it declares rightful ownership over the property. The decision thus affects the rights of the parties "to a specific and substantial degree," regardless of the potential difficulties that enforcing the judgment may present. *Cf. Ctr. for Biological Diversity*, 925 F.3d at 1048 (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993)).

The historical cases cited by Judge Bybee's concurrence do not persuade me otherwise. For one thing, those cases do not address Article III requirements. Instead, they reference the general in rem jurisdiction requirements. *See, e.g.*, *The Rio Grande*, 90 U.S. (23 Wall.) 458, 463 (1874); *Dobbins's Distillery v. United States*, 96 U.S. (6 Otto) 395, 396 (1877). But even if those cases are read as considering Article III

requirements, they demonstrate that Article III jurisdiction is coextensive with—and inseparable from—the in rem jurisdiction requirements. In other words, those cases suggest Article III jurisdiction rises or falls with obtaining proper in rem jurisdiction. *See Scott v. McNeal*, 154 U.S. 34, 46 (1894) ("[A] judgment in proceedings strictly in rem . . . is wholly void if a fact essential to the jurisdiction of the court did not exist."). Thus, even if historically, "control of the *res* is the *sine qua non* of *in rem* actions," *Batato*, 833 F.3d at 439 (Floyd, J., dissenting), control of the res is precisely what the majority opinion requires. By satisfying the majority opinion's requirements to obtain in rem jurisdiction, the court also satisfies Article III's requirements.

Despite my view that constructive control cures the problems identified by Judge Bybee's concurrence, I agree with the view that a better path forward is treating these actions as quasi in rem actions. Concurrence at 41–42. That approach would provide a simpler cure to the personal jurisdiction defects and stronger assurances of Article III jurisdiction. But Congress or the Supreme Court must forge that path. In the meantime, the majority opinion's constructive control requirement makes an in rem civil forfeiture controversy justiciable.

BENNETT, Circuit Judge, dissenting:

The majority holds that "due process[1] requires a district court to establish control or constructive control over property in a forfeiture action to exercise in rem jurisdiction over the property," Majority Op. 5, including "in rem jurisdiction over *foreign* property," *id.* at 16 (emphasis added). Because the majority improperly addresses an issue that Nasri waived, reaches a conclusion opposite to what is required by both the plain language of the relevant statute and our precedent, and is wrong on the merits, I respectfully dissent.[2]

I.

The majority frames the issue in this case as one of procedural "due process." It claims that "[t]his case squarely presents the question our prior cases did not consider nor answer," that is, whether "exercising in rem jurisdiction over

---

[1] I assume that the majority is referring to procedural due process, rather than substantive due process.

[2] As discussed below, the panel ordered supplemental briefing on three issues. The United States provided this response, with which I completely agree:

> (1) [T]his Court has previously held that it does not violate due process to exercise jurisdiction even if the district court lacks actual or constructive control over the property in question, (2) if this Court had not already decided the issue, principles of due process would not prevent the exercise of jurisdiction under these circumstances, and (3) Nasri acknowledged that his sole due process argument was foreclosed by this Court's decision in [*United States v. Obaid*, 971 F.3d 1095 (9th Cir. 2020)], and he has waived any other claims by not raising them below or in his briefs.

foreign property without establishing control or constructive control over the property violate[s] the Due Process Clause." Majority Op. 16. But the majority is incorrect that this case "squarely presents" this due process issue, because Nasri waived this argument. And even were it "squarely presented," our prior cases did address "due process" in the context of in rem jurisdiction over *foreign* property.

### A.

Nasri presented his "due process" arguments in two ways both below and on appeal. First, he argued that "[t]he district court's assertion of jurisdiction violated due process because the court failed to undertake the requisite 'minimum contacts' analysis and such minimum contacts do not exist."[3] Second, he argued that "[t]he Fugitive Disentitlement Statute violates due process because it extends to persons who would not have been fugitives at common law—that is, persons who have no ties to the United States and who have not fled the country in order to avoid prosecution."[4] Neither argument is the same as the majority's framing of the issue here. The central holding of the majority opinion is that "due process requires district courts to *establish control or constructive control* over

---

[3] Nasri argued similarly below that the district court "lacks *in rem* jurisdiction over the frozen assets because [§] 1355(b)(2) does not confer jurisdiction and neither the assets nor [Nasri] ha[s] even minimal contacts with this district."

[4] Nasri argued similarly below: "Nasri wishes to preserve this issue [that the Fugitive Disentitlement Statute violates due process] for possible later review and will therefore be concise. 'The fundamental requirement of due process is the opportunity to be heard.' *Because the disentitlement statute strips a claimant of that opportunity, it does not comport with due process*." (emphasis added) (citation omitted).

property in an in rem civil forfeiture action." Majority Op. 7 (emphasis added).

This is different from Nasri's first argument of whether due process requires the district court to undertake the "minimum contacts" analysis. We definitively closed that door in *United States v. Obaid*, 971 F.3d 1095 (9th Cir. 2020). There, the defendant argued that, because "*in personam* jurisdiction over him was necessary to adjudicate this *in rem* forfeiture action," "the district court was required to apply the minimum contacts standard established by United States Supreme Court precedent [in *Shaffer v. Heitner*, 433 U.S. 186, (1977)] to determine whether he had sufficient contacts with the forum." *Obaid*, 971 F.3d at 1098. We disagreed, holding that "*Shaffer*['s minimum contacts analysis] is limited to quasi in rem actions and does not extend to *in rem* actions." *Id.* at 1105. The majority so recognizes, concluding that we rejected that argument in *Obaid* and thus declines to revisit that issue. [5] Majority Op. 15 n.4 (citing *Obaid*, 971 F.3d at 1105).

The majority's framing of the issue is also different from Nasri's second argument. Nasri contended that the *Fugitive*

---

[5] In its supplemental brief, the United States has it exactly right:

> In his opening brief, Nasri asserted that the district court's exercise of jurisdiction "violated due process." But he did so solely on the grounds that the district court failed to undertake a "minimum contacts" analysis. In his reply brief, Nasri acknowledged this Court's decision in *Obaid* foreclosed that argument and was "undeniably the law in this Circuit." Nevertheless, he argued that *Obaid* was "wrongly decided."

(citations omitted).

*Disentitlement Statute* violates due process. But that is a different issue from whether the district court's exercise of in rem jurisdiction violates due process. The majority also acknowledges this by noting that it "need not reach those challenges [to the Fugitive Disentitlement Statute] because the district court must first determine whether it can exercise in rem jurisdiction over the assets consistent with due process." Majority Op. 20 n.6.

Thus, not only did Nasri fail to frame his argument below as the one the majority addresses, *see supra* notes 3–4— which alone would waive that argument, *see Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999)—Nasri also continued to make these two completely different due process arguments in his briefs on appeal.[6]

---

[6] The majority claims that "Nasri argued—both in the district court and on appeal—that the district court's exercise of jurisdiction over the assets violated due process because both he *and the assets* lacked connection with the United States." Majority Op. 7 n.2. But in his opening brief on appeal, Nasri mentioned "the assets" only in the context of arguing that the district court failed to undertake the requisite minimum contacts analysis. And below, Nasri cited a Second Circuit case for the proposition that "a showing of control" by the government is needed. (citing *United States v. All Funds on Deposit in Any Accts. Maintained in Names of Meza or De Castro*, 63 F.3d 148, 152 (2d Cir. 1995)). But he did not develop his arguments around that case and instead proceeded to argue for the lack of minimum contacts. Nor did his opening or reply briefs on appeal once use the phrase "control" or "constructive control" in relation to the assets.

Alternatively, the majority notes that "although personal jurisdiction may be waived, this court has not held that in rem jurisdiction in a civil forfeiture case, which concerns the rights of the rest of the world to the property, can be waived." Majority Op. 7 n.2. In support of the claim that in rem jurisdiction in a civil forfeiture case *cannot* be waived, the

### B.

Even putting waiver aside, and even reaching the argument the majority makes for Nasri, the majority still errs by basing its conclusion on the incorrect holding that we

---

majority cites only to *Scott v. McNeal*, 154 U.S. 34 (1894), for the proposition that "a judgment in proceedings strictly *in rem* . . . is wholly void if a fact essential to the jurisdiction of the court did not exist." Majority Op. 7 n.2 (quoting *Scott*, 154 U.S. at 46). But as I explain below, § 1355 specifically provides for in rem jurisdiction absent constructive control of the salient res. There is thus no "fact essential to the jurisdiction of the court" that does not exist here.

Further, there appear to be no cases in which *McNeal* has been cited for the extraordinary proposition that in rem jurisdiction cannot be waived. Rather, the claim that in rem jurisdiction cannot be waived deviates from our own precedent when faced with the question in the context of admiralty proceedings. *See Barnes v. Sea Haw. Rafting, LLC*, 889 F.3d 517, 529 (9th Cir. 2018) ("'[A]s with other forms of jurisdiction over the party, a vessel may waive jurisdiction in rem by appearing in the action and failing to raise the defense of lack of jurisdiction over the party in a timely fashion.'" (citation omitted) (quoting *United States v. Republic Marine, Inc.*, 829 F.2d 1399, 1402 (7th Cir. 1987))).

And while we have yet to squarely address the issue, both the Third and Fourth Circuits have expressly held that in rem jurisdiction may be waived in the civil forfeiture context. *See Porsche Cars N. Am., Inc. v. Porsche.net*, 302 F.3d 248, 256 (4th Cir. 2002) ("[I]n admiralty *and civil forfeiture cases*, for years courts have held that objections to in rem jurisdiction may be waived." (emphasis added)); *United States v. Contents of Accts. Numbers 3034504504 & 144-07143 at Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 971 F.2d 974, 983-84 (3d Cir. 1992).

Given Nasri's failure to brief the issue of in rem jurisdiction as articulated by the majority, we should heed the Supreme Court's unanimous directive to our court in another case where it "vacate[d] [our] judgment and remand[ed] . . . for an adjudication of the appeal attuned to the case shaped by the parties rather than the case designed by the appeals panel." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020).

have not reached the due process issue the majority decides. The majority claims that "critically, in each of the[] cases [interpreting 28 U.S.C. § 1355], we did not address whether such an exercise of in rem jurisdiction comports with due process." Majority Op. 15. Not so.

In *United States v. Approximately $1.67 Million (US) in Cash, Stock, and Other Valuable Assets Held by or at: 1) Total Aviation LDT.* (*$1.67 Million*), 513 F.3d 991 (9th Cir. 2008), a twice-convicted drug smuggler and trafficker who held $1.67 million in alleged drug trafficking proceeds in Cayman Island bank accounts appealed the grant of summary judgment for the United States in its civil forfeiture action. *Id.* at 994. We concluded that "28 U.S.C. § 1355(b) does not require the government to establish constructive control of the proceeds to sustain jurisdiction." *Id.* at 996. Our holding was clear, broad, and without any qualification. We did not say that 28 U.S.C. § 1355(b), *under some circumstances*, may require the government to establish actual or constructive control. *$1.67 Million* should thus control and end the inquiry, as we, a three-judge panel, are "bound by the decisions of prior three-judge panels" unless "the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Lair v. Bullock*, 798 F.3d 736, 745 (9th Cir. 2015) (quoting *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc)). The majority does not point to any intervening higher authority that requires us to reexamine *$1.67 Million*'s clear, broad, and unqualified holding.

The majority, however, contends that the *$1.67 Million* panel reached its holding by "engag[ing] in a *purely* textual interpretation of the statute." Majority Op. 14 (emphasis added). Even were that so, I'm not sure why it would matter.

But even assuming it might matter, that is not what happened. Our analysis in *$1.67 Million* was not "*purely* textual." In *$1.67 Million*, we noted that "[d]ating back to early admiralty law, constructive possession of a res had been a prerequisite to establishing in rem jurisdiction."[7] 513

---

[7] Both we in *$1.67 Million*, 513 F.3d at 996, and the Supreme Court in *United States v. James Daniel Good Real Property*, 510 U.S. 43, 57–58 (1993), noted that this "prerequisite" traced back to an old Supreme Court case, *The Brig Ann*, 13 U.S. (9 Cranch) 289 (1815). *Brig Ann* concerned "twelve casks of merchandize, . . . alleged to have been imported or put on board with an intent to be imported contrary to" law. *Id.* at 289. "[The brig Ann] was seized by a revenue cutter of the United States, on her passage toward New York [from Liverpool] . . . and carried into the port of New Haven[, Connecticut] . . . , and immediately taken possession of by the collector . . . , as forfeited to the United States." *Id.* at 289–90. A few days later, "the collector . . . , in pursuance of directions from the secretary of the treasury, returned the ship's papers to the master, and gave permission for the brig to proceed without delay to New York." *Id.* at 290. The district court, however, ordered that the property be condemned, and the circuit court reversed. *Id.* The Supreme Court affirmed the circuit court's reversal:

> *By the judicial act of the 24th September, 1789, ch. 20, § 9*, the District Courts are vested with 'exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation or trade of the United States, where the seizures are made on waters navigable from the sea by vessels of ten or more tons burthen *within their respective districts*, as well as upon the high seas.' Whatever might have been the construction of the jurisdiction of the District Courts, if the legislature had stopped at the words 'admiralty and maritime jurisdiction,' it seems manifest, by the subsequent clause, that the jurisdiction as to revenue forfeitures, was intended to be given to the Court of the district, not where the offence was committed, but

where the seizure was made. And this with good reason. In order to institute and perfect proceedings *in rem*, it is necessary that the thing should be actually or constructively within the reach of the Court. It is actually within its possession when it is submitted to the process of the Court; it is constructively so, when, by a seizure, it is held to ascertain and enforce a right of forfeiture which can alone be decided by a judicial decree *in rem*. If the place of committing the offence had fixed the judicial forum where it was to be tried, the law would have been, in numerous cases, evaded; for, by a removal of the thing from such place, the Court could have had no power to enforce its decree. *The legislature, therefore, wisely determined* that the place of seizure should decide as to the proper and competent tribunal. *It follows, from this consideration*, that before judicial cognizance can attach upon a forfeiture *in rem*, under the statute, there must be a seizure; for until seizure it is impossible to ascertain what is the competent forum. And, if so, it must be a good subsisting seizure at the time when the libel or information is filed and allowed. If a seizure be completely and explicitly abandoned, and the property restored by the voluntary act of the party who has made the seizure, all rights under it are gone. Although judicial jurisdiction once attached, it is divested by the subsequent proceedings; and it can be revived only by a new seizure. It is, in this respect, like a case of capture, which, although well made, gives no authority to the prize Court to proceed to adjudication, if it be voluntarily abandoned before judicial proceedings are instituted. It is not meant to assert that a tortious ouster of possession, or fraudulent rescue, for relinquishment after seizure, will divest the jurisdiction. The case put (and it is precisely the present case) is a voluntary abandonment and release of the property seized, the legal effect of which must,

F.3d at 996.  But "Congress amended 28 U.S.C. § 1355" in 1992, which now provides:

> (b)(1) A forfeiture action or proceeding may be brought in—
>
>> (A) the district court in which any of the acts or omissions giving rise to the forfeiture occurred, or
>>
>> (B) any other district where venue for the forfeiture action or proceedings is specifically provided for in section 1395 of this title or any other statute.
>
> (b)(2) Whenever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought as provided in

---

> as we think, be to purge away all the prior rights acquired by the seizure.

*Id.* at 290–91 (second emphasis in original and all other emphasis added). In other words, *Brig Ann*'s construction of this "prerequisite" was based on its interpretation of an Act of Congress, *i.e.*, "the judicial act of the 24th September, 1789, ch. 20, § 9." *Id.* at 290.  The Supreme Court nowhere implied that this "prerequisite" is a *constitutional* requirement. It follows that, whatever jurisdiction Congress granted the district courts via the judicial act of the 24th September, 1789, ch. 20, § 9, it could alter that status quo by enlarging or narrowing the district courts' jurisdiction via a subsequent Act of Congress.  And it did so in 1992, via the amended 28 U.S.C. § 1355.  *See United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426, 429–30 (D.C. Cir. 2022) (noting that *Brig Ann* was superseded by § 1355).

> paragraph (1), or in the United States District
> court for the District of Columbia.

*Id.* at 996–97 (quoting 28 U.S.C. § 1355).[8]  We also noted
that "Senator Alphonse D'Amato of New York, when
introducing the bill, clarified how § 1355[(b)(2)] *would alter
the role of constructive control*," *id.* at 997 (emphasis
added):

> Subsection (b)(2) addresses a problem that
> arises whenever property subject to forfeiture
> under the laws of the United States is located
> in a foreign country.  As mentioned, under
> current law, it is probably no longer
> necessary to base in rem jurisdiction on the
> location of the property if there have been
> sufficient contacts with the district in which
> the suit is filed. . . . No statute, however, says
> this, and the issue has to be repeatedly
> litigated whenever a foreign government is
> willing to give effect to a forfeiture order

---

[8] Prior to the 1992 amendment, § 1355 had only one sentence (which
now appears as 28 U.S.C. § 1355(a)):

> The district courts shall have original jurisdiction,
> exclusive of the courts of the States, of any action or
> proceeding for the recovery or enforcement of any
> fine, penalty, or forfeiture, pecuniary or otherwise,
> incurred under any Act of Congress, except matters
> within the jurisdiction of the Court of International
> Trade under section 1582 of this title.

*See* Annunzio-Wylie Anti-Money Laundering Act of 1992, Pub. L. No.
102-550, § 1521, 106 Stat. 3672, 4062–63 (amending § 1355 by
"inserting '(a)' before 'The district'" and "adding at the end the
following new subsections" (b)(1)–(2), (c), and (d)).

> issued by a United States court and turn over
> seized property to the United States if only
> the United States is able to obtain such an
> order.

> Subsection (b)(2) resolves this problem by
> providing for jurisdiction over such property
> in the United States District Court for the
> District of Columbia, in the district court for
> the district in which any of the acts giving rise
> to the forfeiture occurred, or in any other
> district where venue would be appropriate
> under a venue-for-forfeiture statute.

*Id.* (quoting 137 Cong. Rec. S12183–02, S12239 (Aug. 2,
1991)).

The majority now states that "[t]he Second Circuit [in
*United States v. All Funds on Deposit in Any Accounts
Maintained in the Names of Meza or DeCastro*, 63 F.3d 148
(2d Cir. 1995)] came the closest" to "address[ing] whether
the statutory language comports with the fundamental due
process requirements of in rem jurisdiction," "finding that
the statute requires constructive control because Congress
did not intend to override well-settled requirements of in rem
jurisdiction." Majority Op. 13. The majority also "find[s]
instructive the analysis undertaken by the Second Circuit [in
*Meza*] when engaging in [the constructive-control] inquiry."
Majority Op. 20.

But in *$1.67 Million*, after we introduced the historical
and legislative backdrop of 28 U.S.C. § 1355, we then
discussed the cases considering the question of constructive
control from other circuit courts and *declined* to follow the
approach taken by the Second Circuit in *Meza*. 513 F.3d at

997–98.    We noted that, "[n]otwithstanding the plain language of the statute and its legislative history, the Second Circuit in [*Meza*] found that the requirement of constructive control survived the § 1355 amendments." *Id.* at 997 (noting that the *Meza* court "reasoned that 'although Congress certainly intended to streamline civil forfeiture proceedings by amending § 1355, even with respect to property located in foreign countries, [it] d[id] not believe that Congress intended to fundamentally alter well-settled law regarding *in rem* jurisdiction'" (alterations omitted) (quoting *Meza*, 63 F.3d at 152)).  It was clear that when the *Meza* court referred to the so-called "well-settled law regarding *in rem* jurisdiction," that well-settled law included the principles of due process.  *Meza*, 63 F.3d at 152 (citing *United States v. James Daniel Good Real Prop.,* 510 U.S. 43, 46 (1993), which held that "the Due Process Clause of the Fifth Amendment prohibits the Government in a civil forfeiture case from seizing real property without first affording the owner notice and an opportunity to be heard").

We then declined to follow the approach in *Meza*, holding:

> The plain language and legislative history of the 1992 amendments makes clear that Congress intended § 1355 to lodge jurisdiction in the district courts *without reference to constructive or actual control of the res*.  *See Aiken v. Spalding*, 684 F.2d 632, 633 (9th Cir. 1982) ("In statutory construction, the plain, obvious meaning of the language of a statute is to be preferred to a curious or hidden sense.").  Where an act or omission giving rise to the forfeiture occurs

in a district, the corresponding district possesses jurisdiction over the forfeiture action *regardless of its control over the res*.

*$1.67 Million*, 513 F.3d at 998 (emphasis added). If, according to the majority, *Meza* at least "came the closest" to addressing the due process issue, then it logically follows that the *$1.67 Million*'s outright rejection of the approach in *Meza* (and our subsequent reaffirming of the principle in *$1.67 Million*) signified that we did not have any due process concerns with the district court's exercise of in rem jurisdiction over foreign property. *See Obaid*, 971 F.3d at 1106; *United States v. PetroSaudi Oil Servs. (Venezuela) Ltd.*, 70 F.4th 1199, 1210–11 (9th Cir. 2023) ("Read together, . . . *$1.67 Million* and *Obaid* establish that a district court has *in rem* jurisdiction over property not within its actual or constructive control, even when it lacks personal jurisdiction over the property's owner. It follows that under its broad *in rem* jurisdiction in civil forfeiture suits, a district court may issue injunctions to 'preserve the availability of property subject to civil forfeiture.'" (quoting 18 U.S.C. § 983(j)(1))). Again, our holding in *$1.67 Million* cannot be clearer: Congress amended § 1355 to confer jurisdiction (and venue) in the district courts without reference to constructive or actual control of the res. And were there any doubt whether we addressed the "due process" issue, our specific rejection of the *Meza* approach in *$1.67 Million* made clear that exercising in rem jurisdiction over foreign property without establishing control or constructive control over the property does *not* offend "well-settled law regarding in rem jurisdiction" and thus does not violate the Due Process Clause. *$1.67 Million*, 513 F.3d at 997 (quoting *Meza*, 63 F.3d at 152). The majority reaches the opposite conclusion.

And in artfully framing the question posed here as one arising under due process, nominally distinct from "the question *$1.67 Million* sought to answer," Majority Op. 16, the majority evades the en banc process required for this court to overturn circuit precedent. But the majority's holding has the functional effect of overturning *$1.67 Million*. It cannot simultaneously be true that a "district [court] possesses jurisdiction over the forfeiture action regardless of its control over the res," *$1.67 Million*, 513 F.3d at 998, *and* that, as the majority holds, "[s]uch an exercise of jurisdiction is contrary to our most fundamental principles of due process," Majority Op. 18.

Even were the issue of the reach of *$1.67 Million* close, and I think it far from close, surely in a case in which Nasri never raised the issue, we should leave the issue for a future case in which it is raised. As Justice Ginsburg, speaking for a unanimous Supreme Court, told us: we must adjudicate "the appeal attuned to the case shaped by the parties rather than the case designed by the appeals panel." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020).

## II.

The majority is also wrong on the merits. To begin, even though the majority does not say so directly, it is adjudicating the constitutionality of an Act of Congress and striking down that statute as unconstitutional. *See* Majority Op. 16 ("This arrangement may have been Congress's intended result, as we recognized in *$1.67 Million*, but it violates the Due Process Clause for several reasons."); *id.* at 18 ("Congress may have written a statute that purports to 'relax' the requirements for in rem jurisdiction. But whatever power Congress may possess to alter the historical requirements for in rem jurisdiction, we know of no principle

under which Congress can evade the constitutional notice requirements by statute." (citation omitted)).    And the majority remains vague on whether it is holding that the amended § 1355 is *facially* unconstitutional or violates the Due Process Clause only *as applied* to Nasri.  *But see* Nasri's Suppl. Br., Dkt. No. 42 at 1 ("[T]his Court has not previously decided whether it is constitutional to exercise *in rem* jurisdiction under 28 U.S.C. § 1355 when the district court lacks actual or constructive control over the *res* not within its territory.    Purporting to exercise jurisdiction *in those circumstances* violates . . . due process." (last emphasis added)).    Because the majority remands the case for "a finding that [the district court] has control or constructive control over [Nasri's] property," Majority Op. 20, I assume that the majority intends to adjudicate the constitutionality of the amended statute only as applied to Nasri.**[9]**

---

[9] I note, however, that the majority appears to opine on far more than Nasri's individual situation, thus placing it on even more tenuous footing.  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3 ex rel. Orange County*, 695 F.3d 960, 963 (9th Cir. 2012) (applying *Salerno* to a facial procedural due process challenge under the Fourteenth Amendment).

Further, as the Supreme Court recently cautioned:

> [Plaintiff] chose to litigate these cases as facial challenges, and that decision comes at a cost.  For a host of good reasons, courts usually handle constitutional claims case by case, not en masse. "Claims of facial invalidity often rest on speculation" about the law's coverage and its future enforcement.

Even if I am right in my assumption, the majority is still wrong. The majority grounds its due process argument—presumably as applied to Nasri—on the lack of notice to the interested parties. It argues that "[n]otice is particularly important in an in rem suit because it is an action 'against the world' to determine title to the property," and "[w]hen property is seized for an in rem action, theoretically anyone who claims an interest in the property will realize that someone else is currently possessing the property until the question of title is resolved." Majority Op. 17. The majority's concern about the lack of notice not only has no basis in case law but also is contrary to the facts here.

It is true that when the United States moves to civilly forfeit property, a court must "adjudicate the rights of the government to the property as against the whole world." *PetroSaudi*, 70 F.4th at 1210 (quoting *United States v. 51 Pieces of Real Prop., Roswell, N.M.*, 17 F.3d 1306, 1309 (10th Cir. 1994)). In this context, if an "owner-claimant" comes forward, he acts as "neither defendant nor plaintiff, but an intervenor who seeks to defend his or her right to the property against the government's claim." *United States v. One 1985 Mercedes*, 917 F.2d 415, 419 (9th Cir. 1990). Such "owner-claimants" could come from anywhere, with or

_____

And "facial challenges threaten to short circuit the democratic process" by preventing duly enacted laws from being implemented in constitutional ways. This Court has therefore made facial challenges hard to win.

*Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (citations omitted) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008)). It is worth repeating that Nasri made no constitutionality challenge to § 1355—facial or as applied—and it is the majority that is making the argument for him.

without any direct ties to the district. Indeed, in cases in which claiming the forfeited property might amount to admitting criminal liability, there may be no one who comes forward to claim an interest in the property. But that does mean the government is barred from seeking civil forfeiture of the property.

Instead, once the United States moves to forfeit property, due process requires only that potential claimants "receive notice and an opportunity to be heard before the Government deprives them of property." *James Daniel Good Real Prop.*, 510 U.S. at 48 (collecting cases). The United States provided such notice here. The government averred that, after filing a civil complaint against the funds in Liechtenstein on June 21, 2021, it "timely published notice and provided direct notice of this civil forfeiture action to all persons who reasonably appear to be a potential claimant." Nasri does not contest that he received the notice. And *Nasri* did receive that notice. Within two months, on August 10, 2021, *he filed a notice of claim to the property*. On August 13, 2021, Nasri's attorney entered his appearance as attorney of record for Nasri. Under our precedent and principles of due process, nothing more was required. *See One 1985 Mercedes*, 917 F.2d at 420 ("Civil due process in forfeiture cases requires little more than forfeiture proceedings be commenced without unreasonable delay."). There simply cannot be a violation of due process "in the air," and here it is clear Nasri had both actual notice and an actual opportunity to be heard. *See In re Drexel Burnham Lambert Grp. Inc.*, 995 F.2d 1138, 1144 (2d Cir. 1993) ("What process is due under the Due Process Clause when asked *in the abstract* is an imponderable question like 'What is Truth?' When focused on concrete circumstances or particular parties, it still admits of no easy answer, but then

USA v. NASRI                                    85

it is at least agreed that no person may be deprived of life, liberty or property by an adjudicatory process without first being afforded notice and a full opportunity to appear and be heard, *appropriate to the nature of a given case*." (emphasis added) (citation omitted)).  Whether the property at issue is under the actual or constructive control of the district court, or is located in San Diego, the District of Columbia, Liechtenstein, or anywhere else, can't possibly be relevant to whether Nasri had notice of the proceedings and an opportunity to be heard in them.**[10]**

Inexplicably, the majority says that more is needed.  It attaches an additional *due process* requirement to the district court's exercise of in rem jurisdiction—which, as I note above, has no basis in our precedent or principles of due process—and effectively renders Congress's amendment to § 1355 at best meaningless and at worst unconstitutional by reverting to the pre-amendment status quo.  Recall that § 1355(b)(1) allows a forfeiture action to be brought in "the district court . . . in which any of the acts or omissions giving rise to the forfeiture occurred," 28 U.S.C. § 1355(b)(1)(A), and § 1355(b)(2) provides that "an action or proceeding for forfeiture may be brought" as long as "property subject to forfeiture under the laws of the United States is located in a foreign country, *or* has been detained or seized pursuant to legal process or competent authority of a foreign government," *id.* § 1355(b)(2) (emphasis added).  Section 1355's amended language is broad, and it grants the district court jurisdiction without reference to constructive or actual

---

[10] While one could hypothesize that the location of certain types of physical property, and the inability of a particular claimant to inspect that property, could affect such a claimant's ability to "meaningfully" be heard, nothing like that is present here.

control of the res.[11] The majority strips that jurisdiction from
the district court conferred by Congress via a constitutional
statute—and invents a nonexistent *due process*
"constitutional" requirement, *see, e.g.*, Majority Op. 11, of
actual or constructive control. But the meaning of § 1355 is
clear, it is constitutional, and thus it does not admit of that

---

[11] Both of my colleagues individually express concerns over the issue of
redressability—and correspondingly, justiciability and our Article III
jurisdiction—when a court exercises in rem jurisdiction over property
outside of its constructive control. They diverge primarily over what
criteria suffice to demonstrate constructive control.

Judge Desai advances the position that the putative requirement of
constructive control may be satisfied "based on cooperation and
assurances from a foreign government." I disagree that constructive
control is a requisite element of civil forfeiture suits initiated under
§ 1355. But even if it were, the record shows sufficient assurances of
cooperation by the government of Liechtenstein to satisfy the
requirements for redressability as articulated by Judge Desai.

Judge Bybee sounds a more skeptical note, positing that constructive
control exists only when "the executive branch has *seized or exercised*
control over the property." He argues that the ability of foreign courts to
ignore domestic judgments from the United States calls the entire
exercise of in rem jurisdiction over foreign assets into question, "given
the lack of judicial mechanisms" for enforcing such judgments. In
support of this claim, he cites three instances of foreign courts failing to
honor civil forfeiture judgments from the United States.

But redressability does not require absolute certainty that a court be
able to enforce its judgment. To the contrary, "[c]ourts often adjudicate
disputes where the practical impact of any decision is not assured,"
including "cases against foreign nations, whose choices to respect final
rulings are not guaranteed." *Chafin v. Chafin*, 568 U.S. 165, 175–76
(2013) (collecting cases). Given that history, and the fact that neither
party disputes the willingness of Liechtenstein to abide by our judgment,
Judge Bybee's redressability concerns do not reflect the circumstances
before us.

judicial amendment (or that judicial determination of constitutional invalidity).

The majority cites a string of cases for the proposition that "[t]he Supreme Court has repeatedly held that when a sovereign fails to secure property in an in rem proceeding, the resulting judgment is void." Majority Op. 9. But *all* those cases predate § 1355's amendment, and *none* of them concerned a civil forfeiture action against assets *in a foreign country*, as is the case here. *See* Majority Op. 9; *Cooper v. Reynolds*, 77 U.S. (10 Wall.) 308, 311 (1870) (concerning defendants who had fled from the state or had so absconded or concealed themselves that the ordinary process of law could not reach them and the attachment against one defendant's real property in Knox County, Tennessee); *Scott v. McNeal*, 154 U.S. 34, 39 (1894) (addressing "whether letters of administration upon the estate of a person who is in fact alive have any validity or effect as against him"); *Elliott v. Peirsol*, 26 U.S. (1 Pet.) 328, 333 (1828) (concerning "an action of ejectment[] brought in the Circuit Court for the district of Kentucky"); *Hanson v. Denckla*, 357 U.S. 235, 238 (1958) ("concern[ing] the right to $400,000, part of the corpus of a trust established in Delaware by a settlor who later became domiciled in Florida"). To the extent that these cases have *some* bearing on exercise of jurisdiction over domestic res (an issue *not* before us), they do not inform, let alone control, our analysis in this case, when the res, *i.e.*, Nasri's personal bank account and an account for a shell company to house Phantom Secure's proceeds, is in a foreign country (Liechtenstein). This distinction is crucial, as Congress amended § 1355 to allow the United States to assert its interests in enforcing federal

88                          USA v. NASRI

law specifically in cases involving international criminal
activities, such as drug trafficking or money laundering.**12**

---

[12] *See, e.g.*, *United States v. All Funds in Acct. Nos. 747.034/278,
747.009/278, & 747.714/278 in Banco Espanol de Credito*, 295 F.3d 23,
26 (D.C. Cir. 2002) ("Senator D'Amato introduced S.1665, the Money
Laundering Improvements Act, containing the language eventually
enacted as 28 U.S.C. § 1355(b). His explanatory statement indicates that
he, at least, meant to give the district courts jurisdiction over the
forfeiture of assets located in foreign countries[.]").

> By the early 1990s, the government had become
> increasingly frustrated by its inability to forfeit foreign
> assets. This frustration stemmed from a limitation in
> the then-existing forfeiture laws, and, ironically
> enough, the government's effective use of those laws.
> The civil forfeiture laws that Congress enacted in the
> 1970s, and expanded in the 1980s, predominately
> targeted domestic crime. Consistent with the limits of
> in rem jurisdiction, these laws authorized the
> government to forfeit only assets within the territorial
> limits of the district court where the asset was found.
> The government made effective use of these domestic
> forfeiture laws, so much so that it became a victim of
> its own success. The more the government put the
> squeeze on domestic money laundering through the
> use of forfeiture and other prosecutorial tools, the
> more it drove money launderers to use offshore banks
> and other international money laundering devices to
> move illegally derived money.
>
> . . . .
>
> In response to these limitations, Congress in 1992
> amended the statute that grants federal courts
> jurisdiction over forfeiture actions. As amended, Title

### III.

Whether the majority is determining that the statute is unconstitutional whenever the district court lacks actual or constructive control over the res, or making that a de facto result of its decision, it intrudes itself into matters committed to the legislative and executive branches of government. It interferes in foreign relations and the government's ability to fight crime, including organized crime, both here and abroad. And worse, it does so in a case in which Nasri never timely made the arguments it bases its ruling on, and in an area where our court has often held the opposite of what the majority does here. Thus, I respectfully dissent.

---

28 U.S.C. § 1355(a) confers original jurisdiction over forfeitures authorized under any Act of Congress.

Courtney J. Linn, *International Asset Forfeiture and the Constitution: The Limits of Forfeiture Jurisdiction over Foreign Assets Under 28 U.S.C. § 1355(b)(2)*, 31 Am. J. Crim. L. 251, 262–65 (2004) (footnotes omitted).