**No. 22-55685**

# United States Court of Appeals
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

$1,152,366.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX5.280, HELD IN THE NAME OF GOLDEN CASTLE TECHNOLOGY LIMITED; $53,020.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX3.200, HELD IN THE NAME OF YOUNES NASRI,
DEFENDANTS

AND

YOUNES NASRI,
CLAIMANT-APPELLANT

*On Appeal from the United States District Court*
*for the Southern District of California*
*21CV1134-WQH*

**PETITION FOR REHEARING EN BANC**

ADAM GORDON
*United States Attorney*

DANIEL E. ZIPP
*Assistant U.S. Attorney*
*Chief, Appellate Section*
*Criminal Division*

*880 Front St., Rm. 6293*
*San Diego, CA 92101*
*(619) 546-8463*

## TABLE OF CONTENTS

Page

Introduction .......... 1

Question Presented .......... 4

Statement .......... 5

Discussion .......... 9

Certificate of Compliance

Addendum

## TABLE OF AUTHORITIES

Cases:

*Contents of Acct. No. 03001288 v. United States*,
344 F.3d 399 (3d Cir. 2003) .......... 2, 19

*Fuld v. Palestine Liberation Organization*,
606 U.S. 1 (2025) .......... passim

*Hanson v. Denckla*,
357 U.S. 235 (1958) .......... 15, 16, 17

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) .......... 14

*Mullane v. Central Hanover Bank & Trust Co.*,
399 US. 306 (1950) .......... 13

*Powers v. Ohio*,
499 U.S. 400 (1991) .......... 14

*U.S. Dep't. of Labor v. Triplett*,
494 U.S. 715 (1990) .......... 14

*United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito Spain*
295 F.3d 23 (D.C. Cir. 2002) ........................................ 18-19

*United States v. All Funds on Deposit in Any Accounts Maintained in the Names of Meza or De Castro*,
63 F.3d 148 (2d Cir. 1995) ................................................19

*United States v. Approximately $1.67 Million*,
513 F.3d 991 (9th Cir. 2008) ..............................2, 6, 7, 9, 18

*United States v. Batato*,
833 F.3d 413 (4th Cir. 2016) .............................................19

*United States v. Certain Funds Contained in Acct. Numbers 600-306211-006,600-306211-011 & 600-306211-014 Located at Hong Kong & Shanghai Banking Corp.*,
96 F.3d 20 (2d Cir. 1996) ..................................................19

*United States v. Davenport*,
668 F.3d 1316 (11th Cir. 2012) ..........................................15

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993) ..............................................................13

*United States v. Nasri*,
119 F.4th 1172 (9th Cir. 2024) ............................................7

*United States v. Nasri*,
190 F.4th 694 (9th Cir. 2026) ....................................passim

*United States v. Obaid*,
971 F.3d 1095 (9th Cir. 2020) ..............................................2

*United States v. PetroSaudi Oil Servs. (Venezuela) Ltd.*,
70 F.4th 1199 (9th Cir. 2023) .............................2, 10, 11, 18

*United Student Aid Funds, Inc. v. Espinosa*,
559 U.S. 260 (2010) ...........................................................13

Constitution and Statutes:

Fourth Amendment .......... 12

Fifth Amendment .......... 3, 6, 9, 12, 17

Fourteenth Amendment .......... 3, 8, 16, 17

28 U.S.C. § 1355 .......... passim

28 U.S.C. § 2466 .......... 6

Rules:

Fed. R. App. P. 40(b) .......... 9

Fed. R. Civ. P. 60(b) .......... 14

Other Authorities:

Rule G(4)(a)(iv), G(4)(b)(i) and (v) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions .......... 14

U.S. Dep't of Just., Asset Forfeiture Policy Manual (2025), Ch. 9, Sec. 2 .......... 10

No. 22-55685

# United States Court of Appeals
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE
*v.*
$1,152,366.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX5.280, HELD IN THE NAME OF GOLDEN CASTLE TECHNOLOGY LIMITED; $53,020.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX3.200, HELD IN THE NAME OF YOUNES NASRI,
DEFENDANTS

AND

YOUNES NASRI,
CLAIMANT-APPELLANT

*On Appeal from the United States District Court for the Southern District of California*
*21CV1134-WQH*

## INTRODUCTION

For decades, when the United States identified proceeds of criminal activity hidden overseas, it has been able to seek an order of forfeiture in any district where the acts giving rise to those illegal proceeds occurred. Congress expressly provided jurisdiction for district courts to issue such forfeiture orders in 28 U.S.C. §1355, and this Court has repeatedly confirmed that jurisdiction is proper

regardless of whether the district court has "control or constructive control" of the property located abroad. See *United States v. Approximately $1.67 Million*, 513 F.3d 991, 996 (9th Cir. 2008); *United States v. Obaid*, 971 F.3d 1095, 1099 (9th Cir. 2020); *United States v. PetroSaudi Oil Servs. (Venezuela) Ltd.*, 70 F.4th 1199, 1210 (9th Cir. 2023). Of course, Courts have recognized that a lack of control or constructive control might determine the *effectiveness* of any forfeiture order, *Contents of Acct. No. 03001288 v. United States*, 344 F.3d 399 (3d Cir. 2003), but under the plain language of the statute, it did not affect the courts' underlying jurisdiction to issue orders in the first place.

The "extraordinary" majority opinion in this case upends this established jurisprudence. *United States v. Nasri*, 190 F.4th 694, 732 (9th Cir. 2026) (Bennett, J., dissenting). At least under one reading of the opinion, the courts can no longer exercise jurisdiction under §1355 unless the government *already* has control or constructive control over the foreign assets it wants to seize. In so holding, the majority imposes a circular impediment to the exercise of jurisdiction. The United States is a party to numerous bilateral and multilateral treaties that obligate other countries to execute requests for forfeiture assistance. Pursuant to those treaties, the United States typically obtains process from a U.S. court, which it

then uses to trigger the assistance of foreign authorities in seizing assets. But if seizure of the assets abroad is a prerequisite to the courts even asserting jurisdiction in the first place, it could create a Catch-22 in which the government must request foreign assistance without first obtaining judicial authorization for such a restraint.

Neither the Fifth Amendment Due Process Clause, nor the precedent cited by the majority opinion, supports imposing such a rule. As the dissent explains, the historical cases cited by the majority that recognized a "control" requirement for in rem jurisdiction arose under the Fourteenth Amendment and were driven by "interstate federalism concerns." *Id.* at 751. But the Supreme Court recently made clear in *Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025), that those same concerns do not apply to purely federal statutes like §1355. For those statutes, Congress is free to set the jurisdictional parameters, and the Fifth Amendment imposes, at most, a flexible "reasonableness" test, which §1355 easily passes.

Furthermore, while the majority equates "control" with "notice," it is undisputed that Nasri already *received* actual notice in this case. *Id.* at 704. He cannot "raise…[the] rights of others," *id.* at 699, and whatever interest some unknown other parties might

have in his criminal proceeds should not prevent the court from adjudicating Nasri's rights. As the dissent put it, "[t]here simply cannot be a violation of due process in the air." *Id.* at 755. Certainly, such vague notions of third-party due process should not be sufficient to "strike[] down a statute that the political branches have used for decades to combat crime…." *Id.* at 734. That is especially true since the Supreme Court warned, just last year, that courts should not "cavalierly interfere with the political branches' 'delicate judgments' on matters of foreign affairs." *Fuld*, 606 U.S. at 19.

Finally, in addition to being "wrong on the merits," *id.* at 748, the majority opinion also effectively overturned several earlier published opinions of this court, and "circumvent[ed] the en banc process" to do so. *Id.* at 744. The opinion is also in clear tension with the decisions of at least three other Circuits. *Id.* at 749. For all those reasons, this case presents a question of "exceptional importance," and this Court should order rehearing en banc.

## QUESTION PRESENTED

Whether a district court must already have actual or constructive control over property located abroad to exercise jurisdiction over forfeiture actions under 28 U.S.C. §1355.

## STATEMENT

Phantom Secure, a Canada-based company, sold encrypted blackberry devices to criminal organizations, with the promise that they were unbreakable and could be remotely "wiped" if they fell into the hands of law enforcement. Excerpts of Record (ER)-34-35. Clients of the company engaged in a range of criminal activity using the phones, including importing and distributing cocaine in the Southern District of California. ER-109. Younes Nasri, a Canadian citizen living in Dubai, was an employee of Phantom Secure, who laundered proceeds from the company through a series of shell corporations. ER-33, 118-19. Over the course of several years Nasri transferred more than $20 million in illicit proceeds to two bank accounts in Liechtenstein. ER-123.

In 2018, the United States indicted Nasri on RICO and drug-trafficking conspiracy charges in the Southern District of California. ER-29-41. After learning of the indictment, the bank in Liechtenstein froze approximately $1.2 million in proceeds remaining in Nasri's accounts. ER-20-22. A magistrate judge issued a seizure warrant for the funds, which the United States served on the bank. ER-26. The United States also filed a verified civil forfeiture complaint with the district court. ER-94; 117. The complaint outlined the facts of the conspiracy and noted that

jurisdiction was proper, under 28 U.S.C. §1355, because "some of the acts and omissions" giving rise to the forfeiture occurred in the Southern District of California. ER-93.

Nasri, through local counsel, responded to the civil forfeiture complaint by filing a verified claim to the funds. ER-173. His attorney filed a declaration explaining that Nasri would exercise his Fifth Amendment rights and decline to appear in court. Supplemental Excerpts of Record (SER)-40-41. The United States then filed a motion to strike Nasri's claim to the funds under the fugitive disentitlement statute, 28 U.S.C. §2466. SER-31. The United States noted it "timely published notice and provided direct notice of this forfeiture action to all persons who reasonably appear to be a potential claimant." SER-38. It explained that Nasri was aware of the forfeiture motion and aware of his outstanding arrest warrant, and he was deliberately refusing to enter the United States to avoid prosecution. SER-31-57.

On June 30, 2022, the district court issued an order granting the United States' motion to strike. ER-3-13. After concluding that the requirements for fugitive disentitlement were satisfied, the court determined that the forfeiture statute "does not require the government to establish constructive control of the [property] to sustain jurisdiction." ER-11 (quoting *$1.67 Million*, 513 F.3d at

996). Nasri filed an appeal, arguing that the district court's exercise of jurisdiction violated due process, but he did so solely on the grounds that the court failed to undertake a minimum contacts analysis—which he acknowledged was an argument foreclosed by caselaw. ECF 10. This Court submitted the case on the briefs without argument, but four months later the court *sua sponte* ordered the parties to file simultaneous, supplemental briefing on whether due process requires the district court to have "actual or constructive control" over property, and whether Nasri waived the argument by not raising it in his briefs. ECF 40.

After the parties filed briefing, the Court issued an opinion on October 29, 2024, holding that due process requires a court to have "control or constructive control" over foreign assets to exercise jurisdiction under §1355. *United States v. Nasri*, 119 F.4th 1172 (9th Cir. 2024). The United States filed a petition for rehearing en banc, and the Court ordered the parties to file another round of simultaneous briefing addressing the impact of the Supreme Court's recent decision in *Fuld*. Shortly after the parties filed briefing, the court withdrew its original opinion, held remote oral argument, and took the matter under submission. ECF 58, 65, 74.

Eight months later, the Court issued a revised opinion with the same fundamental holding: Due Process "requires a district

court to establish control or constructive control over property" abroad to exercise in rem jurisdiction. *United States v. Nasri*, 190 F.4th 694, 696 (9th Cir. 2026). The majority opinion explained that "notice is the touchstone of due process in in rem proceedings, and constructive control has long been the notice required by the Constitution." *Id.* at 704. Moreover, even though it was undisputed that Nasri himself had already received notice in this case, and he could not "raise … [the] rights of others," it was still possible there were "other potential claimants" who did not receive notice. *Id.* at 704. Finally, the majority questioned whether the Supreme Court's recent decision in *Fuld* even applied to in rem cases and sought to distinguish it on the facts if it did. *Id.* at 706.

Judge Bennett dissented, explaining first why the majority improperly addressed an issue that no one raised below in violation of the doctrines of forfeiture and party presentation. *Id.* at 734-40. Next, he explained why previous "binding Circuit authority," even if it primarily engaged in a statutory analysis of §1355, should have controlled the panel's decision. *Id.* at 741-45. The dissent next explained why the majority was "wrong on the merits," since the historical Fourteenth Amendment precedent relied on by the majority to establish the control requirement did not apply in the Fifth Amendment context, and the statute easily met the more

flexible standard set forth in *Fuld*. *Id*. at 748-55. The dissent also explained that the United States provided notice and an opportunity to be heard, and it is undisputed that Nasri himself received actual notice. *Id*. at 755-56. Finally, the dissent concluded by warning that the majority's decision "overrides the political branches' delicate judgments in the realm of foreign affairs … interferes with the government's ability to fight crime, including organized crime," and "does so in contravention of binding circuit and Supreme Court precedent." *Id*. at 757.

**DISCUSSION**

This case presents a question of "exceptional importance" warranting en banc review. Fed. R. App. P. 40(b). More than thirty years ago, Congress amended section 1355 of the civil forfeiture statute to extend jurisdiction to assets located abroad—so long as the acts giving rise to the forfeiture occurred in a district in the United States. In a series of published opinions, this Court confirmed that the "plain language and legislative history of the … amendments makes clear that Congress intended §1355 to lodge jurisdiction in the district courts without reference to constructive or actual control of the res." *$1.67 Million*, 513 F.3d at 997. That is, while traditionally in rem forfeiture required the court to have "actual or constructive control" of the property, Congress "relaxed

this requirement" and "[c]onstructive or actual control of the *res* is no longer necessary." *PetroSaudi Oil*, 70 F.4th at 1210. For decades the United States has relied on this authority and used civil forfeiture actions to target criminal proceeds abroad; disrupt transnational criminal organizations; and recover assets to compensate victims of fraud and corruption.

The majority opinion calls this all into question. For the first time, this Court now holds that district courts cannot exercise jurisdiction, consistent with due process, unless they establish "control or constructive control" over the assets abroad. *Nasri*, 190 F.4th at 696. If read to require control irrespective of notice, this creates a significant practical problem. While some countries may "restrain" assets in advance of civil forfeiture proceedings, as Liechtenstein did here, that will not always be the case. The extent of assistance provided by each country will "vary greatly depending upon the applicable treaty obligations and foreign laws," U.S. Dep't of Just., Asset Forfeiture Policy Manual (2025), Ch. 9, Sec. 2.

The United States is party to numerous multilateral treaties covering requests for forfeiture assistance. It is also party to numerous bilateral mutual legal assistance treaties and agreements covering requests for forfeiture assistance. Although the specifics of some of these treaties vary, the restraint or seizure

of foreign assets by foreign authorities normally requires a formal treaty or official mutual legal assistance request. For instance, in *PetroSaudi*, after the United States obtained an arrest warrant in rem and made a treaty request, the High Court in the United Kingdom recognized its "Treaty obligation of mutual assistance" and ordered the disputed property seized. 70 F.4th at 1205. But the United States was only able to obtain the arrest warrant after the district court found it had jurisdiction "pursuant to 28 U.S.C. §1355 because the Government plausibly alleged that 'acts or omissions giving rise to the forfeiture' took place in the Central District of California." *Id.* at 1204. If the courts of the United States do not have jurisdiction over foreign assets abroad, it creates a sort of Catch-22: The United States ordinarily obtains constructive control of foreign assets by representing to foreign authorities that the U.S. court has jurisdiction based on its issuance of legal process, but according to the majority opinion, the U.S. courts does not have jurisdiction to issue that process absent prior constructive control of the foreign assets. Moreover, even if foreign authorities were willing to cooperate and restrain assets without a court order, the current practice of involving U.S. courts in the process ensures judicial oversight and helps protect the Fourth Amendment rights of potential claimants. Requiring the government to go outside the

courts and ask for restraint would appear to be more intrusive of individual rights rather than less. And, if the United States lacks jurisdiction over an asset, it is far from clear what authority would even justify a request to a foreign country to restrain the assets in the first place. This circular practical result alone presents a question of exceptional importance warranting further review.

Moreover, there is nothing in the Fifth Amendment Due Process Clause or the historical precedent cited by the majority that would support imposing such a broad new restriction on the application of §1355. To the extent the majority opinion requires "control or constructive control" even if proper notice has been provided,[1] that holding finds no support in the caselaw of this Circuit or the Supreme Court. The Due Process Clause embodies "the general rule" that "individuals must receive notice and an opportunity to be heard before the Government deprives them of property," a rule that generally applies to civil forfeiture

---

[1] The United States outlined in its initial petition for rehearing en banc those portions of the majority opinion that could be read to suggest that either control *or* proper notice would be sufficient to satisfy due process. ECF 53 at 13-14. If the majority opinion could be construed to require control of the *res* only when the United States does not otherwise provide sufficient notice, that would substantially limit the practical impact of the opinion.

proceedings. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993). Under the familiar due process notice standard of *Mullane v. Central Hanover Bank & Trust Co.,* notice must simply be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 339 U.S. 306, 314 (1950). And even where a plaintiff fails to serve the defendant with the summons and complaint normally required to provide fair notice of a civil action, a defendant who nevertheless learns of the action will have "actual notice," which "more than satisfie[s] [his] due process rights." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010). Here, as the majority recognizes, "Nasri received actual notice" of the action. 190 F.4th at 704. As a result, he promptly filed a notice of claim to the property in the forfeiture action. *Id.* at 697. This was sufficient to satisfy his due process rights. See *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) (receipt of "*actual* notice of the filing … more than satisfied United's due process rights.").

The majority emphasized that it did "not know whether *other* potential claimants received notice of the action." 190 F.4th at 694 (emphasis added). But it is hard to see why that would matter. As the majority acknowledges, Nasri cannot "raise or forfeit rights of

others." *Id.* at 699. But if Nasri cannot raise the due process rights of others, and he himself received notice consistent with due process, that should be the end of the analysis. The law is clear that a litigant must ordinarily assert "his own legal rights and interests," and this rule applies "even when the very same allegedly illegal act that affects the litigant also affects a third party." *U.S. Dep't. of Labor v. Triplett*, 494 U.S. 715, 720 (1990). Moreover, to assert such third-party rights, the litigant "must," among other things, "have a close relation to the third party" whose rights are at issue. *Powers v. Ohio*, 499 U.S. 400, 411 (1991); see *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Here, even if some unknown third party might have a claim to the bank-account funds, that claim would be entirely adverse to Nasri's. There is no reason the court would not have jurisdiction, at the very least, to adjudicate Nasri's claims first. If any other potential claimants later surfaced who believed they had been denied constitutionally sufficient notice, they could always seek relief via motion under Fed. R. Civ. P. 60(b).

Furthermore, even if Nasri had not received actual notice and an opportunity to respond, it is not clear why "control or constructive" control would be the *only* (or even best) way to provide notice. The Government provides notice in civil forfeiture cases by transmitting direct notice to known potential claimants and by

notifying the world by publication of notice online. See Rule G(4)(a)(iv), G(4)(b)(i) and (v) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. These notice provisions "codify and restate prevailing due process requirements governing adequate notice." *United States v. Davenport*, 668 F.3d 1316, 1322 (11th Cir. 2012). A court's actual or constructive control of intangible property might increase the *likelihood* that a claimant would receive actual notice of the proceeding, but it has never been a necessary requirement for constitutionally sufficient notice.

The majority's conclusion that constitutionally sufficient notice always requires actual or constructive control appears to rest on *Hanson v. Denckla*, 357 U.S. 235 (1958). But that case cannot support the majority's new requirement. *Hanson* involved a dispute over a Florida state-court judgment resolving inheritance rights to property held in trust in Delaware. *Id.* at. 240-41. The Florida Supreme Court held that the trial court's judgment was binding not only on the parties who had appeared before the court but also on the nonresident defendants on whom no personal service had been made, "even though the trust assets were not 'physically in [Florida].'" *Id.* The Supreme Court reversed, and its analysis proceeded in two parts. First, the Court concluded that "Florida had

no in rem jurisdiction" over the assets, *id.* at 249, because "the in rem jurisdiction of a state court is limited by the extent of its power and by the coordinate authority of sister States"; the "basis of [such state-court] jurisdiction is the presence of the subject property within the territorial jurisdiction of the forum State," *id.* at 246; and the property at issue was "located in Delaware and not in Florida," *id.* at 247. Then, in the second step of its analysis, "[h]aving concluded that Florida had no in rem jurisdiction," the Court held that its judgment cannot "extinguish the interest of … a person in [that] property" if the court also lacks personal jurisdiction over that person. *Id.* at 250.

As the Supreme Court recently made clear in *Fuld*, however, the key predicate for *Hanson*'s analysis of state court authority is wholly inapplicable to the federal government. 606 U.S. at 14. Indeed, *Fuld* specifically cites and quotes *Hanson* as reflecting Fourteenth Amendment constraints on state authority that emerge "as 'a consequence of territorial limitations on the power of the respective States.'" *Fuld*, 606 U.S. at 14 (quoting *Hanson*, 357 U.S. at 251). Those constraints "ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Id.* (citation omitted). And such considerations involving states' limited

territorial authority "do not apply to limitations under the Fifth Amendment" because "[t]he Constitution confers upon the Federal Government … both nationwide and extraterritorial authority." *Id.* at 15. *Fuld* therefore concludes that, given the "distinct territorial reach of the Federal Government's sovereign power," it makes "little sense" to incorporate into the Fifth Amendment context the Fourteenth Amendment's limits on state authority, which reflect "the States' more constrained sovereign spheres." *Id.* at 16.

The same is true here. It makes "little sense" to extend *Hanson*'s determination that a *state* lacks in-rem jurisdiction over property when the property is located outside its territorial authority to the federal government, which the Constitution itself vests with "nationwide and extraterritorial authority." *Fuld*, 606 U.S. at 15-16. Likewise, *Hanson*'s second determination—that a State cannot extinguish a person's property right in property where the state lacks both in rem jurisdiction over the property and personal jurisdiction over the person—necessarily depended on its first determination and has no application in the federal context. And, of course, the Court in *Hanson* never addressed what "notice" was required to satisfy due process under the Fifth Amendment.

Finally, in addition to the practical problems it creates, and the fundamental flaws in the majority due process reasoning, the

majority opinion is also difficult to reconcile with this Court's existing caselaw. This Court has issued several published opinions that explicitly held that "control or constructive" control is *not* required for a court to exercise jurisdiction under §1355. See *$1.67 Million*, 513 F.3d at 996; *PetroSaudi Oil*, 70 F.4th at 1210. While these cases focused on the statutory language and did not address the specific due process argument raised by the majority here, they are still hard to square with the majority's decision. As the dissent points out, "[i]t cannot simultaneously be true that a 'district court possesses jurisdiction over the forfeiture action regardless of its control over the res,'" under *$1.67 Million*, but "[s]uch an exercise of . . . jurisdiction is contrary to our most fundamental principles of due process," under the majority opinion. 190 F.4th at 744. As a result, the majority's holding effectively "abrogates" this Court's prior law and "circumvent[s] the en banc process" to do so. *Id.*

For similar reasons, the majority opinion is also in clear tension with the decisions of at least three other Circuits. Specifically, the D.C., Third, and Fourth Circuits have all explicitly held that district courts can exercise jurisdiction under §1355 even without control or constructive control over the assets. See *United States v. All Funds in Acct. Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain*, 295 F.3d 23, 27

(D.C. Cir. 2002); *Contents of Acct. No. 03001288*, 344 F.3d 399, 405 (3d Cir. 2003); *United States v. Batato*, 833 F.3d 413, 420 (4th Cir. 2016). And while the Second Circuit reached the opposite conclusion, in *United States v. All Funds on Deposit in any Accts. Maintained in Names of Meza or De Castro*, 63 F.3d 148, 149 (2d Cir. 1995), one year later that court issued another decision calling the validity of *Meza* into doubt. See *United States v. Certain Funds Contained in Acct. Numbers 600-306211-006,600-306211-011 & 600-306211-014 Located at Hong Kong & Shanghai Banking Corp.*, 96 F.3d 20, 26 (2d Cir. 1996). While none of these cases addressed the specific due process argument at issue here, the outcome of each case would still be "contrary to our most fundamental principles of due process" under the majority reasoning. *Nasri*, 190 F.4th at 744. This Circuit now stands alone in effectively "strik[ing] down [§1355(b)(2)] as unconstitutional." *Id*. at 748.

* * *

Last year in *Fuld*, the Supreme Court emphasized that "when the Executive and Congress have spoken with one voice" in the sphere of foreign affairs, "their coordinate action is supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion" rests "heavily upon any who might attack it." 606 U.S. at 19 (citation omitted). That is

precisely the case here. The Executive has implemented Congress's express direction that forfeiture proceedings may be brought in the district court for the "district in which any of the acts or omissions giving rise to the forfeiture occurred" whenever such property is "located in a foreign country." 28 U.S.C. §1355(b)(1)(A) and (2). *Fuld* makes clear that courts must not "cavalierly interfere with the political branches' delicate judgments on matters of foreign affairs," particularly given that the "Constitution confers upon the Federal Government … both nationwide and extraterritorial authority," 606 U.S. at 15, 19 (citation and alterations omitted). Because the majority opinion in this case "does just that," 190 F.4th 733, and in the process "interferes with the government's ability to fight crime, including organized crime, at home and abroad," *id.* at 757, it presents a question of exceptional importance. This Court should order rehearing en banc.

Respectfully submitted,

ADAM GORDON
*United States Attorney*

S/DANIEL E. ZIPP
*Assistant U.S. Attorney*
*Chief, Appellate Section*
*Criminal Division*

NOVEMBER 18, 2026.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form: https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 22-55685

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

(●) Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,193 **.**
*(Petitions and responses must not exceed 4,200 words)*

**OR**

( ) In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/Daniel E. Zipp **Date** 11/18/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

YOUNES NASRI,

*Claimant-Appellant*,

v.

$1,152,366.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX5.280, Held in The Name of Golden Castle Technology Limited; $53,020.18 IN FUNDS FROM BENDURA BANK AG, PORTFOLIO NUMBER XX3.200, Held in The Name of Younes Nasri,

*Defendants*.

No.22-55685

D.C. No.
3:21-cv-01134-WQH-BLM

OPINION

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted December 18, 2025
Pasadena, California

Filed September 2, 2026

Before: Jay S. Bybee, Mark J. Bennett, and Roopali H. Desai, Circuit Judges.

Opinion by Judge Desai;
Concurrence by Judge Bybee;
Concurrence by Judge Desai;
Dissent by Judge Bennett

## SUMMARY*

### Civil Forfeiture

The panel vacated the district court's order in a civil forfeiture action granting the United States's motion to strike under the fugitive disentitlement statute Younes Nasri's claim of innocent ownership over assets in a foreign bank account.

Nasri is a Canadian citizen residing in Dubai. After indicting Nasri on criminal racketeering and drug conspiracy charges, the government brought this civil forfeiture action alleging that Nasri's Canadian-based company, Phantom Secure, sold encrypted Blackberry phones to criminals. According to the complaint, Phantom Secure operated across

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the world, including in the Southern District of California. Nasri opened a personal bank account and an account for a shell company in Liechtenstein to house Phantom Secure's proceeds. The government moved to strike Nasri's claim to the assets under the fugitive disentitlement statute, 28 U.S.C. § 2466. The district court, purporting to exercise in rem jurisdiction over the assets, granted the government's motion to strike Nasri's claim.

As an initial matter, the panel held that neither forfeiture nor the party presentation principle barred review of the claims in this case. Nasri argued—both in the district court and on appeal—that the district court's exercise of jurisdiction over the assets violated due process because both he and the assets lacked connection with the United States. And in any event, although personal jurisdiction may be waived, this court has not held that in rem jurisdiction in a civil forfeiture case, which concerns the rights of the rest of the world to the property, can be waived.

The panel held that the district court's exercise of in rem jurisdiction without finding that it has control or constructive control over the defendant property violates the Due Process Clause. Under 28 U.S.C. § 1355(b)(2), a civil forfeiture action may be brought "[w]henever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government" in the district in which the acts giving rise to the forfeiture occurred. No cases have squarely addressed whether the statutory language of § 1355 comports with the fundamental due process requirements of in rem jurisdiction. The panel held that the Due Process Clause requires a court to have control or constructive control over property in a forfeiture action to establish in rem jurisdiction. Here, the

Case: 22-55685, 10/08/2026, ID: 12995710, DktEntry: 83, Page 29 of 152



district court expressly declined to evaluate whether it had control or constructive control over the assets. Accordingly, the panel held that the district court's exercise of in rem jurisdiction violated the Due Process Clause, and remanded for the district court to evaluate whether it had control or constructive control over the assets.

Concurring, Judge Bybee agreed with the majority opinion in full because proceeding *in rem* without the property itself violates the Fifth Amendment's Due Process Clause. Further, because the United States does not hold the property, the proceeding is premature and nonjusticiable.

Concurring, Judge Desai wrote that the majority opinion's requirement that the district court have control or constructive control over the assets satisfies Article III's justiciability requirements and cures the problems identified by Judge Bybee's concurrence.

Dissenting, Judge Bennett wrote that the majority opinion's holding—that that application of 28 U.S.C. § 1355(b)(2) violates the Due Process Clause of the Fifth Amendment whenever the district court lacks actual or constructive control over the res—overrides the political branches' delicate judgments in the realm of foreign affairs and interferes with the government's ability to fight crime, including organized crime, at home and abroad. Worse still, the majority opinion does so in contravention of binding circuit and Supreme Court precedent, and in violation of the party presentation principle.

## COUNSEL

Daniel E. Zipp (argued), Assistant United States Attorney, Chief, Appellate Section, Criminal Division; David Rawls, Assistant United States Attorney; Randy S. Grossman, Adam Gordon, and Tara K. McGrath, United States Attorneys; Office of the United States Attorney, United States Department of Justice, San Diego, California; for Plaintiff-Appellee.

Edward H. Williams II (argued), Orrick Herrington & Sutcliffe LLP, Washington, D.C.; John C. Lemon, Law Offices of John C. Lemon, San Diego, California; for Claimant-Appellant.

---

## OPINION

DESAI, Circuit Judge:

The United States seeks to recover ill-gotten profits from a fugitive, Younes Nasri. After indicting Nasri on criminal racketeering and drug conspiracy charges, the government brought a civil forfeiture action against Nasri's assets in a foreign bank account. Nasri filed a claim of innocent ownership over the assets, and the United States moved to strike the claim under the fugitive disentitlement statute. Nasri responded, challenging the court's jurisdiction over the assets. He claimed that neither he nor the assets had ties to the United States. The district court, purporting to exercise in rem jurisdiction over the assets, granted the government's motion to strike Nasri's claim.

We hold that the Due Process Clause requires a district court to establish control or constructive control over

property in a forfeiture action to exercise in rem jurisdiction over the property.

## Background

Younes Nasri is a Canadian citizen residing in Dubai. The Department of Justice indicted Nasri and four others on RICO and drug trafficking conspiracy charges. The government alleged that Nasri led a Canada-based company, Phantom Secure, which sold encrypted Blackberry phones to criminals. The phones were marketed as uncrackable by law enforcement and could be wiped remotely to hide or destroy evidence.

According to the complaint, Phantom Secure operated across the world, including in the Southern District of California. Several of Nasri's alleged co-conspirators also operated in the Southern District. The complaint stated that Nasri was a "significant worldwide distributor" of Phantom Secure devices and laundered the enterprise's profits through foreign shell companies. Nasri opened a personal bank account and an account for one such shell company, Golden Castle Technology, in Bendura Bank AG in Liechtenstein to house Phantom Secure's proceeds. Nasri has purportedly never entered the United States.

When the CEO of Phantom Secure, Vincent Ramos, was arrested in the United States, he entered into a plea agreement in which he agreed to turn over $80 million in illegal profits and implicated Nasri in the Phantom Secure conspiracy. The government indicted Nasri and initiated a civil forfeiture action against the assets pursuant to 18 U.S.C. § 981 and 21 U.S.C. § 881.

In response, Nasri filed a verified claim asserting innocent ownership of the assets. The government and Nasri

sought a global resolution of the criminal and civil claims, and the district court granted a stay during the negotiations. Negotiations failed, and the district court lifted the stay and ordered the parties to appear. But Nasri failed to appear, stating that he was "exercising his Fifth Amendment right against self-incrimination." Nasri also failed to surrender in his criminal case.

The government moved to strike Nasri's claim to the assets under the fugitive disentitlement statute, 28 U.S.C. § 2466.[1] Nasri opposed the motion, arguing that the court lacked jurisdiction over the assets because neither he nor the assets had any ties to the United States. He also asserted the fugitive disentitlement statute violates due process or, in the alternative, does not apply to him. The district court granted the government's motion, finding that (1) it had in rem jurisdiction over the assets, (2) the fugitive disentitlement statute does not violate due process, and (3) Nasri qualified as a fugitive under the statute even if avoiding prosecution was not the "sole reason" he remained outside the United States. Nasri timely appealed.

**Standard of Review**

A district court's rulings on personal jurisdiction are reviewed de novo. *United States v. Obaid*, 971 F.3d 1095, 1098 (9th Cir. 2020) (citing *Myers v. Bennett L. Offs.*, 238 F.3d 1068, 1071 (9th Cir. 2001)).

[1] The fugitive disentitlement statute allows the government to move to strike an individual's claim to ownership in a civil forfeiture proceeding when he intentionally evades a criminal action against him related to the forfeiture. 28 U.S.C. § 2466.

## Analysis

### I. The district court's exercise of in rem jurisdiction violated the Fifth Amendment's Due Process Clause.

A federal court must have "the power to decide the claim before it (subject-matter jurisdiction) and power over the parties before it (personal jurisdiction)." *See Lightfoot v. Cendant Mortg. Corp.*, 580 U.S 82, 95 (2017). Without personal jurisdiction, "the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (citation modified). When courts seek to exercise in rem jurisdiction, they must typically seize or constructively possess the defendant property before exercising in rem jurisdiction. But here, the government argues that the court can exercise jurisdiction over Nasri's property, which is entirely outside of the court's possession or control, without violating the Due Process Clause. We disagree.

To explain our holding that federal courts must have control over defendant property before exercising in rem jurisdiction, we start with the historical requirements of in rem jurisdiction. Next, we consider our departure from these historical principles in cases brought pursuant to the civil forfeiture statute, 28 U.S.C. § 1355. But we ultimately conclude that the Fifth Amendment's Due Process Clause requires district courts to establish control or constructive control over property in an in rem civil forfeiture action based on historical in rem principles and the Supreme Court's recent "flexible" jurisdictional inquiry. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025).

Before addressing the merits, we explain why neither forfeiture nor the party presentation principle bars review of the claims in this case. The government and the dissent argue

that Nasri forfeited the arguments at the heart of our ruling by failing to raise them in the district court and on appeal. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). For the same reasons, they insist that the party presentation principle prevents us from confronting the constitutional question this case presents. But Nasri argued—both in the district court and on appeal—that the district court's exercise of jurisdiction over the assets violated due process because both he *and the assets* lacked connection with the United States. And in any event, although personal jurisdiction may be waived, this court has not held that in rem jurisdiction in a civil forfeiture case, which concerns the rights of the rest of the world to the property, can be waived. *Cf. Scott v. McNeal*, 154 U.S. 34, 46 (1894) ("[A] judgment in proceedings strictly in rem . . . . is wholly void if a fact essential to the jurisdiction of the court did not exist.").

To be sure, in some cases, an individual objection to in rem jurisdiction may be waived by a vessel that "actively participate[s] in the litigation . . . without challenging the court's in rem jurisdiction." *See Barnes v. Sea Haw. Rafting, LLC*, 889 F.3d 517, 529 (9th Cir. 2018). It does not follow that a claimant in an in rem forfeiture case can waive the rights of all other claimants to object to the district court's exercise of in rem jurisdiction. Even the case that the dissent cites for the proposition that other circuits "have expressly held in the civil forfeiture context that in rem jurisdiction is waivable," recognizes this nuance. *United States v. Contents of Accts. Nos. 3034504504 & 144-07143 at Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 971 F.2d 974, 983–84 (3d Cir. 1992). There, the Third Circuit concluded that a claimant waived his right to object to in personam and in rem jurisdiction in a civil forfeiture case. *Id.* But the district court nevertheless lacked in rem jurisdiction, and thus "it did

not . . . have the power to enter an adjudication determining that the government's right to the res was superior to all potential claimants." *Id.* at 984.

In sum, although Nasri can raise or forfeit his own rights, he cannot raise or forfeit rights of others. Neither forfeiture nor the party presentation principle thus prevents us from addressing the fundamental and dispositive jurisdictional question at issue in this case. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (holding that a court does not "stray beyond its constitutional or prudential boundaries" by addressing "an issue antecedent to and ultimately dispositive of the dispute before it, even an issue the parties fail[ed] to identify and brief" (citation modified)).

### A. Historically, in rem jurisdiction required seizure or constructive control over the property.

In rem jurisdiction allows parties to file actions and courts to enter judgments against property. *United States v. Ten Thousand Dollars ($10,000.00) in U.S. Currency*, 860 F.2d 1511, 1513 (9th Cir. 1988). When exercising in rem jurisdiction, a court can exercise control over the defendant property itself regardless of whether the property owner has ties to the forum. *See Shaffer v. Heitner*, 433 U.S. 186, 205 (1977). This is because, for most of American legal history, the basis for in rem jurisdiction has been "the presence of the subject property within the territorial jurisdiction of the forum state." *Hanson v. Denckla*, 357 U.S. 235, 246 (1958); *see Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 722 (1877) ("[E]very State possesses exclusive jurisdiction and sovereignty over persons and property within its territory."). The property's presence in the forum ensured that the court had exclusive power to adjudicate rights to the property.

*Hanson*, 357 U.S. at 246–47. In circumstances where the property cannot be seized, such as actions against real or intangible property, courts have found constructive possession sufficient to establish in rem jurisdiction. *Miller v. United States*, 78 U.S. 268, 296 (1870) ("An assertion of control, with a present power and intent to exercise it, is sufficient."); *Tyler v. Defrees*, 78 U.S. 331, 349 (1870) (writ of attachment for real estate).

The Supreme Court has repeatedly held that when a sovereign fails to secure property in an in rem proceeding, the resulting judgment is void. *See Cooper v. Reynolds*, 77 U.S. (10 Wall.) 308, 319 (1870) ("[T]he seizure of the property . . . is the one essential requisite to jurisdiction, as it unquestionably is in proceedings purely in rem. Without this the court can proceed no further." (citation modified)); *Scott*, 154 U.S. at 46 ("[A] judgment in proceedings strictly in rem . . . . is wholly void if a fact essential to the jurisdiction of the court did not exist."); *Elliott v. Peirsol's Lessee*, 26 U.S. (1 Pet.) 328, 340 (1828) ("Where a Court has jurisdiction, it has a right to decide every question which occurs in the cause . . . . But, if it act[s] without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void."); *Hanson*, 357 U.S. at 249–50. Its precedent is clear that when courts act without authority over property, the resulting judgment is void and violates due process.[2] *Hanson*, 357 U.S. at 250.

[2] The dissent minimizes the applicability of these cases because they predated the civil forfeiture statute, 28 U.S.C. § 1355, and do not address civil forfeiture actions against assets in a foreign country. Dissent at 116–118. The dissent's criticism highlights the very reason these cases are instructive. They illustrate the longstanding requirements for in rem

These jurisdictional rules were initially matters of state law. *Id.* at 249–50. But shortly after the passage of the Fourteenth Amendment, the Supreme Court clarified that the rules were tethered to the Constitution's Due Process Clause. *Pennoyer*, 95 U.S. (5 Otto) at 736–37; *Hanson*, 357 U.S. at 249–50. In *Pennoyer*, the Court explained that the exercise of jurisdiction upon persons over whom a court has no power violates due process. 95 U.S. (5 Otto) at 733. Decades later, in *Hanson v. Denckla*, the Supreme Court confirmed the same principle applies to in rem jurisdiction.[3] 357 U.S. at 250 ("Since a State is forbidden to enter a judgment attempting to bind a person over whom it has no jurisdiction, it has even less right to enter a judgment purporting to extinguish the interest of such a person in property over which the court has no jurisdiction.").

In the several decades following *Pennoyer*, the Supreme Court expanded in personam jurisdiction, first holding due process was satisfied so long as the individual had minimum contacts with the forum state. *Int'l Shoe Co. v. State of*

---

jurisdiction, which, as we explain below, courts appear to have abandoned after the § 1355 amendments without analyzing the constitutional implications.

[3] *Hanson* invoked the Fourteenth Amendment's Due Process Clause, whereas Nasri's case invokes the Fifth Amendment's Due Process Clause. The government insists that this distinction matters, but we are not persuaded. To be sure, the Supreme Court has held that in an in personam case, the Fifth Amendment imposes a "more flexible jurisdictional inquiry" than the Fourteenth Amendment. *Fuld*, 606 U.S. at 16. But the Court has never drawn this distinction in the in rem context. To the extent the Fifth Amendment Due Process Clause instead requires us to apply this "flexible" standard or analyze the "reasonableness" of the assertion of jurisdiction, as we explain below, the assertion of in rem jurisdiction without control or constructive control over the property does not satisfy either standard.

Case: 22-55685, 01/08/2026, ID: 12959160, DktEntry: 80, Page 38 of 152



*Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945). Then, in *Shaffer v. Heitner*, the Supreme Court expanded that rationale to quasi in rem cases, holding that quasi in rem jurisdiction—which really amounts to an exercise of jurisdiction over a person's interest in property—also requires a showing of minimum contacts. 433 U.S. at 212. And more recently, the Supreme Court held that an even "more flexible" test than the Fourteenth Amendment's minimum contacts test applies when evaluating personal jurisdiction—at least in personam—under the Fifth Amendment. *Fuld*, 606 U.S. at 16. But none of these developments disturb the requirements for in rem jurisdiction. In fact, in *Shaffer*, the court noted that although in personam jurisdiction had been expanded significantly since *Pennoyer*, "[n]o equally dramatic change ha[d] occurred in the law governing jurisdiction in rem." 433 U.S. at 205.

Against this backdrop, we turn to civil forfeiture cases. The Supreme Court has long recognized that civil forfeiture actions are in rem proceedings. *The Palmyra*, 25 U.S. (12 Wheat.) 1, 12–13 (1827); *see also United States v. Bajakajian*, 524 U.S. 321, 330 (1998) ("The theory behind such forfeitures was the fiction that the action was directed against 'guilty property,' rather than against the offender himself."). And, as with all in rem proceedings, the Court requires control or constructive control over the defendant property. *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 87 (1992) ("[T]he court must have actual or constructive control of the res when an in rem forfeiture suit is initiated." (citation modified)); *Ten Thousand Dollars*, 860 F.2d at 1513 ("A forfeiture action is in rem. . . . [T]he court's jurisdiction is predicated on its control over an item of property or *res*." (citation modified)). In the past three

decades, however, courts interpreting civil forfeiture statutes have often overlooked this essential constitutional requirement.

### B. Recently, courts have conducted strict textual analyses of the civil forfeiture statute without considering fundamental due process principles.

The government may bring civil forfeiture actions pursuant to several statutes. *See* 28 U.S.C. § 1355; 21 U.S.C. § 881. The statute used by the government here to bring an action against Nasri's assets is 28 U.S.C. § 1355. Prior to 1992, the statute "simply provided that district courts had subject matter jurisdiction over forfeiture proceedings." *United States v. All Funds on Deposit in Any Accts. Maintained in the Names of Meza or De Castro* ("*Meza*"), 63 F.3d 148, 151 (2d Cir. 1995). In 1992, Congress amended the statute to make it easier to bring civil forfeiture actions by providing for nationwide venue and service of process. In its current form, the statute provides:

> **(a)** The district courts shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress, except matters within the jurisdiction of the Court of International Trade under section 1582 of this title.
>
> **(b)(1)** A forfeiture action or proceeding may be brought in—
>
> **(A)** the district court for the district in which any of the acts or omissions

giving rise to the forfeiture occurred, or

**(B)** any other district where venue for the forfeiture action or proceeding is specifically provided for in section 1395 of this title or any other statute.

**(2)** Whenever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought as provided in paragraph (1), or in the United States District court for the District of Columbia.

28 U.S.C. § 1355.

Section 1355(a) establishes subject matter jurisdiction over forfeiture actions. *Id.* § 1355(a). Section 1355(b) addresses where such an action may be brought, and § 1355(b)(2) contemplates the circumstances presented here. On its face, § 1355(b) does not make clear whether it establishes venue, personal (in rem) jurisdiction, subject matter jurisdiction, or some combination thereof.

Several circuits have interpreted § 1355, but none squarely addresses whether the statutory language comports with the fundamental due process requirements of in rem jurisdiction. The Second Circuit comes the closest, finding that the statute requires constructive control because Congress did not intend to override well-settled

requirements of in rem jurisdiction. *Meza*, 63 F.3d at 152. But other circuits, including ours, engage in only a rote statutory analysis without considering the constitutional requirements of in rem jurisdiction. Notably, those decisions do not address the constitutional question presented here.

To be sure, only the Second Circuit interpreted § 1355 in harmony with traditional in rem principles. *Id.* The question in *Meza* was whether Congress's amendments to § 1355 eliminated the requirement to establish in rem jurisdiction because the statute provided for subject matter jurisdiction and venue. *Id.* at 151. The court held that the control or constructive control requirement must survive Congress's amendment to the statute, despite the statute's silence on the issue. *Id.* at 152. It explained that "[a]lthough Congress certainly intended to streamline civil forfeiture proceedings by amending § 1355, . . . we do not believe that Congress intended to fundamentally alter well-settled law regarding in rem jurisdiction." *Id.* (citation modified).

Other circuits that have considered § 1355, including ours, do not address the constitutional issue. Rather, they engage in a purely textual interpretation of the statute. *See United States v. Approximately $1.67 Million (US) in Cash, Stock and Other Valuable Assets Held by or at: 1) Total Aviation LDT.*, 513 F.3d 991, 996–98 (9th Cir. 2008); *United States v. All Funds in Acct. Nos. 747.034/278, 747.009/278, & 747.714/278 Banco Espanol de Credito, Spain* (*Banco Espanol*), 295 F.3d 23, 26 (D.C. Cir. 2002); *Contents of Acct. No. 03001288 v. United States*, 344 F.3d 399, 403–05 (3d Cir. 2003).

Indeed, in *$1.67 Million*, we held that the statute did not require control or constructive control over the property at issue in the civil forfeiture action. 513 F.3d at 996–98. But,

Case: 22-55685, 01/08/2026, ID: 12959150, DktEntry: 80, Page 42 of 152



notably, the parties did not raise, and we did not consider, whether such a rule comports with the constitutional requirements of in rem jurisdiction. In that case, the United States sought to recover the claimant's assets in the Cayman Islands and obtained an order from the Grand Court of the Cayman Islands freezing the funds. *Id.* at 995. When the claimant challenged the district court's jurisdiction over the forfeiture proceeding, the district court held that the Cayman's cooperation was sufficient to give the court "constructive control" over the assets. *Id.* On appeal, both the claimant and the government argued that the statutory text does not require "constructive control." Thus, the issue was not in dispute. We assumed the parties' interpretation of the statutory text and adopted the government's theory that § 1355(b)(2) alone provided the court with jurisdiction over the accounts. *Id.* at 996–98. In doing so, we explained that the statute provides for personal jurisdiction—rather than merely subject matter jurisdiction and venue—and the statute requires only that the government show an act or omission giving rise to the forfeiture occurred in the district. *Id.*; 28 U.S.C. § 1355(b)(1), (2). But again, our analysis and holding did not grapple with the constitutional requirements of in rem jurisdiction.

In subsequent cases, we repeated *$1.67 Million*'s holding, which was nothing more than an interpretation of the statute's text, without so much as a mention of the fundamental due process principles of in rem jurisdiction. In *United States v. Obaid*, for example, we noted that the statutory text of § 1355(b)(2) gives federal courts jurisdiction in forfeiture actions over property even if the

property is located in a foreign country.[4] 971 F.3d at 1102. And more recently, we conclusively held that § 1355(b)(2) "relaxed" traditional in rem jurisdiction requirements and that "[r]ead together, . . . *$1.67 Million* and *Obaid* establish that a district court has in rem jurisdiction over property not within its actual or constructive control, even when it lacks personal jurisdiction over the property's owner." *United States v. PetroSaudi Oil Servs. (Venezuela) Ltd.*, 70 F.4th 1199, 1210 (9th Cir. 2023) (citation modified).

But critically, in each of these cases, we did not address whether such an exercise of in rem jurisdiction comports with due process. *See, e.g.*, *$1.67 Million*, 513 F.3d at 996. The dissent asserts that the *$1.67 Million* panel "reasoned that constitutional due process does not impose any requirement of actual or constructive control." Dissent at 99. But *$1.67 Million* did not provide any reasoning about constitutional due process requirements related to in rem jurisdiction. Neither party argued that exercising jurisdiction over the proceeds violated due process. Both parties believed that the district court's conclusion that it constructively controlled the assets was irrelevant, focusing only on the plain text of 28 U.S.C. § 1355. *$1.67 Million*, 513 F.3d at 996. We thus reject the notion that *$1.67 Million* implicitly answered a constitutional question that was neither raised by the parties nor addressed in the court's reasoning. *See Tate v. United States*, 982 F.3d 1226, 1227–28 (9th Cir. 2020)

---

[4] In *Obaid*, we addressed a different constitutional question—whether the court was required to determine that the claimant had minimum contacts with the forum to exercise jurisdiction over the claimant's property. 971 F.3d at 1098. We held that the district court was not required to have minimum contacts with the claimant in an in rem suit. *Id.* at 1103–05. Although Nasri asks us to revisit this question, we have no authority to do so.

(per curiam) (explaining that a court announces a "statutory, rather than a constitutional, rule," when it "fram[es] its inquiry as 'a question of congressional intent'" (quoting *Rehaif v. United States*, 588 U.S. 225, 228 (2019))). And this case squarely presents the question our prior cases neither considered nor answered: does exercising in rem jurisdiction over foreign property without establishing control or constructive control over the property violate the Due Process Clause?

**C. The Fifth Amendment's Due Process Clause requires a court to have control or constructive control over property in a forfeiture action to establish in rem jurisdiction.**

The development of our case law in civil forfeiture actions has led to a constitutionally untenable result. Although civil forfeiture actions brought pursuant to 28 U.S.C. § 1355 are called "in rem" actions, they bear little resemblance to true in rem proceedings. That is, the court has not seized the property, nor has it engaged in any analysis of its constructive control over the property. Whether we apply the historical in rem principles or the Supreme Court's more recent "flexible" jurisdictional inquiry, we arrive at the same conclusion: this arrangement violates the Due Process Clause.

For starters, when the court has not seized or constructively seized the property, the interested parties lack sufficient notice. Notice is particularly important in an in rem suit because it is an action "against the world" to determine title to the property. *See* 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 1070 n.18 (4th ed. 2023). When property is seized for an in rem action, theoretically anyone who claims an interest in the

property will realize that someone else is currently possessing the property until the question of title is resolved. *See Greene v. Lindsey*, 456 U.S. 444, 452 (1982); *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 316 (1950). And if property is not capable of being seized, proper notice requires personal notice to known claimants and publication to the world. *See* Fed. R. Civ. P. Supp. R. G(4); *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 796 n.3 (1983) ("Our cases have required the State to make efforts to provide actual notice to all interested parties.").

The government argues that when the United States moves to forfeit property, due process requires only that potential claimants receive notice and an opportunity to be heard. This argument turns the inquiry inside out. Notice does not, as the government suggests, exempt courts from complying with the fundamental in rem jurisdiction requirements. Instead, compliance with the fundamental requirements ensures proper notice. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 57–58 (1993) ("[I]n order to institute and perfect proceedings in rem, [the property] should be actually or constructively within the reach of the Court. . . . In the case of real property, the res may be brought within the reach of the court simply by posting notice on the property and leaving a copy of the process with the occupant." (citation modified)). In other words, notice is the touchstone of due process in in rem proceedings, and constructive control has long been the notice required by the Constitution.

Here, the scope of the notice provided by the government is unclear. The government did not serve Nasri personally, and understandably so, because he is a fugitive. Absent personal service, however, seizing the account is the best way to put potential claimants on notice of the action. And

although Nasri received actual notice, we do not know whether other potential claimants received notice of the action.[5] In its motion to strike, the government asserted that it "published notice" sufficient to satisfy due process. But without seizure of the property or further information about the published notice, we cannot evaluate whether the notice was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Mullane*, 339 U.S. at 314.

Applying the traditional in rem jurisdiction requirements also prevents an "unbounded" exercise of personal jurisdiction. *See Fuld*, 606 U.S. at 18. In *Fuld*, the Court declined to adopt the petitioners' argument that "the Fifth Amendment imposes no territorial limits on personal jurisdiction." *Id.* (citation modified). There, the government acknowledged that "the theory is not easily confirmed as a historical matter," nor should the Court accept it as a matter of policy. *Id.* We thus conclude that the Fifth Amendment imposes some "limits on the territorial jurisdiction of the federal courts." *Id.* at 19. But without control or constructive control over the property, the court's jurisdiction is virtually unbounded. Indeed, at oral argument, the government maintained that the statute allows a federal court to adjudicate title to foreign property—such as a private manufacturing plant—located in another country over which it has no control, authority, or access merely because the government filed a civil forfeiture action. Such an exercise

[5] The dissent focuses on whether Nasri received proper notice. But since an in rem action is an action "against the world," we are concerned with more than the notice provided to Nasri. *See* Wright & Miller, *supra*, § 1070.

of "in rem" jurisdiction is contrary to our most fundamental principles of due process.

The government asks us to abandon these longstanding principles. In its view, *Fuld* requires us to apply a more "flexible" test under the Fifth Amendment. At the outset, we note that *Fuld* may not apply to this case at all because *Fuld* involved an in personam case, not an in rem case. 606 U.S. at 5. As explained above, the Supreme Court has recognized that despite changes to the in personam jurisdiction analysis, no similar change in law has occurred "governing jurisdiction in rem." *Shaffer*, 433 U.S. at 205. And our court has declined to map the in personam requirements onto in rem cases. *See Obaid*, 971 F.3d at 1098. But to the extent *Fuld*'s approach applies, it only reinforces our conclusion.

In *Fuld*, the Supreme Court considered whether the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA") violates the Fifth Amendment's Due Process Clause. 606 U.S. at 6–7. The PSJVTA allows American victims of terrorism to bring an action against the perpetrators for civil damages. 18 U.S.C. § 2334(e)(1), (5). The Act deems the Palestine Liberation Organization ("PLO") and Palestinian Authority ("PA") to have consented to personal jurisdiction in such an action in two circumstances: if the PLO or PA makes payments to imprisoned terrorists or their families, or when either organization maintains an office in the United States (other than at the United Nations). 18 U.S.C. § 2334(e)(1), (5); *Fuld*, 606 U.S. at 9. The Court held that the PSJVTA's jurisdictional requirements satisfied the Due Process Clause for three reasons, none of which apply to § 1355, the statute at issue here.

First, the Court held that the PSJVTA satisfies due process requirements because it "reflects the political branches' balanced judgment of competing concerns over sensitive and weighty interests of national security and foreign affairs." *Id.* at 20 (citation modified). The PSJVTA applies to a subset of cases that necessarily implicate national security and foreign affairs interests. *See id.* The civil forfeiture statute, on the other hand, is a general statute that applies broadly to domestic and foreign forfeitures alike. *See* 28 U.S.C. § 1355.

Second, the PSJVTA is "suitably limited to achieving" its specific foreign affairs goals. *Fuld*, 606 U.S. at 20. The Court highlighted that the Act applies only to "a narrow category of claims that provide civil remedies only for Americans injured by acts of international terrorism." *Id.* The civil forfeiture statute is not similarly limited or focused. Instead, it provides for jurisdiction over actions involving "any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress." 28 U.S.C. § 1355(a). This is a far cry from the narrow category of cases—claims under the Anti-terrorism Act for Americans injured by acts of international terrorism—covered by the PSJVTA.[6]

[6] The dissent insists that this category of cases is "suitably limited" to achieving Congress's foreign policy goals because the government may only forfeit "proceeds [of a crime], contraband, [or] property that has played a part in the commission of a crime." Dissent at 108–109. We fail to see how this is a meaningful limitation. Requiring only that property "has played a part in the commission of a crime" creates an expansive, rather than narrow, category of claims that fall within § 1355's ambit. Indeed, according to the most recent Asset Forfeiture Fund Report to Congress, the government forfeited nearly $2 billion of assets in 2025. *See* U.S. Dep't of Just., Assets Forfeiture Fund and Seized Asset Deposit

And third, the PSJVTA triggers jurisdiction only in "narrow" circumstances and implicates only "two enumerated nonsovereign foreign entities, both of which have been subject to a series of congressional enactments aimed at deterring terrorism." *Fuld*, 606 U.S. at 21. In other words, the statute gives two specific entities notice of the actions they might take that would trigger personal jurisdiction in the United States. *See id.*; 18 U.S.C. § 2334(e). By contrast, the civil forfeiture statute triggers jurisdiction anytime property is "subject to forfeiture" and "located in a foreign country." 28 U.S.C. § 1355(b)(2). Rather than representing the "targeted" exercise of jurisdiction that *Fuld* endorses, the civil forfeiture statute enables the "unbounded" exercise of jurisdiction that *Fuld* declined to adopt. *See* 606 U.S. at 18, 21–22.[7]

---

Fund Method of Disposition of Forfeited Property (FY 2025), https://www.justice.gov/afp/fy2025-asset-forfeiture-fund-reports-congress [https://perma.cc/4JMP-KW6U]. Contrast this sweeping category with the narrow category of claims covered by the PSJVTA—Antiterrorism Act claims for Americans injured or killed by acts of international terrorism. *Fuld*, 606 U.S. at 20. To the extent the dissent suggests that whether the jurisdictional provision covers a narrow category of claims is irrelevant to this inquiry, *Fuld* says otherwise. *See id.* at 20–21 (concluding the PSJVTA is "suitably limited" to Congress's foreign policy objectives because it "applies only to . . . a narrow category of claims" and "[i]t is permissible for the Federal Government to craft a narrow jurisdictional provision").

[7] *Fuld* expressly declined to decide whether a "reasonableness" test applies in personal jurisdiction cases under the Fifth Amendment's Due Process Clause. 606 U.S. at 23–24. Even if we were to adopt some kind of "reasonableness" test here, we would conclude that the exercise of in rem jurisdiction without control or constructive control is unreasonable in light of "the burden on the defendant, the interests of the forum State,

In sum, each factor weighing in favor of concluding that the statute satisfied due process in *Fuld* weighs against it here. The district court here purports to exercise in rem jurisdiction over property located abroad, over which it apparently has no connection, possession, or control. Under our traditional principles of in rem jurisdiction, this scheme violates the Due Process Clause. And the scheme fares no better under *Fuld*'s more flexible approach. Thus, to avoid "transgress[ing] . . . the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts," *see id.* at 19, a court must conclude it has control or constructive control over the property the government seeks to forfeit in order to properly assert in rem jurisdiction.

**D. The district court must evaluate control or constructive control on remand.**

The district court expressly declined to evaluate whether it had control or constructive control over the assets. Although the government argued in its motion to strike that the assets are subject to a temporary restraining order, the terms of that order and the extent to which Liechtenstein is willing to assist the United States government remain unclear. We thus remand for the district court to assess in the first instance whether the court has control or constructive control over the assets to assert in rem jurisdiction in accordance with due process principles.

We find instructive the analysis undertaken by the Second Circuit when engaging in this inquiry. In *Meza*, for example, the Second Circuit held that the district court had

---

and the plaintiff's interest in obtaining relief." *Id.* (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987)) (citation modified).

constructive control over funds abroad based on (1) a restraining order "issued solely because of a request from federal authorities," (2) a foreign court judgment affirming the restraining order, and (3) "the general cooperation of the [foreign] authorities with respect to the funds." 63 F.3d at 153. It also rejected the argument that the district court lacked any degree of control because the foreign government was not legally bound to remit the funds to the United States. *Id.* We agree that a binding obligation under a treaty or foreign law is not required to establish control or constructive control. Instead, as the *Meza* court put it, constructive control exists if the foreign government "act[s] essentially as an agent of the United States for purposes of th[e] forfeiture action." *Id.* at 154. If the district court concludes that the United States has received sufficient assurances and cooperation from Liechtenstein to constitute constructive control over the assets, it may exercise in rem jurisdiction without running afoul of the Due Process Clause. If not, the action must be dismissed.[8]

## Conclusion

For the foregoing reasons, we hold that the district court's exercise of in rem jurisdiction without finding that it has control or constructive control over the defendant property violates the Fifth Amendment's Due Process Clause.

**VACATED and REMANDED.**

[8] Nasri also challenges several aspects of the fugitive disentitlement statute, but we need not reach those challenges because the district court must first determine whether it can exercise in rem jurisdiction over the assets consistent with the Due Process Clause.

BYBEE, Circuit Judge, concurring:

Younes Nasri—a Canadian citizen now residing in exile in Dubai—is a fugitive from U.S. justice. According to the government's complaint, Nasri accrued nearly $1.2 million in proceeds traceable to illegal exchanges for controlled substances in the Southern District of California. When Nasri refused to submit to U.S. jurisdiction following his indictment on conspiracy charges, the government sought forfeiture of the $1.2 million pursuant to 21 U.S.C. § 881(a)(6), which provides that "[a]ll moneys . . . furnished by any person in exchange for a controlled substance . . . [and] all proceeds traceable to such an exchange" are forfeitable to the United States. The problem: the money is in bank accounts in Liechtenstein, not the United States. But 28 U.S.C. § 1355(b)(2) provides that, "[w]henever property subject to forfeiture under the laws of the United States is located in a foreign country . . . an action or proceeding for forfeiture may be brought" in the district in which the acts giving rise to the forfeiture occurred. Relying on our court's previous construction of § 1355, the district court affirmed its jurisdiction over the $1.2 million because § 1355 "does not require the government to establish constructive control of the proceeds to sustain jurisdiction." *United States v. $1,152,366.18 in Funds from Bendura Bank AG*, No. 21-CV-1134, 2022 WL 2373356, at *5 (S.D. Cal. June 30, 2022) (citation omitted).

And therein lies the problem. An action in forfeiture is an action *in rem*, and "seizure of the res has long been considered a prerequisite to the initiation of *in rem* forfeiture proceedings." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 57 (1993). The forfeiture action before us is nominally an *in rem* proceeding, but it is

unrecognizable as such in several material respects. The United States is proceeding *in rem* against property that it does not possess. That is contrary to well-established principles of general law. As Chief Justice Marshall opined while riding circuit, in an *in rem* action, "possession of the thing is necessary, as a foundation for the jurisdiction of the court . . . . There must be seizure to vest the jurisdiction." *The Little Charles*, 26 F. Cas. 979, 982 (Marshall, Circuit Justice, C.C.D. Va. 1818) (No. 15,612).

Proceeding *eo nominee in rem*, but without the property itself, creates two immediate problems. First, as Judge Desai's opinion for the majority demonstrates, it violates the Fifth Amendment's Due Process Clause. Because an action *in rem* determines title against the whole world, constitutionally adequate notice of such an action requires seizure or constructive control of the property. I join that opinion in full. Second, because the United States does not hold the property, the proceeding is premature and nonjusticiable. Without seizing the property, or, at the least, constructive control of the property, the district court lacks *in rem* jurisdiction and, thus, no way to guarantee the enforcement of its judgment; its opinion is advisory. Whether we label this a "ripeness," "advisory opinion," or "redressability" problem, the point is that we have vitiated Article III's case-or-controversy requirement.[1]

---

[1] Although I believe this case may be nonjusticiable for reasons I explain in Part I, I join the majority opinion because it correctly identifies a defect in the assertion of personal jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[A] court may dismiss for lack of personal jurisdiction without first establishing subject-matter jurisdiction."); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S.

Case: 22-55685, 01/08/2026, ID: 12957150, DktEntry: 80, Page 54 of 152



In Part I, I explain my view as to why the case before us is nonjusticiable until the United States seizes or controls the defendant property, and I consider potential solutions to our current quandary. In Part II, I recount how our circuit—like several others—has abandoned first principles of personal jurisdiction through our interpretation of § 1355, and I offer an interpretive solution that would realign the statute with the general-law rules of *in rem* jurisdiction.

I

As federal courts, we have the power to decide "Cases" and "Controversies." *See* U.S. Const. art. III, § 2. "The fundamentals" of Article III's limits on federal court jurisdiction "are well-known and firmly rooted in American constitutional law." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). I start in Part I.A by describing the interlocking justiciability doctrines at issue here, including ripeness, the prohibition on issuing advisory opinions, and redressability. I explain in Part I.B why an *in rem* forfeiture proceeding is nonjusticiable until the government has seized or controlled the defendant property. I conclude in Part I.C by offering some potential legislative solutions to these Article III problems.

A. *First Principles of Justiciability*

Article III's case-or-controversy requirement is an indispensable thread in the fabric of separation of powers. Indeed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to

574, 584 (1999) ("Personal jurisdiction, too, is an essential element of the jurisdiction of a district . . . court, without which the court is powerless to proceed to an adjudication." (cleaned up)).

actual cases or controversies." *All. for Hippocratic Med.*, 602 U.S. at 397 (quoting *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976)); *see also Allen v. Wright*, 468 U.S. 737, 750 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Discerning the justiciability of a dispute is no easy task; the "words ['Cases' and 'Controversies'] have an iceberg quality, containing beneath their surface . . . complexities which go to the very heart of our constitutional form of government. . . . Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine." *Flast v. Cohen*, 392 U.S. 83, 94–95 (1968).

"Justiciability is itself a concept of uncertain meaning and scope." *Id.* at 95. It is "not a legal concept with a fixed content," *Poe v. Ullman*, 367 U.S. 497, 508 (1961), nor is it "susceptible of scientific verification," *id.*, or "precise definition," *Allen*, 468 U.S. at 751. But we are hardly adrift. To illustrate the outer limits of the judicial power, the Supreme Court has disaggregated the case-or-controversy requirement into several familiar doctrines, such as standing, ripeness, the prohibition against advisory opinions, the political question doctrine, and so on. Those doctrines help ensure that "some meaningful form can be given to the jurisdictional limitations placed on federal court power," *Flast*, 392 U.S. at 99, by laying down "clarifying principles or even clear rules" from which courts can draw as they face new questions, *Allen*, 468 U.S. at 752. Helpful as they are, those doctrines present only part of the picture. *See Flast*,

392 U.S. at 95. Each doctrine is at best a metonym for the broader requirement of Article III justiciability:

> All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.

*Allen*, 468 U.S. at 750 (quoting *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178–79 (D.C. Cir. 1983) (Bork, J., concurring)). The heart of justiciability turns on "the appropriateness of the issues for decision" by federal courts. *Poe*, 367 U.S. at 509. That bedrock principle remains operative notwithstanding the particular label we ascribe to a nonjusticiable case. Whether we dismiss a case on standing or ripeness grounds, for instance, matters less than the bottom-line conclusion that the case is inappropriate as a constitutional matter for resolution by a federal court.

At least three interrelated justiciability doctrines are relevant here: ripeness, the prohibition against advisory opinions, and the redressability prong of standing. Whether this dispute falls neatly within one of those doctrines or whether those doctrines analogically suggest that this dispute is constitutionally inappropriate for decision by this court, my conclusion is the same—the dispute before us is not justiciable.

The doctrine of ripeness "ensure[s] that courts adjudicate live cases or controversies and do not 'issue advisory opinions.'" *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1153 (9th Cir. 2017) (citation omitted). "'[T]hrough avoidance of premature adjudication,' the ripeness doctrine prevents courts from becoming entangled in 'abstract disagreements.'" *Wolfson v. Brammer*, 616 F.3d 1045, 1057 (9th Cir. 2010) (alteration in original) (citation omitted). Ripeness has both constitutional and prudential dimensions. *See id.* at 1058. In applying the constitutional dimension of the ripeness inquiry, we have reminded ourselves that "the Constitution mandates that prior to our exercise of jurisdiction . . . the issues presented are 'definite and concrete, not hypothetical or abstract.'" *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (citation omitted). But even when the issues are definite and concrete, the doctrine of prudential ripeness may counsel against immediate resolution of the case. In making that assessment, we consider "the fitness of the issues for judicial decision," as well as "the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Even if the question at bar is a purely legal one, we may stay our hands when "further factual development would 'significantly advance our ability to deal with the legal issues presented.'" *Id.* at 812 (citation omitted).

"[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." *Flast*, 392 U.S. at 96 (citation omitted). Though it has some prudential benefits, "the rule against advisory opinions implements the separation of powers prescribed by the Constitution and confines federal courts to the role assigned them by Article III." *Id.* As a consequence,

we may not issue judgments that are "subject to revision by some other and more authoritative agency." *Nashville, Chattanooga & St. Louis Ry. v. Wallace*, 288 U.S. 249, 262 (1933). Instead, our judgments must be "binding and conclusive on the parties." *Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 114 (1948). We have reiterated that "to present a justiciable dispute rather than a request for an advisory opinion . . . . the court must be empowered to issue a decision that serves as more than an advisement or recommendation." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 925 F.3d 1041, 1047–48 (9th Cir. 2019).

The doctrine of redressability also safeguards against the hasty issuance of an advisory opinion. To carry its burden of establishing redressability, a plaintiff must demonstrate "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (citation omitted). A "merely 'speculative'" possibility of redress will not suffice. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Simon*, 426 U.S. at 43). "In adhering to th[e] core principle" that the injury must be redressable in federal court, we are to "examine[] history and tradition . . . as a meaningful guide to the types of cases that Article III empowers federal courts to consider." *United States v. Texas*, 599 U.S. 670, 676–77 (2023) (citation and quotation marks omitted). Importantly, we have found redressability lacking when "any prospective benefits depend on an independent actor who retains broad and legitimate discretion the courts cannot presume either to control or predict." *Mayfield v. United States*, 599 F.3d 964, 972 (9th Cir. 2010) (citation omitted).

B. *Whether Nasri's Case Is Justiciable*

The "clarifying principles" espoused by the justiciability doctrines, *Allen*, 468 U.S. at 752, lead me to conclude that civil asset forfeiture proceedings are nonjusticiable when the district court purporting to exercise *in rem* jurisdiction has neither seized nor meaningfully controlled the property.

To start, an *in rem* proceeding is not ripe for adjudication until the executive branch has seized or exercised control over the property. The basis for *in rem* jurisdiction has historically been the court's physical control of property located within its boundaries. *See James Daniel Good*, 510 U.S. at 57 (explaining that in cases involving "the forfeiture of vessels and other movable personal property," a "seizure of the res . . . [was] a prerequisite to the initiation of *in rem* forfeiture proceedings"). As the Court opined in *Dobbins's Distillery v. United States*, "[j]udicial proceedings *in rem*, to enforce a forfeiture, cannot in general be properly instituted until the property inculpated is previously seized by the executive authority, as it is the preliminary seizure of the property that brings the same within the reach of such legal process." 96 U.S. (6 Otto) 395, 396 (1877). Justice Story, writing for the Court in *The Brig Ann*, emphasized that, to "enforce a right of forfeiture which can alone be decided by a judicial decree *in rem*," "it is necessary that the thing should be actually or constructively within the reach of the Court." 13 U.S. (9 Cranch) 289, 291 (1815); *see also*, *e.g.*, *The Rio Grande*, 90 U.S. (23 Wall.) 458, 463 (1874) ("When the vessel was seized by the order of the court and brought within its control the jurisdiction was complete."); *Taylor v. Carryl*, 61 U.S. (20 How.) 583, 599 (1857) ("[T]o give jurisdiction *in rem*, there must have been a valid seizure and an actual control of the ship by the marshal of the court . . . ."); *Keene v. United States*, 9 U.S. (5 Cranch) 304,

310 (1809) ("[N]othing more is necessary to give jurisdiction in cases of this nature, than that the seizure should be within the district . . . ."). Chief Justice Marshall, sitting by designation as Circuit Justice, elaborated, "That possession of the thing is necessary, as a foundation for the jurisdiction of the court, is, in general, true. There must be seizure to vest the jurisdiction." *The Little Charles*, 26 F. Cas. at 982.

Proceeding *in rem* but before a seizure of the property therefore renders the case unripe and the court's judgment merely advisory. *See United States v. Batato*, 833 F.3d 413, 435–40 (4th Cir. 2016) (Floyd, J., dissenting). If the court does not control the property, it has no mechanism by which it can enforce its *in rem* judgment against the world. *See Gelston v. Hoyt*, 16 U.S. (3 Wheat.) 246, 313 (1818) (Story, J.) ("If its decree were not binding upon all the world upon the points which it professes to decide, the consequences would be most mischievous to the public."). "Because the *res* is a party and because the judgment purports to adjudicate rights in the *res* binding against the whole world, control of the *res* is the *sine qua non* of *in rem* actions." *Batato*, 833 F.3d at 439 (Floyd, J., dissenting). That is why the Supreme Court has repeatedly held that when a sovereign fails to secure the property in an *in rem* proceeding, the judgment is void *ab initio*, not merely voidable. *See Scott v. McNeal*, 154 U.S. 34, 46 (1894) ("[A] judgment in proceedings strictly *in rem* . . . . is wholly void if a fact essential to the jurisdiction of the court did not exist."); *Windsor v. McVeigh*, 93 U.S. (3 Otto) 274, 282 (1876) ("The judgments mentioned, given in the cases supposed, would not be merely erroneous: they would be absolutely void; because the court in rendering them would transcend the limits of its authority in those cases."); *Cooper v. Reynolds*,

77 U.S. (10 Wall.) 308, 319 (1870) ("[T]he seizure of the property . . . is the one essential requisite to jurisdiction, as it unquestionably is in the proceedings purely *in rem*. Without this the court can proceed no further . . . ."); *Elliott v. Peirsol's Lessee*, 26 U.S. (1 Pet.) 328, 340 (1828) ("Where a Court has jurisdiction, it has a right to decide every question which occurs in the cause . . . . But, if it act without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void . . . ."); *see also Hanson v. Denckla*, 357 U.S. 235, 249–50 (1958); *Voorhees v. Jackson, ex rel. Bank of the United States*, 35 U.S. (10 Pet.) 449, 477 (1836).[2]

[2] We are accustomed to thinking that personal jurisdiction can be waived such that a judgment rendered without proper jurisdiction is voidable, but not void. *See* Fed. R. Civ. P. 12(h); *see also Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704 (1982) ("In sum, the requirement of personal jurisdiction may be intentionally waived, or for various reasons a defendant may be estopped from raising the issue."). That logic holds for jurisdiction *in personam* or *quasi in rem*. In those instances, the defendants are a limited, identifiable group who may waive their own rights. An *in rem* proceeding, however, is to settle property rights against the world.

In this case, who would have the right to waive *in rem* jurisdiction? Not Nasri. Even if he wished to waive his own rights, Nasri has no privilege to waive the rights of the rest of the world. Indeed, Judge Bennett acknowledges that Nasri would not have standing to raise the objections of others. *See* Dissenting Op. at 124 (quoting *United States v. Raines*, 362 U.S. 17, 21–22 (1960)). This points to why Judge Bennett's repeated statement that Nasri received actual notice, *see id.* at 78, 83, 87, 120, 123–24, is irrelevant. In an *in rem* proceeding, notice to Nasri is a necessary but not a sufficient condition. Nasri is not the only person who may have an interest in the funds held by Liechtenstein.

For that reason, an *in rem* judgment issued without a prior seizure of the property violates the redressability doctrine. The Supreme Court historically acknowledged that a court's *in rem* jurisdiction based on constructive control alone was defective if the court was unlikely to be able to enforce the judgment. *See Gelston*, 16 U.S. (3 Wheat.) at 13; *The Brig Ann*, 13 U.S. (9 Cranch) at 291 (holding that the enforceability of an *in rem* judgment requires "that the thing should be actually or constructively within the reach of the

---

While it is true that in some circumstances an appearing claimant may waive his own objection to *in rem* jurisdiction, *see Barnes v. Sea Haw. Rafting, LLC*, 889 F.3d 517, 529–30 (9th Cir. 2018); *Porsche Cars N. Am., Inc. v. Porsche.net*, 302 F.3d 248, 256 (4th Cir. 2002), he may not relinquish the rights of others. In each of those cases the res was within the territory, and thus the reach, of the courts of the United States; the claimant's waiver resolved only who could complain of a curable defect. Waiver by one claimant binds that claimant. It cannot bind the rest of the world, whose rights a judgment in rem purports to extinguish.

This also shows why Judge Bennett's extended discussion of the party-presentation principle is similarly irrelevant here: Nasri can only raise his own rights; he cannot raise the rights of others. By the same token, he can forfeit or waive his own rights; he cannot forfeit or waive the rights of others. The reason the panel requested additional briefing from Nasri and the government (the only parties before us) is our concern that there might be other interested parties in an *in rem* proceeding. That is more than sufficient reason for the court to assure itself that there is no "manifest injustice." *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992); *see* Dissenting Op. at 84–85, 87. Nor does it exceed the bounds of the acceptable role of a court: "[A] court may consider an issue 'antecedent to . . . and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief." *U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (holding that the D.C. Circuit did not "stray beyond its constitutional or prudential boundaries" when it raised an issue question sua sponte, ordered supplemental briefing, invited presentation at oral argument, and decided it).

Court"). Chief Justice Marshall noted that *in rem* jurisdiction could be lost if "the thing could neither be delivered to the libellants, nor restored to the claimants . . . ." *The Little Charles*, 26 F. Cas. at 982. In such cases, the judgment "would be useless, and courts will not render judgments which can operate on nothing." *Id.* In *The Brig Ann*, the Court reiterated this enforceability requirement for constructive control cases: "[Property] is constructively [possessed], when, by a seizure, it is held to ascertain and enforce a right of forfeiture which can alone be decided by a judicial decree *in rem.*" 13 U.S. (5 Cranch) at 291. Stated differently, constructive possession existed when a right of forfeiture could be enforced by judicial decree. *See, e.g.*, *Tyler v. Defrees*, 78 U.S. (11 Wall.) 331, 349 (1870) ("[W]hile the general rule in regard to jurisdiction *in rem* requires the actual seizure and possession of the *res* by the officer of the court, such jurisdiction may be acquired by acts which are of equivalent import, and which stand for and represent the dominion of the court over the thing, and in effect subject it to the control of the court." (citation omitted)). In cases involving "movable personal property, capable of actual manucaption," a court's judgment "would be ineffectual" "[u]nless [the property was] taken into actual possession by an officer of the court." *Miller v. United States*, 78 U.S. (11 Wall.) 268, 294 (1870). As the Supreme Court has more recently noted, the "traditional, theoretical concerns of jurisdiction" *in rem* turn principally on the "enforceability of judgments." *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 87 (1992).

The "rule [is] that the court must have actual or constructive control of the res when an *in rem* forfeiture suit is initiated." *Id.* A change in the status of the property during the suit may affect the power of the court to enforce the

judgment, and "a court might determine that a judgment would be 'useless.'" *Id.* But that fact would not necessarily deprive a court of jurisdiction. *See MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 295–96, 301–03 (2023); *Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 424 F.3d 852, 861–62 (9th Cir. 2005); *J. Lauritzen A/S v. Dashmont Shipping, Ltd.*, 65 F.3d 139, 141 (9th Cir. 1995). A "continuous-control requirement" assures the enforceability of any judgment, but it is not itself a jurisdictional requirement. *Stevedoring Servs. of Am. v. Ancora Transport, N.V.*, 59 F.3d 879, 882–83 (9th Cir. 1995). But a court that does not control the property—actually or constructively—at the outset of the suit cannot afford relief to the parties and, accordingly, cannot be exercising *in rem* jurisdiction. *See All Funds Distributions to, or o/b/o Weiss*, 345 F.3d 49, 56–58 & n.11 (2d Cir. 2003) (court cannot exercise jurisdiction over funds that may become subject to forfeiture in the future).[3]

[3] The majority opinion does not decide what constitutes "constructive control." In the admiralty context, arrest of the vessel was sufficient, even without taking physical control of the vessel, and the arrest could be waived by the parties. The filing of a bond was also sufficient to constitute constructive control. *See Salvors, Inc. v. Unidentified Wrecked & Abandoned Vessel*, 861 F.3d 1278, 1286–88 (11th Cir. 2017); *Dluhos v. Floating and Abandoned Vessel, Known as New York*, 162 F.3d 63, 69 (2d Cir. 1998). I would leave to the district court to determine in the first instance what "constructive control" means with respect to assets held in a foreign bank. *See James Daniel Good*, 510 U.S. at 58 ("The Government's legitimate interests at the inception of forfeiture proceedings are to ensure that the property not be sold, destroyed, or used for further illegal activity prior to the forfeiture judgment. These legitimate interests can be secured without seizing the subject property."); *see also $46,588.00 in U.S. Currency and $20.00 in Canadian Currency*, 103 F.3d 902, 904–05 (9th Cir. 1996).

Those justiciability problems are potentially fatal here. The court today remands for further findings by the district court regarding the Executive Branch's constructive control over Nasri's accounts in Liechtenstein, and it does so—properly, in my view—out of concern for Nasri's and others' due process rights. But the same concern should animate an Article III inquiry as well. Absent U.S. control of the accounts, any judgment issued by the Southern District of California depends on an act of comity by the government of Liechtenstein, and, at least on this record, its cooperation is far from guaranteed. Without control of the property, the district court has no means to enforce its judgment as this is an *in rem* proceeding. *See Batato*, 833 F.3d at 439 (Floyd, J., dissenting) ("Simply put, the *res* in this case is beyond the United States' sovereign territory and our courts cannot—absent control of the *res*—declare rights in it that are binding against the world."). Although we have entered into various treaties, mutual assistance pacts, and executive agreements that pledge cooperation in securing the forfeiture of drug proceeds,[4] there is no international equivalent of the Full

---

[4] *See*, *e.g.*, Treaty Between the United States of America and the Principality of Liechtenstein on Mutual Legal Assistance in Criminal Matters, art. XVII, LI-U.S., July 8, 2002, T.I.A.S. No. 03-801 ("Each party shall assist the other . . . in proceedings relating to the forfeiture of the proceeds and instrumentalities of offenses . . . ."); Agreement Between the Government of the United States of America and the Government of the Principality of Liechtenstein on Enhancing Cooperation in Preventing and Combatting Serious Crime, LI-U.S., June 27, 2012, T.I.A.S. No. 18-309; Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, July 27, 1970, 23 U.S.T. 2555 (entered into force for United States Oct. 7, 1972); Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, Feb. 21, 1971, 32 U.S.T. 543 (entered into force for United States July 15, 1980);

Faith and Credit Clause. And even if there were such a clause, under the historical rules of comity, a judgment from one state could always be challenged for defects in personal jurisdiction in the courts of the state being asked to recognize it. *See Ins. Corp. of Ir.*, 456 U.S. at 706; *Baldwin v. Iowa State Traveling Men's Ass'n*, 283 U.S. 522, 524–25 (1931); *Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 722–23 (1877); Restatement (First) of Judgments § 2 (Am. L. Inst. 1942) ("[I]f the court had no jurisdiction over the property . . . . the judgment is open to collateral attack."); 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 3536 (4th ed. 2023) ("Historically . . . a party could attack a judgment collaterally on the ground that the court rendering the judgment had lacked either personal or subject matter jurisdiction.").

The government has assured us that Liechtenstein has cooperated with the United States by issuing a restraining order on the funds. But restraining the funds and recognizing the judgment of a foreign court are very different things. We know of no assurance that Liechtenstein will acquiesce in a U.S. judgment declaring the United States to be the only lawful owner of the funds. *See Batato*, 833 F.3d at 439 (Floyd, J., dissenting) ("Absent control, the court's judgment cannot bind the property but, instead, merely advises the foreign sovereign that *does* control the property as to how a United States court believes the rights in the property should be settled."). I recognize that the enforceability in a foreign court of a judgment of U.S. courts

28 U.S.C. § 1781 (covering the transmittal of letters of rogatory or request by the Department of State to a foreign tribunal); *see also* William J. Snider, *International Cooperation in the Forfeiture of Illegal Drug Proceeds*, 6 Crim. L.F. 377, 383–84 & nn. 9–11 (1995) (collecting international agreements).

does not, for that reason alone, make the matter nonjusticiable. What is unique about this case is that we know from the outset that our assertion of *in rem* jurisdiction is infirm.[5] Because there is an obvious defect in the judgment, it is quite conceivable that someone—Nasri is certainly an obvious possibility, but there may be other claimants—will challenge the U.S. judgment in the courts in Liechtenstein. How Liechtenstein will treat the judgment is just speculation, but we know that Liechtenstein has

[5] Judge Bennett suggests that I have confused redressability with enforceability. Dissenting Op. at 125–27. The question is a fair one, as the two principles overlap but are distinct. In this case, however, I have treated them correctly. Redressability concerns our ability, even if only in theory, to give relief to the parties before us; that is, whether "the court has the power to right or to prevent the claimed injury." *Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1199 (9th Cir. 2017) (quoting *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) (Kennedy, J.)); *see also Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020) (redressability requires relief sought to be "within the district court's power to award"). Enforceability asks whether, as a practical matter, the prevailing party will be able to collect. When we issue a judgment in a tort case, for example, we may do so without regard to the solvency of the defendant, or the need to take the judgment to another jurisdiction to enforce it against out-of-state assets. Those are questions of enforceability, not redressability, and should not inform our power to hear the case. The tort is redressable so long as we have *in personam* jurisdiction over the defendant because our judgment binds him. In this case, by contrast, we have no control over the real defendant-in-interest, which is the bank account in Liechtenstein, not Nasri. If we had *in personam* jurisdiction over Nasri, there would be no redressability problem, even if the enforceability remained an open question. For the reasons I have explained, because we do not have at least constructive control over the account, any judgment we issue in this case is purely advisory; it is of no legal effect. The government has no redress in U.S. courts, only in Liechtenstein, where the assets are beyond our jurisdiction.

Case: 22-55685, 01/08/2026, ID: 12957150, DktEntry: 80, Page 68 of 152



entertained such challenges in the past.[6] *See, e.g.*, *United States v. Collins*, 503 F.3d 616, 617–18 (7th Cir. 2007) (per curiam) ("Collins instead retained counsel in Liechtenstein to oppose the government's recovery efforts. . . . Several years of legal proceedings ensued in Liechtenstein, culminating in the Liechtenstein court ultimately returning the money to Collins after ruling that it was not the product of illegal transactions."). Thus, Liechtenstein may well treat a U.S. judgment regarding the funds its banks hold as exactly what it is—an advisory opinion; it is an announcement that this is what we would decide assuming *arguendo* that we actually had jurisdiction over the property. And this is not a phenomenon unique to Liechtenstein. *See Batato*, 823 F.3d at 418 (noting that, notwithstanding the district court's restraining orders, courts in New Zealand had allowed the claimant access to his accounts); *id.* at 437 n.3 (Floyd, J., dissenting) (noting that a New Zealand court had issued an order enjoining the registration of the U.S. forfeiture judgment); Courtney J. Linn, *International Asset Forfeiture and the Constitution: The Limits of Forfeiture Jurisdiction over Foreign Assets Under 28 U.S.C. § 1355(b)(2)*, 31 Am. J. Crim. L. 251, 273–74 (2004) (discussing extensive litigation in Costa Rican courts over a U.S. forfeiture action

[6] We should expect no better treatment in the courts of Liechtenstein than we are willing to afford foreign judgments in our courts. We will recognize judgments of foreign courts in forfeiture proceedings, but we will decline to give effect where the foreign court proceeded under "procedures incompatible with the requirements of due process of law," "lacked personal jurisdiction over the defendant," "lacked jurisdiction over the subject matter," or "did not take steps in accordance with the principles of due process, to give notice of the proceedings to a person with an interest in the property." 28 U.S.C. § 2467(d)(1)(A)–(D). We can only imagine how well we would receive a foreign judgment that purported to declare title to property within U.S. jurisdiction.

and noting that the Costa Rican courts refused to uphold the requests of the Costa Rican government on behalf of the United States).

Judge Bennett responds that a judgment would give the Executive "added leverage" and "another tool with which to negotiate with Liechtenstein." Dissenting Op. at 127.[7] But "[r]edressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment) (emphases in original)). A judgment prized for its diplomatic "leverage" is the paradigm of an advisory opinion. Nothing in the treaties between the United States and Lichtenstein invoked by Judge Bennett changes this. Dissenting Op. at 125–26. Those are not jurisdiction-conferring treaties; they are diplomatic pledges of cooperation. The diplomatic remedy

---

[7] Judge Bennett relies on *Chafin v. Chafin*, 568 U.S. 165 (2013) for the proposition that courts adjudicate "cases against foreign nations, whose choices to respect final rulings are not guaranteed." *See* Dissenting Op. at 126 (quoting *Chafin*, 568 U.S. at 176). This is misplaced. In *Chafin*, the Court held that a Hague Convention appeal was not mooted by the child's removal to Scotland, even though Scotland might ignore a re-return order. 568 U.S. at 174–76. But that was only because relief remained within the judicial power: "The U.S. courts continue to have personal jurisdiction over Ms. Chafin, may command her to take action even outside the United States, and may back up any such command with sanctions." *Id.* at 175. The judgment in *Chafin* therefore ran against a party before the court; whether a foreign sovereign would aid or obstruct the judgment went only to its practical effect. In that way, *Chafin* is essentially concerned with full faith and credit in a foreign jurisdiction, which is a question of enforceability, not redressability.

remains available to the United States, but it is not one we can grant.

Moreover, even if Liechtenstein were willing to afford some deference to the United States's claim to Nasri's accounts, because Liechtenstein holds the funds, it is under no obligation to recognize the United States as the exclusive owner of the funds. In effect, Liechtenstein can revise the district court's judgment as to who holds title. Who else might have a claim on the funds? Nasri is a Canadian citizen. Is he subject to a tax lien in Canada? The funds have been parked in Liechtenstein for some time. Does the bank in Liechtenstein have some claim to the funds? Nasri currently resides in Dubai. Is there a secured creditor in Dubai or somewhere else? Nasri's connection to the Southern District of California is based on the allegation that Nasri was a member of a criminal organization known as the Phantom Secure Enterprise, whose members engaged in drug trafficking "throughout the world, including Australia, Thailand, Canada, United Arab Emirates, and in the United States, within the State of California in the Counties of Los Angeles, Orange, and San Diego." Might Australia, Thailand, Canada, and the U.A.E. have similar forfeiture claims based on their own laws? *See United States v. Federative Republic of Braz.*, 748 F.3d 86, 87–91 (2d Cir. 2014) (describing competing claims by the U.S. and Brazil and entities in the British Virgin Islands and Cayman Islands). Even assuming that those countries and entities received notice of the forfeiture proceedings in the Southern District of California, did we really expect that those jurisdictions would appear in San Diego to press their claims to money held by banks in Liechtenstein?

Additional consequences follow from the current state of affairs. For one, the current situation risks running afoul of

Case: 22-55685, 09/08/2026, ID: 12959102, DktEntry: 83, Page 71 of 152



the doctrine of exclusive jurisdiction—which really drives home the whole redressability problem. From time to time, we encounter situations in which two sovereigns claim jurisdiction over the same property. The classic example of such a conflict is a consequence of our system of dual sovereignty. Even when the two jurisdictions are the United States and the state where the property is located, both can properly lay claim to the property because it is within their sovereign territory. *See*, *e.g.*, *Penn Gen. Cas. Co. v. Pennsylvania*, 294 U.S. 189 (1935); *United States v. One 1985 Cadillac Seville*, 866 F.2d 1142 (9th Cir. 1989). The rule of decision in such cases is instructive:

> Where the judgment sought is strictly *in personam* . . . both a state court and a federal court having concurrent jurisdiction may proceed with the litigation, at least until judgment is obtained in one court which may be set up as res adjudicata in the other. But if the two suits are *in rem* or *quasi in rem*, requiring that the court or its officer have possession or control of the property which is the subject of the suit in order to proceed with the cause and to grant the relief sought, the jurisdiction of one court must of necessity yield to that of the other.

*Penn Gen.*, 294 U.S. at 195 (citations omitted); *see Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939). The doctrine thus avoids "unseemly and disastrous conflicts." *Penn Gen.*, 294 U.S. at 195. If the United States were to disagree with how Liechtenstein decides to distribute the proceeds, we would have no claim under the doctrine of exclusive jurisdiction, because we don't have jurisdiction

Case: 22-55685, 01/08/2026, ID: 12959160, DktEntry: 80, Page 72 of 152



over the property at all, much less exclusive jurisdiction. Because only Liechtenstein enjoys exclusive jurisdiction over Nasri's bank accounts, we know at this instant that the courts of the United States "must of necessity yield to [those] of [Liechtenstein]." *Id.* When the judgment "would be useless," we lack Article III jurisdiction because "courts will not render judgments which can operate on nothing." *The Little Charles,* 26 F. Cas. at 982. The district court here is operating on nothing.

Our justiciability doctrines are a consequence of our separation of powers principles. *See All. for Hippocratic Med.*, 602 U.S. at 378 ("Article III standing . . . . is 'built on a single basic idea—the idea of separation of powers.'" (citation omitted)). When Congress ostensibly assigns us the power to issue a judgment *in rem* without seizure or control of the property, it raises serious separation-of-powers concerns. Our Constitution vests the Executive with considerable foreign affairs powers, including "the power to open diplomatic channels simply by engaging in direct diplomacy with foreign heads of state and their ministers." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 13–14 (2015); *see Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("[T]he historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring))); *see also* Amy M. Schaldenbrand, *The Constitutional and Jurisdictional Limitations of* In Rem *Jurisdiction in Forfeiture Actions: A Response to International Forfeiture and the Constitution: The Limits of Forfeiture Jurisdiction over Foreign Assets Under 28 U.S.C. § 1355(b)(2)*, 38 Syracuse J. Int'l L. & Com. 55, 83 (2010)

("If the United States attempts to obtain jurisdiction over property that it does not have active or constructive control over, it may offend officials in foreign countries that have conflicting laws with those of the United States."). We must be especially wary of claiming this power for ourselves, especially when doing so transgresses Article III and encroaches on Article II. "Judicial aggrandizement is as pernicious to the separation of powers as any aggrandizing action from either of the political branches." *SEC v. Jarkesy*, 603 U.S. 109, 203 (2024) (Sotomayor, J., dissenting). And Congress may not deputize federal judges as agents of the Executive Branch, nor may the Executive ask the Judiciary to do by judicial fiat that which the Executive is bound to do by diplomacy. The foreign affairs issues raised by the present case "are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility . . . ." *Waterman*, 333 U.S. at 111.

There is nothing inappropriate about the United States, through the appropriate Executive Branch channels, asking Liechtenstein to turn over Nasri's accounts to us; indeed, the Executive Branch has done exactly that in the past. *See*, *e.g.*, *United States v. $4,224,958.57*, 392 F.3d 1002, 1003 (9th Cir. 2004) (noting that the United States requested—and a Liechtenstein magistrate agreed to—repatriation of funds prior to a domestic forfeiture proceeding). But if Congress or the Executive Branch believes a judicial decree would aid the U.S. forfeiture efforts abroad, it must find an appropriate vehicle within the "judicial Power" to do so. When the

Executive asks us to support it in violation of all general principles regarding *in rem* jurisdiction, it is an invitation to join the Executive and leave the confines of the "judicial Power" conferred by Article III.[8] We are neither the State Department nor the Department of Justice, and given the lack of judicial mechanisms for enforcing a judgment that purports to be *in rem*, we should stay out of this and let the Executive Branch do its job. *See Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 116 (2013) (noting the "danger of unwarranted judicial interference in the conduct of foreign policy").

C. *Potential Solutions*

The justiciability problems I have just articulated are not incurable. The foregoing Article III difficulties derive from the form of the present action. This is nominally a proceeding *in rem*, for which the forfeiture laws contemplate a declaration of *title* in the United States. *See* 21 U.S.C. § 881(h). In true *in rem* proceedings, neither the Full Faith and Credit Clause nor principles of international comity have ever had to be invoked. That is because a judgment *in rem*, by definition, does not require enforcement outside of the jurisdiction because the property had to be seized within the court's jurisdiction before the suit was commenced. Judgments obtained *in personam* may have to be enforced in other jurisdictions, but not a judgment *in rem*. *See Hilton v. Guyot*, 159 U.S. 113, 167 (1895) ("A judgment *in rem* . . . is treated as valid everywhere. . . . 'No court of co-ordinate

[8] I also suggest in Part II that Congress could provide for the United States to proceed *quasi in rem*, which would resolve the question of ownership between the United States and Nasri alone. That judgment would not violate general law and might satisfy the United State's interest in seeking funds held overseas.

jurisdiction can examine the sentence.'" (quoting *Williams v. Armroyd*, 11 U.S. (7 Cranch) 423, 432 (1813))). And that will bring me to this fundamental point: This really doesn't look like an action *in rem*. It is unrecognizable as such, in law or fact. To call a forfeiture action involving property located in a foreign country an "action *in rem*" is an error in category. It is an action, but it is not an action *in rem*, at least by any traditional understanding of that phrase. It is much closer in form to an action *quasi in rem*, in which a court may declare, as between a limited number of claimants, who owns the property, even if the property is located elsewhere.[9]

Congress could cure many of the defects in jurisdiction I have described here by recognizing that civil asset forfeitures involving property outside of our territory are really *quasi in rem* proceedings in which we are asking a foreign government to secure the property, subject to our forfeiture proceedings and any competing claims to the property. In an action *quasi in rem*, the winning party does not take title—only a claim superior to the other parties to the suit. *Cf. Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 200 (2014) ("[T]he declaratory judgment suit . . . provide[s] 'an immediate and definitive determination of the legal rights *of the parties*.'" (emphasis added) (citation omitted)). But the winning claimant's judgment is not superior to claims to title that may be

[9] Assuming it could solve the proper notice and service of process problems, the United States could always proceed *in personam*. Historically, actions *in personam* were actions in equity, while actions *in rem* were actions at law. So although State A could not settle title to real estate in State B, it could, in an action in equity, order the defendant, for example, to convey good title to the plaintiff. *See* Fleming James, Jr., Geoffrey C. Hazard, Jr. & John Leubsdorf, *Civil Procedure*, § 1.10, at 28–29 (5th ed. 2001).

asserted by nonparties. *See* Restatement (First) of Judgments, *supra*, § 3 ("In the case of a proceeding *quasi in rem*, as distinguished from a proceeding *in rem*, interests of persons other than the parties and their privies are not affected by the judgment."). If the present action proceeded as a *quasi in rem* suit, the United States could obtain a declaration of superior title in the $1.2 million against Nasri, but the forfeiture would not purport to decide the United States's rights against other potential claimants. The Executive Branch would have its judicial declaration, but it would be up to Liechtenstein to determine whether and to what extent to honor the judgment. So long as the United States satisfies the *quasi in rem* due process standard—including the minimum contacts test, *see Shaffer v. Heitner*, 433 U.S. 186, 211–22 (1977)—the government would not need to possess the property before seeking forfeiture.

There may be other, creative solutions to the problems I have raised here, and I have suggested a couple of modest steps that Congress might take. Those potential solutions are not before us, and the details matter. The point is simply that the form of the action makes a difference. The action as currently constituted cannot be squared with Article III.

II

There is one more jurisdictional issue that looms in this case. The Supreme Court has long suggested in dicta that Congress may alter the general-law rules of personal jurisdiction (subject, of course, to the Fifth Amendment Due Process Clause). The lower federal courts, however, have never actually considered *how* Congress may alter those rules. In Part II.A, I review the Court's statements and conclude that Congress's power to change general-law principles may be invoked only by a clear statutory

statement. In Part II.B, I provide an overview of the forfeiture statute at issue here, 28 U.S.C. § 1355. In Part II.C, I address the case law interpreting § 1355, and I explain how we came to depart from our general-law principles. And in Part II.D, I explain why—notwithstanding our prior cases—§ 1355 does not contain the necessary clear statement to depart from the seizure-or-control requirement of the general law.

A. *General Law and the Clear Statement Rule*

Contemporaneously with the development of the seizure-or-control rules for *in rem* jurisdiction, the Supreme Court repeatedly suggested in dicta that the general-law rules of personal jurisdiction were not immutable and could perhaps be altered by Congress—at least with respect to federal courts. *See*, *e.g.*, *Toland v. Sprague*, 37 U.S. (12 Pet.) 300, 330 (1838) ("If, indeed, it be assumed that [C]ongress acted under the idea that the process of the circuit courts could reach persons in a foreign jurisdiction, then the restrictions might be construed as operating only in favour of the inhabitants of the United States[.] . . . [But] [C]ongress had not those in contemplation at all, who were in a foreign jurisdiction, it is easy to perceive why the restriction in regard to the process was confined to inhabitants of the United States."); *Hollingsworth v. Barbour*, 29 U.S. (4 Pet.) 466, 472 (1830) ("[B]y the general law of the land, no court is authorised to render a judgment or decree against any one, or his estate until after due notice by service of process, to appear and defend. This principle is dictated by natural justice; and is only to be departed from in cases expressly warranted by law, and excepted out of the general rule."); *The Nereide*, 13 U.S. (9 Cranch) 388, 423 (1815) ("Till such an act be passed, the Court is bound by the law of nations which is a part of the law of the land."). Justice Story, riding

circuit, framed the inquiry this way: "If [C]ongress had prescribed such a rule [departing from general-law principles], the court would certainly be bound to follow it, and proceed upon the law. The point of difficulty is, whether such a rule ought to be inferred from so general a legislation . . . ." *Picquet v. Swan*, 19 F. Cas. 609, 615 (Story, Circuit Justice, C.C.D. Mass. 1828) (No. 11,134); *see also Ex parte Graham*, 10 F. Cas. 911, 913 (Washington, Circuit Justice, C.C.E.D. Pa. 1818) (No. 5,657) ("[S]hould it be the will of [C]ongress to vest in the courts of the United States an extra-territorial jurisdiction . . . , over persons and things found in a district other than that from which the process issued, it would seem to be proper . . . to prescribe the mode of executing the process."); Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703, 1709–10 (2020) (arguing that Congress may alter the general-law rules of personal jurisdiction).

More recently, in *Bristol-Myers Squibb Co. v. Superior Court of California*, the Court "[left] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court" as the Fourteenth Amendment imposes on state courts. 582 U.S. 255, 269 (2017). This past Term, the Court answered this question in *Fuld v. Palestine Liberation Org.* 606 U.S. 1, 16 (2025). The Court held that "it makes little sense to mechanically import the limitations that the Fourteenth Amendment imposes on the authority of state courts" into the Fifth Amendment's limitations on the Federal Government. *Id.* Instead, "the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* Although the Court declined to "delineate the outer bounds of the

Federal Government's power . . . to hale foreign defendants into U.S. courts," *id.* at 18, it found that the PSJVTA's clear statutory language, which states that specific parties, referred to by name, "shall be deemed to have consented to personal jurisdiction" was within Congress's authority, *id.* at 8 (quoting 18 U.S.C. §§ 2334(e)(1), (5)).

Congress's potential authority to alter these rules, however, does not excuse it from complying with other constitutional requirements. *See Fuld*, 606 U.S. at 18; *The Mary*, 13 U.S. (9 Cranch) 126, 144 (1815) (Marshall, C.J.). Consistent with that constraint, Congress's power to change the terms by which general-law principles are applied to foreign persons or states is subject to a clear-statement rule. Justice Story opined that "[s]uch an intention" to depart from the general-law rules is "so repugnant to the general rights and sovereignty of other nations, [that it] ought not to be presumed, unless it is established by irresistible proof." *Picquet*, 19 F. Cas. at 613; *see also id.* at 614 ("But when the circuit courts are called upon to adopt the same rule, it ought to be seen, that [C]ongress have, in an unambiguous manner, made it imperative upon them."); *cf. Toland*, 37 U.S. (12 Pet.) at 328 (describing Justice Story's opinion in *Picquet* "as having great force"). Justice Thomas recently endorsed this view in *Fuld*. *See* 606 U.S. at 35–40 (Thomas, J., concurring) ("Even if Congress generally respected such rules, it retained the power to override them through *clear statutory command*." (emphasis added)).

A clear-statement rule is particularly apt in this context. "Typically, we find clear-statement rules appropriate when a statute implicates historically or constitutionally grounded norms that we would not expect Congress to unsettle lightly," *Jones v. Hendrix*, 599 U.S. 465, 492 (2023), such as in cases involving abrogation of state sovereign immunity,

*Atascadero State Hosp. v. Scanlon*, 473 U.S. 234 (1985), or the extraterritorial application of federal statutes, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). The general-law rules have, for over two hundred years, limited federal courts in their exercise of personal jurisdiction. These rules reflect historical and constitutional principles that formed the backdrop to the Constitution, including Law and Equity, *see* U.S. Const. art. III, § 2, cl. 1; the Law of Nations, *see id.* art. I, § 8, cl. 10; the rules of the common law, *see id.* amend. VII; and due process, *see id.* amend. V. Even if these rules are not constitutionally compelled, we would expect Congress to speak unambiguously before abrogating them.

B. *28 U.S.C. § 1355*

I now turn to the statute in question. Congress has crafted a capacious forfeiture regime, one that sprawls across many titles and sections of the U.S. Code and has its own set of procedural rules.[10] In Title 18, Congress has provided the substantive rules for forfeiture. *See* 18 U.S.C. §§ 981–87. In Title 21, Congress has set forth the basics of forfeiture related to the drug trade. Section 881 provides: "All moneys . . . furnished . . . in exchange for a controlled substance . . . , all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any [such] violation" are "subject to forfeiture to the United States." 21 U.S.C. § 881(a)(6). "[U]pon commission of the act giving rise to forfeiture," "[a]ll right, title, and interest . . . shall vest in the United States[.]" *Id.* § 881(h). In

[10] There are special Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions ("Supp. R.") appended to the Federal Rules of Civil Procedure. The Supplemental Rules cover forfeitures *in rem*, including actions for property located outside the United States. *See* Supp. R. G(3)(c)(iv), (4)(a)(iv)(B).

Title 28, Congress has set out the procedural rules for recovering fines, penalties, and forfeitures. Section 2461 provides that a "civil fine, penalty or pecuniary forfeiture . . . may be recovered in a civil action." 28 U.S.C. § 2461(a).

A different section, 28 U.S.C. § 1355, provides for subject matter jurisdiction and venue for forfeiture proceedings in U.S. district courts. The statute reads, in relevant part:

> (a) The district courts shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress . . . .
>
> (b)(1) A forfeiture action or proceeding may be brought in—
>
> (A) the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred, or
>
> (B) any other district where venue for the forfeiture action or proceeding is specifically provided for in section 1395 of this title or any other statute.
>
> (2) Whenever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign

> government, an action or proceeding for forfeiture may be brought as provided in paragraph (1), or in the United States District court for the District of Columbia.
>
> . . . .
>
> (d) Any court with jurisdiction over a forfeiture action pursuant to subsection (b) may issue and cause to be served in any other district such process as may be required to bring before the court the property that is the subject of the forfeiture action.

28 U.S.C. § 1355.

There are a number of interpretive challenges in § 1355. Subsection (a) confers subject matter jurisdiction over forfeiture proceedings to U.S. district courts. *See id.* § 1355(a). The next subsection, § 1355(b), is a venue provision. It is divided into two subparagraphs. Subparagraph (b)(1) is the general venue rule: "A forfeiture action or proceeding may be brought in . . . the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred." *Id.* § 1355(b)(1)(A). Subparagraph (b)(2) is a special venue rule for cases involving property in foreign countries: "Whenever property subject to forfeiture under the laws of the United States is located in a foreign country . . . an action or proceeding for forfeiture may be brought as provided in paragraph (1), or in the United States District court for the District of Columbia." *Id.* § 1355(b)(2). So far, so good. Read together, the foregoing subsections make clear that U.S. district courts have subject matter jurisdiction over

forfeiture actions, and that when the property subject to forfeiture is located in another country, the action may be brought in either "the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred," *id.* § 1355(b)(1)(A), or in the federal district court in Washington, D.C., *id.* § 1355(b)(2).

Before 1992, § 1355 only provided for subject matter jurisdiction over forfeiture actions (what is now subsection (a)); it detailed nothing else. Venue was addressed under the general venue rule in 28 U.S.C. § 1395(b) ("A civil proceeding for the forfeiture of property may be prosecuted in any district where such property is found."). That system proved unworkable in a certain subset of cases. When the forfeiture action was brought in the district where the acts or omissions giving rise to the forfeiture occurred, but the property was located in another U.S. district, the district court presiding over the action had no means by which it could obtain control over the property. *See United States v. One 1978 Piper Cherokee Aircraft*, 91 F.3d 1204, 1207 (9th Cir. 1996) ("Prior to October 1992, federal courts struggled with the questions whether a district court other than that in which the property was located could exercise jurisdiction over the subject of a forfeiture and could effectuate process against the property."). This obstacle arose because, "[p]rior to 1992, § 1355 . . . . did not . . . authorize a district court to issue process against property not within its district." *United States v. All Funds on Deposit in Any Accts. Maintained in the Names of Meza or De Castro* ("*Meza*"), 63 F.3d 148, 151 (2d Cir. 1995).

So, concurrent with the rest of its 1992 amendments, Congress enacted § 1355(d) to address these difficulties and give district courts the ability to effectuate process against property located in other U.S. districts. *See One 1978 Piper*

Case: 22-55685, 01/08/2026, ID: 12957150, DktEntry: 80, Page 84 of 152



*Cherokee Aircraft*, 91 F.3d at 1207. Section 1355(d) clarifies that "[a]ny court with jurisdiction over a forfeiture action pursuant to subsection (b) may issue and cause to be served in any other district such process as may be required to bring before the court the property that is the subject of the forfeiture action." 28 U.S.C. § 1355(d). Section 1355(d) thus authorized one federal district court to exercise jurisdiction over property physically located within the boundaries of another district court.[11] Effectively, § 1355(d) treats the seizure by the government anywhere within the United States as if it had been conducted in the district that otherwise has proper subject matter jurisdiction and venue. *See Meza*, 63 F.3d at 152 ("This national service of process provision clearly conferred *in rem* jurisdiction on district courts in forfeiture proceedings with respect to property located within another judicial district in the United States.") (citations omitted). The addition of subsection (d) effected a minor change, more venue than jurisdiction, because the property was within the territory of the United States as a whole. *See One 1978 Piper Cherokee Aircraft*, 91 F.3d at 1206 (noting that the aircraft was seized within the United

[11] *See United States v. 51 Pieces of Real Prop., Roswell, N.M.*, 17 F.3d 1306, 1309–12 (10th Cir. 1994) (holding that a district court could seize property within its district and that, although § 1355(d) altered this rule, this section was not retroactive); *United States v. Contents of Accounts Nos. 3034504504 and 144-07143 at Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 971 F.2d 974, 983 (3d Cir. 1992) (holding that a forfeiture could only be filed under 28 U.S.C. § 1395(b) in the district where the property was located and recognizing that this might require filing multiple forfeiture actions); *see also* Supp. R. C advisory committee's note to 2000 amendment ("Section 1355(d) allows a court with jurisdiction under § 1355(b) to cause service in any other district of process required to bring the civil proceeding for forfeiture in the district where the forfeitures accrues or . . . the property is found . . . .").

States, but not within the Eastern District of California, where the forfeiture action was brought; upholding the district court's jurisdiction over the aircraft).

Nestled in § 1355(d) is a cross-reference to § 1355(b)—one that ultimately paved the way for courts across the country to abandon first principles of *in rem* jurisdiction. Section 1355(d) allows a "court with *jurisdiction* over a forfeiture action *pursuant to subsection (b)*" to issue certain kinds of process. 28 U.S.C. § 1355(d) (emphasis added). This should strike a careful reader as odd. After all, § 1355(b) is a venue provision and says nothing about jurisdiction. It is subsection (a), not subsection (b), that vests courts with subject matter jurisdiction over forfeiture actions. The reference in § 1355(d) to "[a]ny court with jurisdiction over a forfeiture action pursuant to subsection (b)" could be read to mean that any court—having subject matter jurisdiction as provided in subsection (a) and venue as provided in subsection (b)—may issue process to "any other *district*" to seize the property that is the subject of the forfeiture action. Such a reading would honor the rules regarding *in rem* proceedings, not alter them.

Unfortunately, that is not how most courts of appeals have understood the relationship between § 1355(b)(2) and § 1355(d). As we will see, the Second Circuit reconciled the relationship between the provisions by agreeing that § 1355(b)(2) did not effect a fundamental shift in the rules of *in rem* jurisdiction. Then, the other circuits to address the question reversed course—including ours.

C. *Case Law Interpreting § 1355*

The Second Circuit was the first court to address the new amendments to § 1355. In *Meza*, the court considered

whether § 1355(d) relieved district courts from the historical requirements of *in rem* jurisdiction. The government argued to the panel that "*in rem* jurisdiction is no longer required in actions seeking forfeiture of property located in a foreign country . . . because subject matter jurisdiction and venue [we]re appropriate in the Eastern District of New York" under § 1355(d). *Meza*, 63 F.3d at 151 (quotation marks omitted). The Second Circuit disagreed. It explained, "Although Congress certainly intended to streamline civil forfeiture proceedings by amending § 1355, even with respect to property located in foreign countries, we do not believe that Congress intended to fundamentally alter well-settled law regarding *in rem* jurisdiction." *Id.* at 152. It recognized that § 1355(d) was enacted to "provide[] districts [*sic*] courts with the required control over property located within the United States," not to abrogate the seizure-or-control requirement. *Id.* The court continued, "Absent any degree of control over property located in a foreign country, however, a district court's forfeiture order directed against such property would be wholly unenforceable." *Id.* So, it held that "in order to initiate a forfeiture proceeding against property located in a foreign country, the property must be within the actual or constructive control of the district court in which the action is commenced." *Id.* at 153.

The D.C. Circuit took a different path just a few years later. It held that § 1355 abrogated the general-law seizure-or-control requirement because § 1355(d) expressly references "jurisdiction . . . pursuant to subsection (b)." *See United States v. All Funds in Acct. Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain* ("*Banco Espanol*"), 295 F.3d 23, 26 (D.C. Cir. 2002); *see also United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 4th 426, 429–30 (D.C. Cir. 2022). The

lynchpin for the court was not § 1355(b)(2) itself, but § 1355(d). As the court put it, "[i]t would make little sense for Congress to provide venue in a district court" under § 1355(b)(2) "if there were no means for that court to exercise jurisdiction." *Banco Espanol*, 295 F.3d at 26.[12] The Third and Fourth Circuits eventually followed the D.C. Circuit's lead. *See Batato*, 833 F.3d at 419–20; *Contents of*

[12] The D.C. Circuit addressed *Meza* by pointing to a subsequent Second Circuit case. *See Banco Espanol*, 295 F.3d at 26–27 (citing *United States v. Certain Funds Located at the Hong Kong & Shanghai Banking Corp.* ("*Hong Kong Banking*"), 96 F.3d 20, 22 (2d Cir. 1996)). The D.C. Circuit excerpted and agreed with language from that decision describing § 1355 as "provid[ing] district courts with *in rem* jurisdiction over a *res* located in a foreign country." *Id.* (quoting *Hong Kong Banking*, 96 F.3d at 22). Following *Banco Espanol*, the Fourth Circuit also treated *Meza* as having been overruled by *Hong Kong Banking*. *See Batato*, 833 F.3d at 419 n.2 (treating *Hong Kong Banking* as "abrogat[ing] *Meza* in the Second Circuit"). The Third and Ninth Circuits also expressed doubt about the status of *Meza* in light of *Hong Kong Banking*. *See Approximately $1.67 Million*, 513 F.3d at 997 n.3 ("It is unclear whether *Meza* remains good law . . . ."); *Contents of Acct. No. 03001288 v. United States*, 344 F.3d 399, 404 n.3 (3d Cir. 2003).

The D.C. Circuit—and the courts that followed—misread *Hong Kong Banking*. *Hong Kong Banking* had nothing to do with whether § 1355(b)(2) is a jurisdiction-conferring provision. Instead, the question there was whether the 1992 amendments to § 1355 could "be applied to an action begun before the effective date of the amendment." *Id.* *Meza* was not even mentioned in *Hong Kong Banking*, although it had been thoroughly briefed to, and discussed by, the district court. *See United States v. Certain Funds Located at the Hong Kong & Shanghai Banking Corp.*, 922 F. Supp. 761, 776–78 (E.D.N.Y. 1996). *Hong Kong Banking* did not cite *Meza* because the government waived its appeal of that portion of the district court's order. *See* Brief for Plaintiff-Appellant at 9 n.3, *Hong Kong Banking*, 96 F.3d 20. *Hong Kong Banking*'s dicta about § 1355(b) cannot be read as silently overruling *Meza*. On my read, there remains a circuit split on the meaning of § 1355.

*Account No. 03001288 v. United States*, 344 F.3d 399, 403–05 (3d Cir. 2003).

We first considered § 1355 in *United States v. Approximately $1.67 Million (US) in Cash, Stock, and Other Valuable Assets Held by or at: (1) Total Aviation Ldt.* (“*Approximately $1.67 Million*”), 513 F.3d 991 (9th Cir. 2008). The district court had concluded that it had constructive control over the assets subject to forfeiture, which were in bank accounts in the Cayman Islands. *See id.* at 995. On appeal, both the government and the claimant agreed that the “constructive control” theory was erroneous. *Id.* at 996. Instead, both parties agreed that the “correct test . . . derive[d] from a plain reading of the jurisdictional statute in question, 28 U.S.C. § 1355(b).” *Id.* We block-quoted the statute but did no statutory interpretation of our own. Without discussing the statute’s text or structure, we found “ourselves in agreement with the analysis of the D.C. and Third Circuits” that § 1355(b) deals with personal jurisdiction because “[t]he plain language and legislative history of the 1992 amendments makes [*sic*] clear that Congress intended § 1355 to lodge jurisdiction in the district courts without reference to constructive or actual control of the res.” *Id.* at 998. Although we acknowledged the “traditional paradigm” that a court must have actual or constructive control over the property, *id.* at 996, we treated § 1355(b)(2) not as a venue provision, but as one granting federal courts personal jurisdiction over property outside the United States, irrespective of whether we had seized the property, in fact or constructively, *id.* at 996–98. We held that § 1355(b) “does not require the government to establish constructive control of the proceeds to sustain jurisdiction.” *Id.* at 996.

We reinforced that holding in *United States v. Obaid*, 971 F.3d 1095 (9th Cir. 2020). There, we rejected the argument that *Shaffer* applied *International Shoe*'s minimum-contacts standard to all true *in rem* proceedings, including forfeiture actions. *See Obaid*, 971 F.3d at 1100–01, 1105. Instead, we concluded that "*Shaffer* is limited to *quasi in rem* actions and does not extend to *in rem* actions," *id.* at 1105, and that the Supreme Court "did not sweep away traditional *in rem* principles in *Shaffer*," *id.* at 1102. But we reconciled "traditional *in rem* principles" with § 1355 by concluding that § 1355 creates a legal fiction that the property is located within the district, thereby giving federal courts jurisdiction in forfeiture actions over property "even if the property is located in a foreign country." *Id.* at 1102.

We addressed § 1355 most recently in *United States v. PetroSaudi Oil Services (Venezuela) Ltd*, 70 F.4th 1199 (9th Cir. 2023). We again acknowledged the traditional rule of actual or constructive control over the asset, but we repeated that, in light of § 1355, "[c]onstructive or actual control of the *res* is no longer necessary." *Id.* at 1210. We explained that § 1355(b)(2) "relaxed this requirement," and that "[r]ead together, *Approximately $1.67 Million* and *Obaid* establish that a . . . court has *in rem* jurisdiction over property not within its actual or constructive control, even when it lacks personal jurisdiction over the property's owner." *Id.* Even though we recognized that PetroSaudi "may refuse to comply with the order and that the district court may have difficulty enforcing compliance," we upheld the district court's *in rem* jurisdiction over the funds held in the United Kingdom. *Id.* at 1211.

In all three cases, as the majority opinion explains, Majority Op. at 16–19, we reached our decision on statutory

grounds only.[13] We have left unanswered several questions, including the proper due process standard for true *in rem* cases, whether Congress possesses the power to alter the general-law rules of personal jurisdiction, and whether § 1355 contains a clear statement abrogating the control-or-seizure requirement for *in rem* cases.

D. *Whether § 1355 Contains a Clear Statement*

We have never addressed whether § 1355 contains the necessary clear statement departing from the general-law rules governing *in rem* jurisdiction. It does not.

Recall that when dealing with a statute purportedly about personal jurisdiction, it "ought not to be presumed" that Congress intended to depart from the settled general-law rules "unless it is established by irresistible proof." *Picquet*,

[13] Judge Bennett argues that *Approximately $1.67 Million*, *Obaid*, and *PetroSaudi* foreclose the inquiry. Dissenting Op. at 94–101. I disagree. As the majority opinion notes, each of those cases resolved questions of statutory interpretation, and *Obaid* addressed a different constitutional question than the one the majority opinion addresses. Majority Op. at 16–19 & 18 n.4. Moreover, in none did any party raise nor did we consider whether a forfeiture proceeding directed at property that neither the court nor the United States possesses or controls presents a case or controversy within the meaning of Article III. Indeed, none of those opinions so much as mentions Article III. "When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011). "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925); *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985) ("[U]nstated assumptions on non-litigated issues are not precedential holdings binding future decisions."). There is no prior panel holding on justiciability to which this panel owes adherence.

19 F. Cas. at 613. We must look at the text of the statute to determine whether Congress has, "in an unambiguous manner," fundamentally altered these rules. *Id.* at 614. "Congress need not incant magic words, but the traditional tools of statutory construction must plainly show" that Congress has deviated from the general-law rules of personal jurisdiction. *Boechler, P.C. v. Comm'r*, 596 U.S. 199, 203 (2022) (citation and quotation marks omitted). An interpretation of the statute as abrogating the general-law rules that is "better[] than . . . alternatives," without more, is not sufficient. *MOAC*, 598 U.S. at 298 (citation and quotation marks omitted). Notwithstanding our interpretation of § 1355 in *Approximately $1.67 Million* and its progeny, § 1355 hardly contains the necessary clear statement to conclude that Congress dispensed with the seizure-or-control requirement of *in rem* jurisdiction.

1. *Text*. On its face, § 1355(b)(2) says nothing about jurisdiction—subject matter or otherwise. It is a venue rule. It deals only with *where* venue is proper when the property is outside the United States. Section 1355(b)(2) dictates that when the property is located abroad—whether it is held by the United States or "detained or seized" by a foreign government—a forfeiture action must be brought in either one of the venues listed in § 1355(b)(1) or in the District of Columbia.

Instead, the jurisdictional reading of subsection (b)(2) turns exclusively on § 1355(d)'s cross-reference to § 1355(b). "This is not the stuff of which clear statements are made." *MOAC*, 598 U.S. at 299. As I have explained, there is an alternative reading of the cross-reference in § 1355(d). *See* Part II.B, *supra*. Subsection (d) could be read to mean that any court that has subject matter jurisdiction under subsection (a) and proper venue under

subsection (b) may issue process to "any other *district*" in the United States. 28 U.S.C. § 1355(d) (emphasis added); *see Meza*, 63 F.3d at 152 ("[Section] 1355(d) clearly provides districts [*sic*] courts with the required control over property located within the United States."). We would not expect Congress to effectuate a radical change to the law of personal jurisdiction through an "oblique or elliptical" cross-reference that is entirely silent on the question of control or possession. *Cf. West Virginia v. EPA*, 597 U.S. 697, 723 (2022).

Reading § 1355(b)(2) as conferring *in rem* jurisdiction without a prior seizure also violates the rule against superfluity. *See Fischer v. United States*, 144 S. Ct. 2176, 2189 (2024) ("[S]urplusage is nonetheless disfavored, and our construction that creates substantially less of it is better than a construction that creates substantially more." (citation and quotation marks omitted)); *Clark v. Rameker*, 573 U.S. 122, 131 (2014) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." (citation omitted)). Section 1355(b)(2) applies in one of two circumstances: first, whenever the property subject to forfeiture "is located in a foreign country," or second, whenever the property subject to forfeiture "has been detained or seized pursuant to legal process or competent authority of a foreign government." 28 U.S.C. § 1355(b)(2). If a U.S. court could exercise *in rem* jurisdiction over property "located in a foreign country" without having seized the property, there would be no need for Congress to separately provide for *in rem* jurisdiction over property that has been seized by a foreign government. The mere fact that the property subject to forfeiture is located abroad would automatically confer jurisdiction, whether or not the foreign government has

seized the property. The first clause of § 1355(b)(2) would swallow the second. In *Approximately $1.67 Million*, we effectively held that we had jurisdiction over the bank proceeds in the Cayman Islands, notwithstanding that there was no evidence that we had seized the funds and there *was* evidence that the proceeds had been "detained or seized" by the Caymans. Under our reading of § 1355, the detention or seizure by a foreign government was irrelevant because the property was outside the United States. *Approximately $1.67 Million*, 513 F.3d at 998. We have read the second clause out of § 1355(b)(2). But if we read the provision in light of the background seizure rule, we can give effect to both provisions. Section 1355(b)(2) acknowledges *in rem* jurisdiction only where the foreign property has been properly seized, either by the United States[14] or by a foreign government cooperating with the United States.[15] This reading construes "each provision to fit harmoniously as part of 'a symmetrical and coherent' statutory scheme." *Rodriguez v. Holder*, 619 F.3d 1077, 1079 (9th Cir. 2010) (per curiam) (citation omitted).

2. *Structure*. There are other compelling reasons for not reading "jurisdiction" in § 1355(d) to refer to *in rem* jurisdiction. Even if one could find clarity in the text taken in isolation, the structure of the broader statutory scheme

[14] There are circumstances in which we can seize property outside the United States. *See, e.g.*, *Maul v. United States*, 274 U.S. 501, 504 (1927) (holding that the governing statute "plainly recognizes that seizures for forfeitures may be made on the high seas"); 18 U.S.C. § 981(k)(1)(A) (providing that funds in a foreign financial institution with an interbank account in the United States are subject to seizure *in rem* "up to the value of the funds deposited into the account at the foreign financial institution").

[15] *See supra* note 3.

undermines the notion that § 1355(d) unambiguously converts § 1355(b)(2) into a personal-jurisdiction provision superseding the general-law rules of *in rem* actions. It would be odd to find such a claim to *in rem* jurisdiction in Part IV of Title 28, where § 1355 is located. Part IV is entitled "Jurisdiction and Venue." Chapter 85, which comprises §§ 1330–69, is devoted to the *subject matter* jurisdiction of the district courts. *See, e.g.*, *id.* § 1330(a) (conferring subject matter jurisdiction over actions against foreign states); *id.* § 1331 (federal question jurisdiction); *id.* § 1332 (diversity jurisdiction); *id.* § 1333 (admiralty jurisdiction); *id.* § 1334 (bankruptcy jurisdiction). Importantly, because the chapter primarily covers subject matter jurisdiction, Congress explicitly uses the phrase "personal jurisdiction" when it articulates rules addressing personal jurisdiction. *See, e.g.*, *id.* § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title."); *id.* § 1330(c) ("[A]n appearance by a foreign state does not confer personal jurisdiction . . . ."). Section 1355(a), which confers original and exclusive subject matter jurisdiction over forfeitures on the district courts, is consistent with this pattern. A claim that § 1355(b)(2) means that the district courts can exercise *in rem* jurisdiction over property located in foreign countries is not an issue of subject matter jurisdiction, but of personal jurisdiction. It would require us to read "jurisdiction" in § 1355(a) to mean "subject matter jurisdiction," but "jurisdiction" in § 1355(d) to mean "personal jurisdiction." Not only would that be a dramatic change in the law of *in rem*, but it would also be a jump shift in what Congress has done elsewhere in Title 28 when it uses the word "jurisdiction."

Case: 22-55685, 01/12/2026, ID: 12957160, DktEntry: 80, Page 95 of 152



3. *Statutory History*. Finally, § 1355(d)'s statutory history shows that it was enacted to address a purely domestic problem. *See supra* Part II.B. Section 1355(d) addressed difficulties that had arisen in cases where the district court had subject matter jurisdiction and venue but where the property subject to forfeiture was located in a different U.S. jurisdiction. The new provision allowed district courts to issue "process as may be required to bring before the court the property" subject to forfeiture, even when that property is located in "any other *district*." 28 U.S.C. § 1355(d) (emphasis added). So long as the government has seized the property within the United States, § 1355(d) allows one district court to treat the seizure as if it had been conducted in that district. *See Meza*, 63 F.3d at 152 ("This national service of process provision clearly conferred *in rem* jurisdiction on district courts in forfeiture proceedings with respect to property located within another judicial district *in the United States*." (emphasis added)). The provision was not intended to upend the seizure-or-control requirement.[16]

*Approximately $1.67 Million* does not control the outcome on this issue for several reasons. For one, it said nothing about whether § 1355 is a clear statement. There is

[16] *Approximately $1.67 Million* relied on a statement included by the bill's sponsor. *See* 513 F.3d at 997 (explaining that under § 1355(b)(2), it would "no longer [be] necessary to base in rem jurisdiction on the location of the property if there have been sufficient contacts with the district in which the suit is filed" (citation omitted)). Senator Alfonse D'Amato sponsored the bill proposed by the Department of Justice. The bill included a section-by-section analysis, which is where the quoted statement came from. *See* 137 Cong. Rec. 21595, 21998 (Aug. 2, 1991). But that statement does not even mention § 1355(d)—and for good reason: The bill as introduced did not have a § 1355(d). That is not a clear statement of intent to change the general law of *in rem* jurisdiction.

a world of difference between the opinion's repeated use of the phrase "plain reading" and a conclusion that the statute has abrogated the general-law rules in an unambiguous manner. A "plain reading" is not the same as a "clear statement." *See MOAC*, 598 U.S. at 298 ("[Congress's] statement must indeed be clear; it is insufficient that a jurisdictional reading is 'plausible,' or even 'better,' than . . . alternatives." (citation omitted)). Moreover, our "plain reading" followed from a single senator's statement in the legislative history and the mistaken holdings of the D.C. and Third Circuits. *See Approximately $1.67 Million*, 513 F.3d at 996–98. That method of analysis sheds little light on whether § 1355 contains the requisite clear statement, because the modern clear-statement "inquiry trains on statutory text rather than legislative history." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 49 (2024); *cf. id.* at 58 ("[I]t is error to grant sovereign immunity based on inferences from legislative history in the face of clear statutory direction . . . . [S]uch notions are relic[s] from a bygone era of statutory construction." (citations and quotation marks omitted) (final alteration in original)).

In the end, to decide that Congress has relaxed the general-law rules of *in rem* jurisdiction, we need an unambiguous statement that Congress has fundamentally altered the seizure-or-control requirement. *Cf. Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 388 (2023) ("This clear-statement rule is a demanding standard. If 'there is a plausible interpretation of the statute' that preserves [the general-law rules] . . . , Congress has not unambiguously expressed the requisite intent." (citation omitted)). Only then can we consider whether it is "warranted by law, and excepted out

of the general rule." *Hollingsworth*, 29 U.S. (4 Pet.) at 472. Today we hold that the government's application of our broad reading of § 1355 violates the Due Process Clause in this case, at least without evidence of U.S. control of the property in Liechtenstein. It remains for future cases to see whether our forced reading of § 1355 can survive in other circumstances. None of our prior cases interpreting § 1355 has addressed whether the statute contains the necessary clear statement. In an appropriate case, we should answer that question in the negative. Unambiguous, § 1355 is not.

* * *

Nasri is not a sympathetic figure. "But that should not obscure what is at stake in his case or others like it." *Jarkesy*, 603 U.S. at 166–67 (Gorsuch, J., concurring). In response to the challenges of international crime and the ease with which criminals can move money from country to country, we have wandered from the basic principles of *in rem* jurisdiction. Along the way, we have assumed to ourselves increasingly sprawling authority inconsistent with the constitutional limits on the judicial power and "repugnant to the general rights and sovereignty of other nations[.]" *Picquet*, 19 F. Cas. at 613. Today's decision is a laudable step in the right direction. It recognizes that constitutionally adequate notice in true *in rem* proceedings requires a seizure of the property. That alone is enough to remand this case to the district court, so the majority understandably goes no further. But this case is about much more than just the Due Process Clause. Article III and general-law principles also supply robust limits on the exercise of *in rem* jurisdiction. We should heed those limits, too.

With these observations, I am pleased to concur.

DESAI, Circuit Judge, concurring:

Our precedent has long used control or constructive control as the touchstone for jurisdiction in in rem cases. *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 87 (1992). A requirement that the district court have control or constructive control over the assets satisfies Article III's justiciability requirements.

To start, if the court has constructive control over the assets, the United States's injury is redressable. A plaintiff satisfies the redressability standard by proving it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38 (1976)). But redressability does not require certainty; a plaintiff "must show only that a favorable decision is *likely* to redress his injury, not that a favorable decision *will inevitably* redress his injury." *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010) (quoting *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994)). Here, if the foreign government offers sufficient assurances of cooperation, then it is more than speculative that an order vesting title in the United States will remedy its alleged injury. *See United States v. Batato*, 833 F.3d 413, 422 (4th Cir. 2016) ("[T]his case meets the test articulated in *Lujan*—the foreign sovereigns have cooperatively detained the res by issuing orders restraining the defendant property pursuant to this litigation."). Judge Bybee's concurrence points to cases concluding that redressability is lacking when "any prospective benefits depend on an independent actor who retains broad and legitimate discretion the courts cannot presume either to control or predict." *Mayfield v. United

*States*, 599 F.3d 964, 972 (9th Cir. 2010) (quoting *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006)). But nothing more is needed if the district court constructively controls the property based on cooperation and assurances from a foreign government.

Constructive control over the property also avoids the risk of the court issuing an advisory opinion, which is generally prohibited. *See Flast v. Cohen*, 392 U.S. 83, 95–96 (1968). To ensure that we do not provide an advisory opinion, a case must satisfy two requirements: (1) "the case must present an honest and actual antagonistic assertion of rights by one party against another" and (2) "the court must be empowered to issue a decision that serves as more than an advisement or recommendation." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 925 F.3d 1041, 1047–48 (9th Cir. 2019) (citation modified). Put another way, a "party does not seek an advisory opinion where valuable legal rights would be directly affected to a specific and substantial degree by a decision from the court." *Id.* at 1048 (citation modified).

Control or constructive control over the assets ensures that these requirements are satisfied. First, there does not appear to be any doubt that the United States has an "actual and antagonistic assertion of rights" over the assets. And second, a decision from the court would serve as more than a mere advisement precisely because the court has assurances that the foreign government would treat it as binding.

The concurrence makes much of the fact that the United States may ultimately not succeed in obtaining the funds. But difficulty enforcing compliance does not make a judgment

"subject to revision." *Cf. Nashville, C. & St. L. Ry. v. Wallace*, 288 U.S. 249, 262 (1933). The Supreme Court has held that a court's judgment is subject to revision when another entity is obligated to review and decide the same subject matter. *See Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 110 (1948). For instance, in *Waterman*, the Supreme Court concluded it did not have jurisdiction to review the denial of an application to engage in overseas and foreign air transportation because the orders were, by statute, subject to approval or denial by the president. *Id.* Because "the decision of the Board . . . grant[ed] no privilege and denie[d] no right" until the president approved it, the Court's judgment on the decision would have "only the force of a recommendation to the President." *Id.* at 112–13.

A civil forfeiture judgment does not suffer the same unenforceability because a judgment in civil forfeiture results in an order vesting title in the United States. 21 U.S.C. § 881(h). Such an order is binding, unlike the order in *Waterman*, which had no effect on any party until the President approved or denied it. 333 U.S. at 113. And a civil forfeiture judgment is conclusive because, assuming potential claimants are given proper notice, it declares rightful ownership over the property. The decision thus affects the rights of the parties "to a specific and substantial degree," regardless of the potential difficulties that enforcing the judgment may present. *Cf. Ctr. for Biological Diversity*, 925 F.3d at 1048 (quoting *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993)).

The historical cases cited by Judge Bybee's concurrence do not persuade me otherwise. For one thing, those cases do not address Article III requirements. Instead, they reference the general in rem jurisdiction requirements. *See, e.g.*, *The Rio Grande*, 90 U.S. (23 Wall.) 458, 463 (1874); *Dobbins's*

*Distillery v. United States*, 96 U.S. (6 Otto) 395, 396 (1877). But even if those cases are read as considering Article III requirements, they demonstrate that Article III jurisdiction is coextensive with—and inseparable from—the in rem jurisdiction requirements. In other words, those cases suggest Article III jurisdiction rises or falls with obtaining proper in rem jurisdiction. *See Scott v. McNeal*, 154 U.S. 34, 46 (1894) ("[A] judgment in proceedings strictly in rem . . . is wholly void if a fact essential to the jurisdiction of the court did not exist."). Thus, even if historically, "control of the *res* is the *sine qua non* of *in rem* actions," *Batato*, 833 F.3d at 439 (Floyd, J., dissenting), control of the res is precisely what the majority opinion requires. By satisfying the majority opinion's requirements to obtain in rem jurisdiction, the court also satisfies Article III's requirements.

Despite my view that constructive control cures the problems identified by Judge Bybee's concurrence, I agree with the view that a better path forward is treating these actions as quasi in rem actions. Bybee Concurrence at 50–51. That approach would provide a simpler cure to the personal jurisdiction defects and stronger assurances of Article III jurisdiction. But Congress or the Supreme Court must forge that path. In the meantime, the majority opinion's constructive control requirement makes an in rem civil forfeiture controversy justiciable.

BENNETT, Circuit Judge, dissenting:

The majority opinion is extraordinary. Taking up a forfeited issue, the majority adjudicates the constitutionality of an Act of Congress and, in violation of binding authority, strikes down the statute as unconstitutional. The majority specifically holds that the civil forfeiture jurisdiction statute, 28 U.S.C. § 1355, violates the Due Process Clause of the Fifth Amendment because due process "requires a district court to establish control or constructive control over property in a forfeiture action to exercise in rem jurisdiction over the property," including "over *foreign* property." Majority Op. at 5–6, 19 (emphasis added). In so holding, the majority improperly addresses a forfeited issue, contravenes controlling precedent, and also errs on the merits.

Worst of all, the majority improperly strips the political branches of an exceptionally important foreign policy tool contrary to centuries of Supreme Court precedent, including a recent decision. Its opinion thus fails to afford "[d]ue respect for the decisions of a coordinate branch of Government," which "demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *See United States v. Morrison*, 529 U.S. 598, 607 (2000). Indeed, stressing this "presumption of constitutionality," *id.*, the Supreme Court just last year instructed courts not to "cavalierly interfere with the political branches' 'delicate judgments' on matters of foreign affairs," *Fuld v. Palestinian Liberation Org.*, 606 U.S. 1, 19 (2025) (quoting *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 273 (2018) (plurality opinion)). But the majority does just that. Therefore, I respectfully dissent.

# I

Nasri's indictment charges him with conspiracy to aid and abet the distribution of cocaine, and with racketeering conspiracy based on drug trafficking, drug import, and obstruction of justice. The government alleges that Nasri operated and managed "PHANTOM SECURE," which "sold encryption services and devices to transnational criminal organizations to facilitate illegal activity". The services and devices were allegedly used to import illegal drugs into various countries, including "hundreds of kilograms of cocaine per month" into the United States, and to distribute some of that cocaine in the Southern District of California. One alleged "objective of PHANTOM SECURE was to engage in money laundering." To that end, Nasri allegedly created "shell companies . . . to launder PHANTOM SECURE's criminal proceeds." He then opened the Liechtenstein bank accounts at issue in this case, which allegedly received "millions of dollars in criminal proceeds" from these activities.

Along with criminal charges, the United States filed a civil forfeiture claim "for violations of the same statutes that form the basis of the racketeering conspiracy." The government sought forfeiture of $1,152,366.18 in funds held in Nasri's Liechtenstein bank account. At the government's request, Liechtenstein issued a restraining order freezing the funds. The government "timely published notice and provided direct notice of this civil forfeiture action to all persons who reasonably appear to be a potential claimant."

It is undisputed that Nasri received that notice. Within two months, he filed a claim of innocent ownership of the property. Three days later, his attorney entered an appearance. Nasri then answered the government's

operative complaint, denying some of the government's allegations. But Nasri has not set out any alternate facts either below or in his appellate briefs.

Because Nasri has remained outside the United States despite his awareness that there is a warrant for his arrest, and despite a court order that he appear, the United States moved to strike Nasri's innocent ownership claim and his answer pursuant to the fugitive disentitlement doctrine.[1] Nasri opposed the motion, arguing that: the government had not established the factual requirements for fugitive disentitlement; that the Fugitive Disentitlement Statute violates due process; that the district court should exercise its discretion not to strike his claim; and that the district court "lacks *in rem* jurisdiction over the frozen assets because [§] 1355(b)(2) does not confer jurisdiction and *neither the assets nor* [*Nasri*] *ha*[*s*] *even minimal contacts* with" the Southern District of California. (second emphasis added). Rejecting these arguments, the district court struck Nasri's claim and answer.

In his opening brief on appeal, Nasri presented his due process arguments in two ways. He argued that "[t]he Fugitive Disentitlement Statute violates due process because it extends to persons who would not have been fugitives at common law . . . ." And he argued that "[t]he district court's assertion of jurisdiction" under 28 U.S.C. § 1355 "violated due process because the court failed to undertake the

---

[1] The Fugitive Disentitlement Statute, 28 U.S.C. § 2466, was passed in 2000. The fugitive disentitlement doctrine dates back at least to 1876, when the Supreme Court "refuse[d] to hear a criminal case in error, unless the convicted party, suing out the writ, is where he can be made to respond to any judgment we may render." *See Smith v. United States*, 94 U.S. 97, 97 (1876).

requisite 'minimum contacts' analysis and such minimum contacts do not exist." Nasri did not argue that due process requires actual or constructive control over the res before a court can exercise personal jurisdiction in an in rem action.

On October 4, 2023, by unanimous vote, we submitted Nasri's appeal on the briefs. Dkt. No. 39; *see also* Ninth Cir. R. 34-4(2). We were "of the unanimous opinion that the facts and legal arguments are adequately presented in the [opening, answering, and reply] briefs and record and the decisional process would not be significantly aided by oral argument." Dkt. No. 38.

But then, on February 27, 2024, our panel *sua sponte* issued a supplemental briefing order. Dkt. No. 40. That order directed the parties "to file simultaneous supplemental briefs addressing the following questions:"

> 1. Has this court previously decided whether exercising in rem jurisdiction under 28 U.S.C. § 1355 violates due process when the district court lacks actual or constructive control over the *res* not within its territory? *See generally, e.g., United States v. Approximately $1.67 Million (US)* . . . , 513 F.3d 991 (9th Cir. 2008); *United States v. Obaid*, 971 F.3d 1095 (9th Cir. 2020); *United States v. PetroSaudi Oil Servs. (Venezuela) Ltd.*, 70 F.4th 1199 (9th Cir. 2023).
>
> 2. If this court has not so decided, does exercising in rem jurisdiction under 28 U.S.C. § 1355 violate due process when the district court lacks actual or constructive control over the res not within its territory?

> 3. If such an exercise of jurisdiction violates due process, has Mr. Nasri nevertheless forfeited and/or waived that argument?

*Id.*

In response, *only after being ordered to do so*, the parties addressed these issues in concurrently filed supplemental briefs. Dkt. Nos. 41, 42. Nasri's court-ordered supplemental brief argued as follows, essentially tracking the language of the *sua sponte* briefing order: "[T]his Court has not previously decided whether it is constitutional to exercise *in rem* jurisdiction under 28 U.S.C. § 1355 when the district court lacks actual or constructive control over the *res* not within its territory. Purporting to exercise jurisdiction in those circumstances violates . . . due process." *See* Appellant's Court-Ordered Supp. Br. at 1, Dkt. No. 42. From there, the majority issued the initial opinion, from which I dissented. *See United States v. Nasri*, 119 F.4th 1172 (9th Cir. 2024); Dkt. No. 47.

The government petitioned for rehearing en banc. Dkt. No. 53. While that petition was pending, on June 20, 2025, the Supreme Court decided *Fuld v. Palestinian Liberation Organization*, 606 U.S. 1 (2025). Soon after, we directed the parties "to file simultaneous supplemental briefs addressing the impact, if any, of [*Fuld*]." Dkt. No. 58. The parties did so. Dkt. No. 59, 61. We then withdrew the initial majority opinion. *See United States v. Nasri*, 159 F.4th 1159 (9th Cir. 2025); Dkt. No. 65. On December 18, 2025, we heard oral argument and re-submitted this case for decision. Dkt. No. 74.

Now, by deciding that the Fifth Amendment's Due Process Clause requires actual or constructive control over

the res in a civil forfeiture case, the majority on its own strikes down a statute that the political branches have used for decades to combat crime at home *and* abroad. Complicating matters, the majority provides no administrable rule for determining whether a court has actual or constructive control over an extraterritorial res. Rather, the majority holds that the foreign government must "act[] essentially as an agent of the United States for purposes of th[e] forfeiture action," and that the district court cannot exercise jurisdiction unless "the United States has received sufficient assurances and cooperation from Liechtenstein to constitute constructive control over the assets." Majority Op. at 26 (second alteration in original) (quoting *United States v. All Funds on Deposit in Any Accts. Maintained in Names of Meza or De Castro* (*Meza*), 63 F.3d 148, 154 (2d Cir. 1995)). Applying this standard, the majority states that actual or constructive control is missing here because, though the funds at issue "are subject to a temporary restraining order" issued by Liechtenstein, "the terms of that order and the extent to which Liechtenstein is willing to assist the United States government remain unclear." *Id.* at 25. With this finding, the majority purportedly stops short of requiring "a binding obligation under a treaty or foreign law" under which the foreign government must turn over forfeited funds. *Id.* But the majority implicitly finds that even a treaty that obligates the foreign sovereign to cooperate with the government's recovery efforts is insufficient—one exists here. *See* Treaty Between the United States of America and the Principality of Liechtenstein on Mutual Legal Assistance in Criminal Matters, art. XVII, LI-U.S., July 8, 2002, T.I.A.S. No. 03-801.

In sum, Nasri received actual notice of the district court proceedings and a complete opportunity to be heard. On appeal, building on his two arguments below, Nasri argues that: (1) the district court violated due process by asserting jurisdiction *because of the lack of minimum contacts*; and (2) the Fugitive Disentitlement Statutes violates due process. Previously, we reached the "unanimous opinion that" these "arguments are adequately presented in the [opening, answering, and reply] briefs." Dkt. No. 38. Completely unprompted by the parties, however, the majority changed course by injecting a third issue into this appeal: (3) whether constitutional due process requires the district court, in a civil forfeiture case, to have actual or constructive control over the res. Dkt. No. 40. It decides this forfeited issue in contravention of binding circuit precedent and crafts a rule inconsistent with the Supreme Court's analysis in *Fuld*.

## II

I begin with forfeiture because "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). We "rely on the parties to frame the issues for decision." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). Our role is merely to be neutral arbiters of "matters the parties present." *Id.* "To put it plainly, courts call balls and strikes; they don't get a turn at bat." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per curiam) (citation modified).

To be sure, "[t]he party presentation principle is supple, not ironclad." *Sineneng-Smith*, 590 U.S. at 376. "There are no doubt circumstances in which a *modest* initiating role for a court is appropriate." *Id* (emphasis added). But just as surely, courts cannot "radical[ly] transform[]" a party's

claim. *Id.* at 380. Doing so "constitute[s] an abuse of discretion." *Id.* at 375.

**A**

Two doctrines—forfeiture and waiver—help enforce the party presentation principle. *See AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1215 (9th Cir. 2020), *overruled in other part by Briskin v. Shopify, Inc.*, 135 F.4th 739, 758 (9th Cir. 2025) (en banc); *United States v. Olano*, 507 U.S. 725, 733 (1993). "Forfeiture is the failure to make the timely assertion of a right . . . ." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 n.1 (2017) (citation modified). "[W]aiver is the intentional relinquishment or abandonment of a known right." *Id.* (citation modified); *see also Hebrard v. Nofziger*, 90 F.4th 1000, 1006 (9th Cir. 2024) ("[T]he failure to raise an argument in a timely fashion is a forfeiture not a waiver.").

"[A]rguments raised for the first time on appeal or omitted from the opening brief are deemed forfeited." *Orr v. Plumb*, 884 F.3d 923, 932 (9th Cir. 2018). So "we have held firm against considering" issues which are "not actually argued in [an] appellant's opening brief." *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). But there are "exceptions" to forfeiture. *Lui v. DeJoy*, 129 F.4th 770, 780 (9th Cir. 2025). "We have discretion to review an issue not raised by [the] appellant . . . when it is raised in the appellee's brief." *In re Riverside-Linden Inv. Co.*, 945 F.2d 320, 324 (9th Cir. 1991). "We can also review a forfeited issue 'if the failure to raise the issue properly did not prejudice the . . . opposing party.'" *Lui*, 129 F.4th at 780 (quoting *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992)). Another exception applies when our failure to review "would result in manifest injustice." *Ullah*, 976 F.2d

at 514 (quoting *United States v. Loya*, 807 F.2d 1483, 1487 (9th Cir. 1987)). In this context, "'argument' and 'issue' are synonymous terms." *Lui*, 129 F.4th at 780.

In determining that the Due Process Clause of the Fifth Amendment requires the district court to have actual or constructive control over the res in a civil forfeiture case, the majority (and not Nasri) shapes the direction of this case, in disregard of Nasri's forfeiture of the issue. And I believe no exception applies.

Recall that Nasri's opening brief presented two issues for our decision: (1) whether the district court's assertion of in rem jurisdiction under 28 U.S.C. § 1355 violated due process *because of the lack of minimum contacts*; and (2) whether the Fugitive Disentitlement Statute comports with due process. The majority originally agreed that these arguments were "adequately presented in the [opening, answering, and reply] briefs." Dkt. No. 38. And as the government correctly observes, by "not raising" any other issues, Nasri forfeited them. Unprompted, however, the majority reaches beyond the two properly presented issues and it then decides that "the Due Process Clause requires a district court to *establish control or constructive control* over property in a forfeiture action to exercise in rem jurisdiction over the property." Majority Op. at 5–6 (emphasis added).

I believe that the majority's course of action violates the doctrine of forfeiture, and thus the party presentation principle. *See Margolin v. Nat'l Assoc. of Immigr. Judges*, 146 S. Ct. 1285, 1288–89 (2026) (per curiam) (concluding that the court of appeals violated the party presentation principle because "[u]nsatisfied with rejecting respondent's arguments" on the briefed issues, the court of appeals "*sua sponte* addressed a much broader [issue] and remanded for

Case: 22-55685, 01/08/2026, ID: 12959150, DktEntry: 83, Page 111 of 152



further proceedings on that question”). Nasri nowhere timely argued that *control or constructive control over the res* is required under the Due Process Clause of the Fifth Amendment for a district court to exercise in rem jurisdiction over the property—not below, and not in his opening brief on appeal. Yet the majority interjects the dispositive issue on Nasri’s behalf. Dkt. No. 40.

The arguments presented prior to our *sua sponte* call for supplemental briefing did not request, even by implication, the majority’s pronouncement requiring actual or constructive control over the res. Indeed, the majority recognizes as much. Majority Op. at 9. With his first argument, Nasri urged a minimum contacts analysis under 28 U.S.C. § 1355. The majority correctly observes that this contention is foreclosed by *United States v. Obaid*, 971 F.3d 1095, 1105 (9th Cir. 2020). Majority Op. at 18 n.4 (citing *Obaid*, 971 F.3d at 1103–05). As to Nasri’s second argument—that the Fugitive Disentitlement Statute violates due process—the majority declines even to reach the issue. The majority’s logic is that “the district court must first determine whether it can exercise in rem jurisdiction over the assets consistent with the Due Process Clause.” Majority Op. at 26 n.8. Against this backdrop, the issue that is dispositive to the majority’s resolution of this appeal—whether due process requires actual or constructive control over the res in a civil forfeiture action—is one that Nasri failed to timely raise, even by implication.

We could nonetheless reach this issue if an exception to forfeiture applies. *See Lui*, 129 F.4th at 780. But the majority invokes no such exception. And in my view, none of the “[t]hree main exceptions to” forfeiture apply here. *See Ullah*, 976 F.2d at 514.

Case: 22-55685, 10/08/2026, ID: 12995710, DktEntry: 80, Page 112 of 152



First, the majority does not explain why applying the ordinary rule of forfeiture "would result in manifest injustice," and I see no reason it would. *See id.* (quoting *Loya*, 807 F.2d at 1487). The government alleges that Nasri personally participated in a criminal drug-trafficking conspiracy as a "significant worldwide distributor" of encrypted phones to his co-conspirators, allowing them to "evade law enforcement," obstruct justice, and "maintain and control a method of secure communication to facilitate the importation, exportation, and distribution of illegal drugs into Australia, Asia, Europe, and North America, including the United States and Canada." His alleged worldwide distribution operations, including those in the Southern District of California, generated "millions of dollars in criminal proceeds," which he allegedly parked in Liechtenstein to evade authorities. He is a fugitive, hiding abroad allegedly to avoid criminal prosecution. The government provided reasonable notice to potential claimants. Nasri received that notice, and, represented by counsel, entered an appearance. Forfeiture of the funds at issue would not work manifest injustice. *Cf. Hunter v. United States*, 146 S. Ct. 1702, 1708 (2026) (defining "miscarriage of justice" as "the kind of egregious error that would bring the judicial system into disrepute").

Second, the issue of actual or constructive control was not "raised in the appellee's [answering] brief." *See Riverside-Linden Inv. Co.*, 945 F.2d at 324.

And third, the exception based on lack of prejudice does not apply here. We have suggested that arguments "based entirely in law" and not reliant "on the factual record" can be "raised for the first time on appeal" if the appellee "will not be prejudiced" because "it has had, and has taken advantage of, a full opportunity to brief its response to the

Caase: 222-5556685, 1019/1082/2202236, IID: 1122995971502, DktEntry: 830, Page 18183 of 11252



new arguments.” *Dream Palace v. County of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004). But we have never extended this exception to arguments raised for the first time in supplemental briefing ordered *sua sponte* by the panel. *See AMA Multimedia*, 970 F.3d at 1215 (“[W]e decline to consider [a party]’s untimely argument” when the party “only discussed it in a supplemental brief filed at our request.”). For good reason. Such an extension would violate the Supreme Court’s command that it is inappropriate, “[w]ith the appeal poised for decision based upon the parties’ presentations,” for the panel to “intervene[]” and “order[] further briefing” on arguments the appellant did not “so much as hint” at “[o]n brief and at oral argument.” *Sineneng-Smith*, 590 U.S. at 376–79. Indeed, the Court specifically instructed us that doing so is inappropriate even when we “permitted” the parties “to file supplemental briefs” on the issue. *Id.* at 379. And here, the initial supplemental briefing order directed the parties “to file *simultaneous* supplemental briefs,” Dkt. No. 40 (emphasis added), with the unavoidable effect of placing the government in the awkward position of having “to address what arguments [Nasri] might have made, had he addressed the issue [in his opening brief], and then refute them,” “without the benefit of anything to argue against.” *Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1149 (9th Cir. 2016). Moreover, the government suffers a serious delay in the final adjudication of its rights to the res, and also must now redevelop the factual record below to support its claims under the majority’s newly created legal framework. *See* Majority Op. at 26 n.8 (ordering “the district court [to] first determine whether it can exercise in rem jurisdiction over the assets consistent with the Due Process Clause”).

At bottom, this case involves a civil appellant who failed to raise the issue the majority now decides. *See Brown*, 840 F.3d at 1149 (calling such failure to raise an issue "a significant error"). "[T]here is no reason to deviate from our usual practice in this case." *See id.* (quoting *EEOC v. Peabody W. Coal Co.*, 773 F.3d 977, 990 (9th Cir. 2014)). We should not "manufacture arguments for [Nasri]," *Indep. Towers*, 350 F.3d at 929 (citation modified), when as the counseled appellant he had every "opportunity to" make the argument concerning control over the res, but "only discussed it"—and briefly, at that—"in a supplemental brief filed at *our* request," *see AMA Multimedia*, 970 F.3d at 1215 (emphasis added).

Nasri has had his at-bat. Having raised a due process challenge to 28 U.S.C. § 1355 below, he had "the ability to frame the question to be decided in any way he cho[]se." *See Yee v. City of Escondido*, 503 U.S. 519, 535 (1992). In "fram[ing] the question" presented, however, Nasri argued "narrowly" for a minimum contacts analysis under § 1355(b)(2). *See id.* Because that argument is foreclosed by binding circuit precedent in *Obaid*, 971 F.3d at 1105, he should have struck out. *See Indep. Towers*, 350 F.3d at 930. His claim survives only because the majority intercedes on his behalf. By doing so, I believe the majority violates the doctrine of forfeiture and ultimately the party presentation principle. *See Sineneng-Smith*, 590 U.S. at 375–79; *Margolin*, 146 S. Ct. at 1288–89.

**B**

The majority's responses do not change my view. The majority claims that "Nasri argued—both in the district court and on appeal—that the district court's exercise of jurisdiction over the assets violated due process because both

he *and the assets* lacked connection with the United States." Majority Op. at 9. It is true that, before the district court, Nasri cited a Second Circuit case for the proposition that "a showing of control" by the government is needed. *See Meza*, 63 F.3d at 152. But he did not develop his arguments around that case. Instead, he proceeded to argue that the *lack of minimum contacts* defeats personal jurisdiction. Likewise, in his opening brief on appeal, Nasri mentioned "the assets" only in the context of arguing that the district court failed to undertake the requisite *minimum contacts* analysis. Moreover, neither his opening brief nor his reply brief on appeal once used the phrase "control" or "constructive control" in addressing the district court's jurisdiction over the assets. He first used the terms only when specifically ordered *sua sponte* to do so in supplemental briefing—by which point the issue had *already* been forfeited.

I recognize that there is no "clear-cut line between cases involving only an 'enlargement' of questions presented [properly] and those involving entirely new questions." *See Illinois v. Gates*, 462 U.S. 213, 220 (1983). And, of course, we are "not hidebound by the precise arguments of counsel." *Machowski v. 333 N. Placentia Prop., LLC*, 38 F.4th 837, 843 (9th Cir. 2022) (quoting *Sineneng-Smith*, 590 U.S. at 380). But in applying forfeiture, we routinely draw this kind of distinction between two discrete issues: here, between minimum contacts and control over the res. *Cf., e.g.*, *United States v. Stennerson*, 150 F.4th 1276, 1281 n.1 (9th Cir. 2025) (concluding that the appellant "forfeited an as-applied challenge to [18 U.S.C.] § 922(g)(3) separate from his vagueness challenge"). The majority thus cannot claim that these two issues are so intertwined such that forfeiture does not apply.

Alternatively, the majority contends that "although personal jurisdiction may be waived, this court has not held that in rem jurisdiction in a civil forfeiture case, which concerns the rights of the rest of the world to the property, can be waived."[2] Majority Op. at 9. In support of the claim that in rem jurisdiction *cannot* be waived in a civil forfeiture case, the majority reasons that "[a] judgment in proceedings strictly in rem . . . is wholly void if a fact essential to the jurisdiction of the court did not exist." *Id.* (second alteration in original) (quoting *Scott v. McNeal*, 154 U.S. 34, 46 (1894)). But it is well established for in personam jurisdiction too "that the judgment of a court lacking jurisdiction is void." *Burnham v. Superior Ct.*, 495 U.S. 604, 608–09 (1990) (plurality opinion). Yet personal jurisdiction *can* be waived in that context. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982).

Further, I have found no case in which *McNeal* has been cited for the extraordinary proposition that objections to in rem jurisdiction cannot be waived in a civil forfeiture case. Such reasoning runs contrary to the general rule that non-Article III limitations on jurisdiction may be forfeited or

---

[2] The majority concedes that, at least "in some cases, an individual objection to in rem jurisdiction may be waived," but stresses that "[i]t does not follow that a claimant in an in rem forfeiture case can waive the rights of all other claimants to object to the district court's exercise of in rem jurisdiction." Majority Op. at 9. I agree. And nothing would prevent a *different* claimant from stepping forward and objecting to the forfeiture action on the grounds that the district court lacks control over the res (though, for the reasons that follow, I believe that to be a losing argument). But *Nasri* has forfeited this argument, and recognizing *his* forfeiture would neither require nor permit us to deem waived hypothetical constitutional arguments that might be raised by future, hypothetical (heretofore unknown) claimants.

waived. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583–84 (1999). The majority's claim also conflicts with our admiralty case law. We have held that "as with other forms of jurisdiction over the party, a vessel may waive jurisdiction in rem by appearing in the action and failing to raise the defense of lack of jurisdiction over the party in a timely fashion." *See Barnes v. Sea Haw. Rafting, LLC*, 889 F.3d 517, 529 (9th Cir. 2018) (citation modified). In addition, two sister circuits have expressly held in the civil forfeiture context that in rem jurisdiction *is* waivable. *See Porsche Cars N. Am., Inc. v. Porsche.net*, 302 F.3d 248, 256 (4th Cir. 2002) ("[I]n admiralty *and civil forfeiture cases*, for years courts have held that objections to in rem jurisdiction may be waived." (emphasis added)); *United States v. Contents of Accts. Nos. 3034504504 & 144-07143 at Merrill Lynch, Pierce, Fenner & Smith, Inc.* (*Merrill Lynch*), 971 F.2d 974, 983–84 (3d Cir. 1992).[3]

[3] The majority notes that, in *Merrill Lynch*, "the Third Circuit concluded that a claimant waived his right to object to in personam and in rem jurisdiction" but found "the district court nevertheless lacked in rem jurisdiction" to enter an order determining the government's rights to the res as against the world. Majority Op. at 9–10. But the Third Circuit *did not* find that the district court lacked jurisdiction to enter an in rem order on the basis of the objection that the claimant had waived. *See Merrill Lynch*, 971 F.2d at 980–83. Instead, considering an argument the claimant expressly raised, *see id.* at 980, the court found that a judgment of forfeiture under the circumstances of that case could not "affect any rights [of] persons who are not subject to the territorial jurisdiction of the district court," *id.* at 983. It is for that reason, the Third Circuit explained, that "the district court lacked *in rem* jurisdiction" and could not "enter an adjudication determining that the government's right to the *res* was superior to all potential claimants." *See id.* at 984. The objection the claimant had waived was a separate one, pertaining only to the court's "power to adjudicate the right to the [res] as between [the claimant] and the government." *See id.* at 983–84.

* * *

Nasri has forfeited the issue of whether the Fifth Amendment requires actual or constructive control over the property for a district court to exercise in rem jurisdiction over the res in a civil forfeiture case. And I believe that no exception to forfeiture applies. Yet at the majority's own behest, and unprompted by the parties, *see* Dkt. No. 40, this forfeited issue forms the core and central holding of the majority opinion. Moreover, in deciding that issue, the majority strikes down as unconstitutional an Act of Congress addressing foreign affairs—an area in which the power of the political branches is at its highest. If ever there were a case that called for judicial discretion, this is it.[4]

In sum, the majority disregards the Supreme Court's unanimous directive to our court to be "attuned to the case shaped by the parties rather than the case designed by the appeals panel." *Sineneng-Smith*, 590 U.S. at 375. As I see it, the majority's decision to shape the direction of this case for Nasri "depart[s] so drastically from the principle of party presentation as to constitute an abuse of discretion." *Id.* Nasri's forfeiture should end this appeal.

## III

But even were it otherwise, I believe that binding circuit authority forecloses the majority's holding. We have held that "28 U.S.C. § 1355(b) does not require the government

[4] And, as discussed, even were the issue preserved and the powers of the political branches not at their highest, our discretion would still be constrained by the "presumption of constitutionality" absent "a plain showing that Congress has exceeded its constitutional bounds." *Morrison*, 529 U.S. at 607. That presumption cannot be defeated here because, as I argue below, the majority's result is foreclosed by binding precedent and is wrong on the merits.

to establish constructive control of the proceeds to sustain jurisdiction." *United States v. Approximately $1.67 Million (US) in Cash, Stock, and Other Valuable Assets* (*$1.67 Million*), 513 F.3d 991, 996 (9th Cir. 2008). As a three-judge panel, we must stay the course unless "the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority." *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). Only one such case is relevant here: *Fuld*. And in my view, *Fuld* not only coheres with our prior precedent, but indeed materially *strengthens* the reasoning of that precedent.

**A**

As the government correctly argues, we have "previously held that it does not violate due process to exercise jurisdiction even if the district court lacks actual or constructive control over the property in question." In "*$1.67 Million* and *Obaid*," we "establish[ed] that a district court has *in rem* jurisdiction [under 28 U.S.C. § 1355] over property not within its actual or constructive control, even when it lacks personal jurisdiction over the property's owner." *United States v. PetroSaudi Oil Servs. (Venezuela) Ltd.*, 70 F.4th 1199, 1210 (9th Cir. 2023). From there, "[i]t follows that under its broad *in rem* jurisdiction in civil forfeiture suits, a district court may" adjudicate civil forfeiture claims to foreign "property not within its actual or constructive control." *See id.* at 1210–11.

**1**

*$1.67 Million* alone should end the inquiry. There, a twice-convicted drug smuggler and trafficker appealed from the district court's grant of summary judgment for the United States in an in rem civil forfeiture action. *See $1.67 Million*,

Case: 22-55685, 01/08/2026, ID: 12957150, DktEntry: 80, Page 120 of 152



513 F.3d at 994. The res at issue: his alleged drug trafficking proceeds, held in Cayman Islands bank accounts. *Id.*

Both parties argued "that the district court erred in concluding it had jurisdiction based on a theory of constructive control of the Cayman Islands bank deposits." *Id.* at 996. They contended that the correct test "derives from a plain reading of the jurisdictional statute in question, 28 U.S.C. § 1355(b), which provides for jurisdiction in a district 'in which any of the acts or omissions giving rise to the forfeiture occurred.'" *Id.* (quoting 28 U.S.C. § 1355(b)). We agreed. *Id.* So we held that "§ 1355(b) does not require the government to establish constructive control of the proceeds to sustain jurisdiction." *Id.* "Rather, applying a plain reading of the statute to the acts giving rise to the forfeiture, we conclude[d] that sufficient acts occurred in [the judicial district] for jurisdiction to lie there properly." *Id.*

Our focus was on the statute's text. But the *$1.67 Million* panel did not "engage in a *purely* textual interpretation of the statute," as the majority contends. Majority Op. at 16 (emphasis added). We noted that "[a] forfeiture action is *in rem*," and that "[j]urisdiction *in rem* is predicated on the 'fiction of convenience' that an item of property is a person against whom suits can be filed and judgments entered.'" *$1.67 Million*, 513 F.3d at 996 (quoting *United States v. Ten Thousand Dollars ($10,000) in U.S. Currency*, 860 F.2d 1511, 1513 (9th Cir. 1988)). And we observed that "[d]ating back to early admiralty law, constructive possession of a res *had been* a prerequisite to establishing in rem jurisdiction." *Id.* at 996 (emphasis

Case: 22-55685, 01/08/2026, ID: 12959150, DktEntry: 80, Page 121 of 152



added).[5] "Under the traditional paradigm," we continued, "the court must have actual or constructive control over the res when an *in rem* forfeiture suit is initiated." *Id.* (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 58 (1993)). We stated that the district court's ruling had "followed the traditional paradigm." *Id.*

But we held that the district court had erred by following that paradigm because "[t]he plain language and legislative history of the 1992 amendments" to 28 U.S.C. § 1355 "make[] clear that Congress intended § 1355 to lodge jurisdiction in the district courts without reference to constructive or actual control of the res." *Id.* at 998. So "[w]here an act or omission giving rise to the forfeiture occurs in a district," we determined, "the corresponding district possesses jurisdiction over the forfeiture action regardless of its control over the res." *Id.*

In reaching that holding, we discussed relevant sister circuit decisions. *See id.* at 997–98. Joining the majority of circuits to have considered the issue, we rejected the traditional "requirement of constructive control." *Id.* In doing so, we expressly declined to follow the Second Circuit's decision in *Meza*, which "found that the traditional requirement" of actual or constructive control over the res "survived the § 1355 amendments." *Id.* (discussing 63 F.3d

[5] Both we in *$1.67 Million*, 513 F.3d at 996, and the Supreme Court in *United States v. James Daniel Good Real Property*, 510 U.S. 43, 57–58 (1993), traced this "prerequisite" of constructive possession back to an 1815 Supreme Court case, *The Brig Ann*, 13 U.S. (9 Cranch) 289 (1815). *The Brig Ann* was essentially a civil forfeiture action against merchandise aboard a ship seized by federal authorities and "immediately taken possession of by the collector . . . as forfeited to the United States" at port in Connecticut. 13 U.S. at 289–90. More on *The Brig Ann* later.

at 152). We did so despite *Meza*'s reliance on *United States v. James Daniel Good Real Property*, a Supreme Court case addressing Fifth Amendment due process in the civil forfeiture context, in support of the Second Circuit's description of the constructive control requirement as "well-settled law regarding *in rem* jurisdiction." *See* 63 F.3d at 152 (citing *James Daniel Good Real Prop.*, 510 U.S. at 57). Fully aware of *Meza*'s suggestion that the constructive control requirement is constitutional, we nevertheless declined to follow *Meza*. *$1.67 Million*, 513 F.3d at 997–98.

Instead, we joined "the D.C. and Third Circuits" in holding that "§ 1355(b) does not require the government to establish constructive control of the proceeds to sustain jurisdiction." *Id.* at 996, 998. And we discussed the D.C. and Third Circuits' cases at length.[6] So *$1.67 Million*'s

---

[6] We discussed as follows in *$1.67 Million*:

> The D.C. Circuit rejected the requirement of constructive control in *United States v. All Funds in Account in Banco Espanol de Credito, Spain*, 295 F.3d 23 (D.C. Cir. 2002) (hereinafter "*Banco Espanol*"). In *Banco Espanol,* the district court had relied on the cooperation between Spanish authorities and the district court to establish constructive control over the res. The D.C. Circuit reasoned that Spain's cooperation had no relevance to the district court's jurisdiction: "Spain's compliance and cooperation determines only the effectiveness of the forfeiture orders of the district courts, not their jurisdiction to issue those orders." *Id.* at 27. *The plain language of*

specific rejection of *Meza* made clear that exercising in rem jurisdiction over foreign property without establishing actual or constructive control over the property does *not* offend "well-settled law regarding *in rem* jurisdiction," and thus does not violate the Due Process Clause of the Fifth Amendment. *See id.* at 997 (quoting *Meza*, 63 F.3d at 152).

The majority states that the Second Circuit's *Meza* decision "comes the closest" to "address[ing] whether the statutory language comports with the fundamental due process requirements of in rem jurisdiction." Majority Op. at 15 (citing 63 F.3d at 152). If *Meza* came "the closest" to addressing the due process issue, then *$1.67 Million*'s outright rejection of *Meza* conveyed that the panel did not have any due process concerns with the district court's exercise of in rem jurisdiction over foreign property under 28 U.S.C. § 1355(b). And yet the majority reaches the opposite conclusion. Worse still, the majority "find[s] instructive the analysis undertaken by the Second Circuit [in

---

> *§ 1355(b) alone provided jurisdiction, not Spanish compliance. Id.*

513 F.3d at 997 (emphasis added). We then continued:

> [T]he Third Circuit declined to follow the Second Circuit's *Meza* decision, holding that § 1355(b) "grants district courts jurisdiction over the property at issue . . . based on the plain language of the statute." *Contents of Account Number 03001288 v. United States*, 344 F.3d 399, 403 (3d Cir. 2003). Mirroring the D.C. Circuit's reasoning, the Third Circuit rejected the idea that the cooperation of the United Arab Emirates in seizing the funds provided the district court with jurisdiction. Rather, § 1355(b) itself provided jurisdiction . . . .

*Id.* at 997–98.

*Meza*] when engaging in [the constructive-control] inquiry," *id.* at 25, despite *$1.67 Million*'s prior rejection of that exact same analysis.

*$1.67 Million* held that the proper focus is on the text of the statute *because* the panel reasoned that constitutional due process does not impose any requirement of actual or constructive control over the res in the civil forfeiture context. *See* 513 F.3d at 997–98. Turning to the statutory text, the panel determined that control over the res is not required for a district court to exercise in rem jurisdiction under 28 U.S.C. § 1355(b)(2). *See id.* at 996. From there, without any qualification, we pronounced the broad holding that § 1355(b)(2) "*does not require the government to establish constructive control of the proceeds*." *Id.* (emphasis added). Because that holding remains binding on our three-judge panel, *$1.67 Million* should end the inquiry. *See Miller*, 335 F.3d at 893. But even if reasonable minds could differ, the default should be that the prior three-judge decision controls, and not that a new three-judge panel which does not agree with the prior decision is able to effectively ignore and overrule it. *Cf. Barapind v. Enomoto*, 400 F.3d 744, 750–51 (9th Cir. 2005) (en banc) (per curiam) (holding that even "dicta" in prior published opinions "constitutes circuit law" and is binding "regardless of whether it was in some technical sense 'necessary' to our disposition of the case"). Though that should be a lodestar principle, even if it weren't, we should not be this eager to overrule precedent, *sua sponte* addressing an issue that Nasri has forfeited.

**2**

Circuit precedents subsequent to *$1.67 Million* also support the government's argument. In *Obaid*, after discussing the traditional rule "anchoring *in rem* jurisdiction

Case: 22-55685, 01/12/2026, ID: 12959102, DktEntry: 80, Page 125 of 152



to the presence of the res," we nevertheless determined that "[t]he threshold inquiry under [§] 1355 is whether sufficient acts giving rise to the forfeiture took place in the [relevant] [d]istrict" because "the action is predicated on whether" the res is "traceable to the proceeds of a crime." 971 F.3d at 1101, 1106 (citation modified).

Then, in *PetroSaudi Oil*, despite once again noting the traditional requirement of actual or constructive control over the res, we determined that reading "*$1.67 Million* and *Obaid*" together "establish[es] that a district court has *in rem* jurisdiction over property not within its actual or constructive control, even when it lacks personal jurisdiction over the property's owner." 70 F.4th at 1210. We even recognized there that the owner of the res "may refuse to comply with the order and that the district court may have difficulty enforcing compliance" with respect to the property abroad. *Id.* at 1211. But we held that "limitations on the ability of the court to enforce compliance 'determine[] only the effectiveness of the forfeiture orders of the district courts, not their jurisdiction to issue those orders.'" *Id.* (quoting *United States v. All Funds in Acct. in Banco Espanol de Credito, Spain*, 295 F.3d 23, 27 (D.C. Cir. 2002)). We thus confirmed that § 1355(b)(2) "relaxed th[e] [traditional] requirement" of actual or constructive control over the res, thereby providing district courts with "broad *in rem* jurisdiction in civil forfeiture suits." *Id.* at 1210–11.

Thus, the majority abrogates not only *$1.67 Million*, but also *Obaid* and *PetroSaudi Oil*. Again, each abrogation is beyond the reach of our three-judge panel. *See Miller*, 335 F.3d at 893.

* * *

As I have shown, the majority attempts to circumvent the en banc process required for this court to overturn circuit precedent by claiming that the question posed is purportedly distinct from the question *$1.67 Million* sought to answer. Majority Op. at 18–19. The error of this approach is multi-layered. Perhaps most fundamentally, the majority opinion effectively overturns *$1.67 Million*, a panel decision that we have adhered to time and again—and which we must continue to adhere to absent intervening authority of the Supreme Court or an en banc panel. It cannot simultaneously be true that a "district [court] possesses jurisdiction over the forfeiture action regardless of its control over the res," *$1.67 Million*, 513 F.3d at 998, *and* that, as the majority holds, "[s]uch an exercise of 'in rem' jurisdiction is contrary to our most fundamental principles of due process" and therefore unconstitutional, Majority Op. at 21–22.

The majority claims that "critically, in each of the[] cases [interpreting 28 U.S.C. § 1355], we did not address whether such an exercise of in rem jurisdiction comports with due process." Majority Op. at 18. But, as discussed, that contention flies in the face of the reasoning and theory of our precedents. As we concluded in *Obaid* and *PetroSaudi Oil*, *$1.67 Million* controls on this issue.

**B**

Moreover, *$1.67 Million* applies with even greater force following the Supreme Court's recent decision in *Fuld v. Palestinian Liberation Organization*. *Fuld* held that the Fifth Amendment, and not the Fourteenth Amendment, governs any due process limits on the extraterritorial personal jurisdiction of federal courts. 606 U.S. at 16. *Fuld* further held that the Fifth Amendment "necessarily permits

a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* And *Fuld* explained that when a statute touches foreign affairs, as § 1355 does, that broader sovereign authority is "supported by the strongest of presumptions and the widest latitude of judicial interpretation." *Id.* at 19 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

*Fuld*'s reasoning is directly relevant here. *Id.* at 18–20. There, the Court found it unnecessary "to delineate the outer bounds of the Federal Government's power, consistent with due process, to hale foreign defendants into U.S. courts." *Id.* at 18. "[W]hatever the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts," the Court explained, the statute at issue there "does not transgress" any such limits because it "ties federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns." *Id.* at 18–19. To identify that close relationship and the political branches' germane foreign policy judgment, the Court examined the legislative history of the pertinent jurisdictional statute. *See id.* at 16, 19–20. In conducting that inquiry, the Court emphasized that courts may not "cavalierly interfere with the political branches' 'delicate judgments' on matters of foreign affairs." *Id.* at 19 (quoting *Jesner*, 584 U.S. at 273 (plurality opinion)). In the end, the Court concluded that the statute is "suitably limited to those [foreign policy] ends" the political branches intended to address. *Id.* at 20.

*Fuld*'s reasoning buttresses the "reasoning or theory" of *$1.67 Million*. *See Miller*, 335 F.3d at 893.[7] Recall that 28 U.S.C. § 1355(b)(2) directly addresses the Federal Government's foreign relations powers. The statute provides:

> Whenever property subject to forfeiture under the laws of the United States *is located in a foreign country*, or has been detained or seized pursuant to legal process or competent authority *of a foreign government*, an action or proceeding for forfeiture may be brought as provided in paragraph (1), or in the United States District court for the District of Columbia.

28 U.S.C. § 1355(b)(2). By subjecting property located abroad to civil forfeiture by adjudication in U.S. courts under

---

[7] The Majority states that "*Fuld* may not apply to this case at all because *Fuld* involved an in personam case, not an in rem case." Majority Op. at 22. But nothing in *Fuld* turned on this distinction. In fact, no opinion in *Fuld* even mentioned the terms "in rem," "in personam," or "res." *See generally* 606 U.S. 1.

Instead, *Fuld*'s holding depended on a different distinction, that between Fifth Amendment due process and Fourteenth Amendment due process. *See id.* at 16 ("Because the State and Federal Governments occupy categorically different sovereign spheres, we decline to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment. Rather, the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority."). *Fuld*'s teachings are therefore relevant in *any* case where "personal jurisdiction is . . . 'authorized by a federal statute'" and is not limited thereby to the scope of personal jurisdiction available to state courts. *See id.* at 11–12 (quoting Fed. R. Civ. P. 4(k)(1)(C)).

U.S. law, the statute effects the political branches' policy judgment on a foreign relations issue—the complex politics of seeking civil forfeiture of property located abroad but acquired through or involved in crimes against the United States. So § 1355(b)(2) undoubtedly embodies "the political branches' delicate judgments on matters of foreign affairs." *See Fuld*, 606 U.S. at 19 (citation modified).

In *$1.67 Million*, conducting the same mode of inquiry the Supreme Court later adopted in *Fuld*, we looked to the text and legislative history of 28 U.S.C. § 1355(b)(2). *See* 513 F.3d at 997. In so doing, we observed that the statute embodies congressional intent to resolve a foreign affairs problem by "alter[ing] the role of constructive control" in civil forfeiture cases concerning extraterritorial property. *Id.* We noted that "Senator Alphonse D'Amato of New York, when introducing the bill," identified a problem

> that arises whenever property subject to forfeiture under the laws of the United States is located in a foreign country. . . . [U]nder current law, it is probably no longer necessary to base in rem jurisdiction on the location of the property . . . . No statute, however, says this, and the issue has to be repeatedly litigated whenever a foreign government is willing to give effect to a forfeiture order issued by a United States Court . . . . Subsection (b)(2) resolves this problem . . . .

*Id.* (quoting 137 Cong. Rec. S12183–02, S12238 (Aug. 2, 1991)). We explained that the statute was enacted to effectuate Congress's judgment that "property subject to

forfeiture under the laws of the United States" and "located in a foreign country" should be subject to in rem jurisdiction in the federal district courts. *See id.* And again, we concluded there that "[t]he plain language and legislative history of the 1992 amendments make[] clear that Congress intended § 1355 to lodge jurisdiction in the district courts *without reference to constructive or actual control of the res*." *Id.* at 998 (emphasis added). In other words, just as *Fuld* did as to the statute in that case, in *$1.67 Million* we determined that by enacting § 1355, Congress addressed a problem directly involving foreign relations.[8] *See id.*

It is true, as the majority recognizes, that 28 U.S.C. § 1355 *as a whole* "applies broadly to domestic and foreign forfeitures alike." *See* Majority Op. at 23. But the majority takes a wholly unjustified leap in stating that § 1355(b)(2) therefore does not "reflect[] the political branches' balanced

[8] As one scholar has explained, "[b]y the early 1990s, the government had become increasingly frustrated by its inability to forfeit foreign assets," which "stemmed from a limitation in the then-existing forfeiture laws." Courtney J. Linn, *International Asset Forfeiture and the Constitution: The Limits of Forfeiture Jurisdiction over Foreign Assets Under 28 U.S.C. § 1355(b)(2)*, 31 Am. J. Crim. L. 251, 262 (2004). "The civil forfeiture laws that Congress enacted in the 1970s, and expanded in the 1980s, predominately targeted domestic crime. Consistent with the limits of in rem jurisdiction, these laws authorized the government to forfeit only assets within the territorial limits of the district court where the asset was found." *Id.* But "[t]he more the government put the squeeze on domestic money laundering through the use of forfeiture and other prosecutorial tools, the more it drove money launderers to use offshore banks and other international money laundering devices to move illegally derived money." *Id.* "In response to these limitations, Congress in 1992 amended the statute that grants federal courts jurisdiction over forfeiture actions. As amended, Title 28 U.S.C. § 1355(a) confers original jurisdiction over forfeitures authorized under any Act of Congress." *Id.* at 265.

judgment of competing concerns over sensitive and weighty interests of national security and foreign affairs." *Id.* (quoting *Fuld*, 606 U.S. at 20). The majority's suggestion is that we may disregard the political branches' legislated judgment as to foreign affairs because the political branches simultaneously exercised their judgment as to domestic affairs. That suggestion is mystifying. While the civil forfeiture statute *as a whole* covers both foreign and domestic forfeitures, we have already held that the subparagraph at issue here *was* enacted by the political branches to solve a specific foreign affairs problem. *See $1.67 Million*, 513 F.3d at 997.

*Fuld* issued a clear command: respect "the political branches' 'delicate judgments' on matters of foreign affairs." 606 U.S. at 19 (quoting *Jesner*, 584 U.S. at 273). And the Court there identified those judgments by looking to legislative history. *Id.* at 19–20. *Fuld* thus reinforces our analysis and holding in *$1.67 Million* that § 1355(b)(2) embodies the political branches' coordinate action to solve a foreign policy issue by extending in rem jurisdiction to cases such as the one before us.,[9] *See* 513 F.3d at 997–98. Therefore, by "cavalierly interfer[ing]" here, the majority both disregards and contravenes *Fuld*. *See* 606 U.S. at 19.

While doing so, the majority misconstrues some of *Fuld*'s reasoning. Relying on the Supreme Court's observation that the statute at issue in *Fuld* does "not put respondents at broad risk of being haled into U.S. courts for myriad civil liability actions," the majority emphasizes *Fuld*'s remark that the statute applies only to "a narrow category of claims" against "two enumerated nonsovereign

[9] Indeed, had we applied a substantially different mode of analysis, the resulting precedent *would* be clearly irreconcilable with *Fuld*.

Case: 22-55685, 01/12/2026, ID: 12959160, DktEntry: 80, Page 132 of 152



foreign entities," and only when narrow "jurisdiction triggering predicates" are met. 606 U.S. at 21–22. The majority construes these features of that statute as additional "reasons" why it "satisfied the Due Process Clause," and it argues that § 1355(b)(2) does not have those features. Majority Op. at 22. But in identifying these features, *Fuld* did not set out a wooden multi-part test. *See* 606 U.S. at 21–22. Rather, these features of that statute merely showed that it was "suitably limited" to "those ends" that the political branches had in mind. *See id.* at 20. Unsurprisingly, those considerations do not map perfectly onto § 1355(b)(2), a different statute enacted for different ends. *Cf. id.* at 16 ("[T]he Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry . . . .").

As discussed, we have explained that § 1355(b)(2) was enacted to deal with the difficult problem of civilly forfeiting property located in a foreign country. *See $1.67 Million*, 513 F.3d at 997–98. In Nasri's case, the government alleges that the relevant property may be forfeited because he committed very serious crimes in the Southern District of California, derived millions of dollars from that criminal activity, and then parked those ill-gotten gains in Liechtenstein. In other words, the government claims the res is forfeitable because it constitutes the instrument and proceeds of a crime against the United States. Prior to the statute's passage, the government lacked tools with which to obtain such property. This inability to seize or forfeit the property also meant that the government lacked certain tools with which to negotiate with foreign governments over such property. It followed that alleged criminals like Nasri could protect from U.S. civil forfeiture their proceeds of crime by stashing their ill-gotten gains abroad. So Congress enacted § 1355(b)(2), which

directly addressed these problems by bringing within the Federal Government's reach property that is civilly forfeitable under U.S. law but located abroad.

Congress's solution is "suitably limited" to achieving this foreign policy goal. *See Fuld*, 606 U.S. at 20. Section 1355(b)(2) vests district courts with jurisdiction over in rem actions concerning the civil forfeiture of property that is "located in a foreign country, or [that] has been detained or seized pursuant to legal process or competent authority of a foreign government." 28 U.S.C. § 1355(b)(2). And because the provision only applies to "property subject to forfeiture under the laws of the United States," *id.*, the jurisdictional grant is inherently limited in scope to res that are, roughly, the "proceeds [of a crime], contraband, [or] property that has played a part in the commission of a crime" *against the United States*, *see United States v. Ursery*, 518 U.S. 267, 298 (1996) (Stevens, J., concurring in the judgment in part and dissenting in part). Indeed, except in very limited circumstances,[10] property is forfeitable only if it is involved in or traceable to the proceeds of a federal crime. *See* 18 U.S.C. § 981(a)(1); 21 U.S.C. § 881(a). And again, in Nasri's case, the government seeks forfeiture of the res because he allegedly derived the funds from his federal crimes. I cannot imagine how a substantially more limited statute could effectuate

[10] When the allegedly forfeitable property is located outside the United States, as is required to trigger § 1355(b)(2), the only other category of property subject to forfeiture consists of assets belonging to a terrorist who is planning an act of terror either against the United States or from within the United States. *See* 18 U.S.C. § 981(a)(1)(G). This very narrow category obviously also implicates the sovereign and foreign-affairs interests of the United States.

Case: 22-55685, 01/02/2026, ID: 12959160, DktEntry: 80, Page 134 of 152



Congress's very specific "considered judgment" here.[11] *See Fuld*, 606 U.S. at 19.

In the end, the relevant intervening Supreme Court decision only strengthens our prior holding in *$1.67 Million*. Thus, I believe that we, as a three-judge panel, must adhere to *$1.67 Million*. *See Miller*, 335 F.3d at 893.

## IV

Even if the party presentation principle and *Miller v. Gammie* did not both stand in the way of the majority, as both do, the majority is wrong on the merits. The majority adjudicates the constitutionality of an Act of Congress and strikes it down as unconstitutional. *Compare* Majority Op. at 16 ("[I]n *$1.67 Million*, we held that the statute did not require control or constructive control over the property at issue in the civil forfeiture action."), *with id.* at 19 ("[T]his arrangement violates the Due Process Clause."). We may do so "only upon a plain showing that Congress has exceeded its constitutional bounds." *Morrison*, 529 U.S. at 607. No such showing has been made here.

Because the majority remands the case for a "finding that [the district court] has control or constructive control over

---

[11] The majority confuses *Fuld*'s holding that a jurisdictional grant is (at least presumptively) consistent with the Fifth Amendment if it is suitably limited to a enacting the political branches' foreign policy judgments, *see Fuld*, 606 U.S. at 20–22, with a non-existent requirement that the category of forfeitable property be narrowly defined, *see* Majority Op. at 23 n.6 ("Requiring only that property 'has played a part in the commission of a crime' creates an expansive, rather than narrow, category of claims . . . ."). *Fuld* found the statute at issue "suitably limited" because it applied to only "a narrow category of claims" under a single statute rather than to "myriad civil liability actions," 606 U.S. at 20. Likewise, § 1355(b)(2) applies to only one narrow category of claims: forfeiture actions against property located in a foreign country.

[Nasri's] property," Majority Op. at 26, I assume that the majority adjudicates the constitutionality of the amended statute only as applied to Nasri.[12]

### A

The majority errs by holding that 28 U.S.C. § 1355(b)(2) is unconstitutional as applied to Nasri's case. All agree on most of the bedrock principles. "Historically, in rem

---

[12] I do so because it is unclear whether the majority holds that the statute is unconstitutional on its face or only as applied to Nasri. At most, Nasri's court-ordered supplemental brief belatedly raised an as-applied challenge to § 1355. *See* Appellant's Court-Ordered Suppl. Br. at 1, Dkt. No. 42 (arguing that "exercis[ing] jurisdiction *in those circumstances* violates . . . due process" (emphasis added)). The majority, however, appears to opine on far more than Nasri's individual situation, thus placing the opinion on even more tenuous footing. "A facial challenge to a legislative Act is, of course, the most difficult type of challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3 ex rel. Orange County*, 695 F.3d 960, 962–63 (9th Cir. 2012) (applying *Salerno* to a facial procedural due process challenge under the Fourteenth Amendment). As the Supreme Court recently cautioned, when a plaintiff chooses to litigate a case as a facial challenge, "that decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). "Claims of facial invalidity," the Court explained, "'often rest on speculation' about the law's coverage and its future enforcement. And 'facial challenges threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008)). In short, "facial challenges" are "hard to win." *Id.*

Regardless, it bears repeating that Nasri brought no timely challenge to § 1355, neither facial nor as applied, arguing that it is inconsistent with a due process requirement of actual or constructive control over the res. By ordering supplemental briefing *sua sponte*, the majority interjected that issue *for* Nasri. Dkt. No. 40.

jurisdiction required seizure or constructive control over the" res. Majority Op. at 10. And "[t]he Supreme Court has repeatedly held"—though never under the Fifth Amendment—"that when a sovereign fails to secure property in an in rem proceeding, the resulting judgment is void." *Id.* at 11. Furthermore, "the exercise of jurisdiction upon persons" or upon a res "over whom" or which "a court has no power violates due process." *Id.* at 12. In applying that rule under the Fourteenth Amendment, "the Supreme Court [has] expanded in personam jurisdiction," loosening the traditional rules that strictly limited the persons over whom courts could exercise jurisdiction. *Id.* at 12–13. But those developments have not "disturb[ed] the requirements for in rem jurisdiction" under the Fourteenth Amendment. *Id.*

I believe, however, that the Fourteenth Amendment principles are inapposite here. None of the above-stated principles, well-established under the Fourteenth Amendment, compel the conclusion that the *Fifth Amendment* requires actual or constructive control over an extraterritorial res for a federal court to exercise in rem jurisdiction. Indeed, the Fifth Amendment may impose no substantive limits at all on personal jurisdiction. *See Fuld*, 606 U.S. at 18. In any event, *Fuld* shows that any such limits on Congress's ability to vest personal jurisdiction in federal courts easily accommodate § 1355(b)(2)'s vesting of in rem jurisdiction in district courts over civilly forfeitable property located abroad.

*Fuld*'s central holding is that the political branches can, by appropriate statute, displace general law rules governing personal jurisdiction, consistent with the Fifth Amendment. 606 U.S. at 19–21. In *Fuld*, the Court reviewed such a statute. *Id.* That statute in particular, the Court remarked,

"reflects the political branches' balanced judgment of competing concerns over," on the one hand national security and foreign affairs, and on the other hand fairness to particular defendants. *Id.* at 13. So, in reviewing that statute, the Court limited its inquiry to whether the statute was "suitably limited to those ends" that the political branches enacted it to address. *Id.* at 20–21.

**1**

To put *Fuld* in perspective, I return to first principles. At the Founding, and until somewhat recently, constitutional due process was not understood as the source of jurisdictional rules. One leading scholar explains as follows:

> [T]hose who adopted the Fifth Amendment didn't see its Due Process Clause as 'the only source of the personal jurisdiction requirement,' as courts see the Fourteenth Amendment's Clause today. Instead, early federal courts adhered to rules derived from general and international law—rules that could be altered by federal statute, with no obvious constitutional constraint.

Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703, 1711 (2020) (footnote omitted) (quoting *Ins. Corp. of Ireland*, 456 U.S. at 703 n.10).

Early precedents confirm this. In the nineteenth century, federal courts regularly recognized that Congress could modify the traditional rules of personal jurisdiction. The Supreme Court stated that if "congress acted under the idea that the process of the circuit courts could reach persons in a

Case: 22-55685, 01/08/2026, ID: 12957150, DktEntry: 80, Page 138 of 152



foreign jurisdiction," courts could exercise that jurisdiction. *Toland v. Sprague*, 37 U.S. (12 Pet.) 300, 329–30 (1838). Similarly, while riding circuit, Justice Story opined that though "[t]he courts of a state, however general may be their jurisdiction, are necessarily confined to the territorial limits of the state," Congress is "doubtless competent . . . to have authorized original as well as final process, to have issued from the circuit courts and run into every state of the Union." *Picquet v. Swan*, 19 F. Cas. 609, 611 (C.C.D. Mass. 1828). And though he thought it "repugnant to the general rights and sovereignty of other nations" to extend federal jurisdiction to "a subject of England, or France, or Russia" to be "summoned from the other end of the globe to obey our process," Justice Story suggested that federal courts must follow such a rule if "congress have, in an unambiguous manner, made it imperative upon them." *Id.* at 613–14. The Supreme Court likewise understood that "[i]f it be the will of the government" to vary the general law rules of personal jurisdiction over maritime captures, it could do so, though "[t]ill such an act be passed, the Court is bound by the law of nations which is part of the law of the land." *The Nereide*, 13 U.S. (9 Cranch) 388, 423 (1815). Further confirming this understanding, the Court explained that "the act of Congress is decisive on this subject," and "whatever may be the responsibility incurred by the nation to foreign powers, in executing such laws, there can be no doubt that Courts of justice are bound to obey and administer" federal jurisdictional statutes. *The Marianna Flora*, 24 U.S. (11 Wheat.) 1, 40 (1825).

*The Brig Ann* is in accord. 13 U.S. (9 Cranch) at 291. This 1815 decision, recognized as establishing the traditional rule requiring constructive control over the res for in rem jurisdiction, involved what was essentially a civil

Case: 22-55685, 01/02/2026, ID: 12959150, DktEntry: 80, Page 139 of 152



forfeiture action against merchandise aboard a ship seized by federal authorities in Connecticut. *Id.* at 289–90. Before the forfeiture proceeding began, the ship sailed to New York. *Id.* On those facts, the Supreme Court held that the Connecticut district court lacked personal jurisdiction under the Judiciary Act of 1789, "ch. 20, § 9," which provided jurisdiction over certain maritime seizure cases. *Id.* at 290–91.

"[W]hatever might have been the construction" of the statute had Congress worded it differently, the Supreme Court explained that "jurisdiction as to revenue forfeitures[] was *intended* to be given to the Court of the district . . . where the seizure was made." *Id.* (emphasis added). "The legislature" had "wisely determined that the place of seizure should decide as to the proper and competent tribunal." *Id.* at 291. And "from this consideration," the Court continued, "it follows . . . that before judicial cognizance can attach upon a forfeiture in rem, *under the statute*, there must be a seizure; for until seizure it is impossible to ascertain what is the competent forum." *Id.* (emphasis modified).

The best reading of *The Brig Ann* is that the jurisdictional limit at issue there derived fundamentally from a statute, not from the Constitution. In other words, whatever jurisdiction Congress granted the district courts by enacting the Judiciary Act of 1789, the legislature could enlarge or narrow the district courts' jurisdiction by subsequent Act.

As the majority notes, these early precedents predate Reconstruction. But the ratification of the Fourteenth Amendment "placed no new limits on federal personal jurisdiction. It expanded the federal courts' power to review *state* jurisdiction, but it left the substance of the jurisdictional

Case: 22-55685, 01/08/2026, ID: 12957160, DktEntry: 80, Page 140 of 152



rules alone." Sachs, *supra*, at 1722. Thus, though in *Pennoyer v. Neff* the Supreme Court held that proceedings involving "parties over whom [a] court has no jurisdiction do not constitute due process of law," 95 U.S. (5 Otto) 714, 733 (1877), the Court did not hold, as the majority contends it did, that the jurisdictional rules themselves "were tethered to the Constitution's Due Process Clause," Majority Op. at 12. Instead, the Fourteenth Amendment's Due Process Clause "require[d] *jurisdiction*, period, without setting out particular rules for obtaining it." Sachs, *supra*, at 1724 (footnote omitted). As a result, "the federal *view* of jurisdictional law now controlled in the state courts." *Id.* at 1726. But "the law of jurisdiction" did not "*itself*" become "federal constitutional law." *Id.* Instead, "Congress still retained power to define federal jurisdiction." *Id.* at 1723. Thus, the Fourteenth Amendment authorized the Court's "enforcing, rather than constitutionalizing, a general law of jurisdiction." *Id.* at 1725.

Over time, the general rules governing personal jurisdiction evolved under the Fourteenth Amendment. The emergent rules, such as the minimum contacts test, flowed "from 'the principles of interstate federalism embodied in the Constitution' and the related protections of due process which ensure that individuals are 'subject only to lawful power.'" *Fuld*, 606 U.S. at 14 (first quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980); and then quoting *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality opinion)). In our constitutional system, States' sovereign authority—their lawful power—"is bounded by the States' respective borders." *Id.* "[T]he limits of State power are defined in view of the relation of the States to each other in the Federal Union." *Id.* (quoting *Burnet v. Brooks*, 288 U.S. 378, 401

(1933)). To enforce these structural limits on States' authority to hale persons and property into court, therefore, standards consistent with interstate federalism developed under the Fourteenth Amendment. *Id.*

"These interstate federalism concerns, however, do not apply to limitations under the Fifth Amendment upon the power of the Federal Government and the corollary authority of the federal courts." *Id.* at 15. "Because the State and Federal Governments occupy categorically different sovereign spheres," *Fuld* determined that the Fourteenth Amendment's minimum contacts standard is inapposite under the Fifth Amendment. *Id.* at 16. The Court explained that the Fifth Amendment instead "permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* The Fifth Amendment therefore does not limit the federal government's power to expand federal court jurisdiction by statute in the same way that the Fourteenth Amendment restricts States' power to expand state court jurisdiction by statute.

It follows that the due process limitations on personal jurisdiction imposed under the Fourteenth Amendment are simply inapposite here. The Fifth Amendment, and not the Fourteenth Amendment, governs the constitutionality of 28 U.S.C. § 1355(b)(2)'s extraterritorial reach. So putting aside the doctrinal developments under the Fourteenth Amendment, we must ask what due process requirements the Fifth Amendment imposes—other than the requirement that courts issue judgments only when they have jurisdiction, as

defined by general law principles *and as modified by federal statute*.[13]

*Fuld* expressly raised the possibility that the Fifth Amendment imposes no other requirements whatsoever, and thus that federal courts can exercise *whatever* personal jurisdiction Congress grants them. *See id.* at 18; *see also id.* at 26 (Thomas, J., concurring in the judgment) ("The critical question in these cases is what boundaries the Fifth Amendment's due process guarantee, as originally understood, places on the Federal Government's power to extend personal jurisdiction over respondents. Historical evidence demonstrates that the answer is 'none.'"). Rather than rejecting this "unbounded jurisdictional theory," the

---

[13] The majority adopts a different understanding of the relevant precedents. According to the majority, "[t]he Supreme Court has repeatedly held that when a sovereign fails to secure property in an in rem proceeding, the resulting judgment is void." Majority Op. at 11. The majority string cites cases in support of this claim. *See id.* But *all* those cases predate § 1355's amendment, *none* of them concerned a civil forfeiture action against assets in a foreign country, and *none* concerned jurisdiction under the Fifth Amendment. *Cooper v. Reynolds*, 77 U.S. (10 Wall.) 308, 311 (1870) (concerning attachment against one defendant's real property in Knox County, Tennessee, when the defendants had fled from the State or had so absconded or concealed themselves such that the ordinary process of law could not reach them); *Scott*, 154 U.S. at 39 (addressing "whether letters of administration upon the estate of a person who is in fact alive have any validity or effect as against him"); *Elliott v. Peirsol's Lessee*, 26 U.S. (1 Pet.) 328, 333 (1828) (concerning "an action of ejectment[] brought in the Circuit Court for the district of Kentucky"); *Hanson v. Denckla*, 357 U.S. 235, 238 (1958) ("concern[ing] the right to $400,000, part of the corpus of a trust established in Delaware by a settlor who later became domiciled in Florida"). As permitted under the Fifth Amendment, and pursuant to Congress's broad sovereign authority, 28 U.S.C. § 1355(b)(2) overrides the default general law rule requiring control of the res for in rem jurisdiction. The majority's string-cited cases are therefore inapposite.

Court chose not to address it in *Fuld* because it was "sufficient unto the day that, whatever the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts, the [statute at issue] does not transgress them." *Id.* at 19 (majority opinion). That was so, the Court explained, because the statute is "suitably limited" to effecting the political branches' "'delicate judgments' on matters of foreign affairs," with which courts should not "cavalierly interfere." *Id.* at 19–20 (quoting *Jesner*, 584 U.S. at 273).

Though the Court held that a jurisdictional statute is at least presumptively consistent with the Fifth Amendment if it is suitably limited to effecting foreign affairs judgments, *see id.* at 19–20, it did not suggest that such a statute *must* be limited in this way. Indeed, we recently concluded that "the exercise of personal jurisdiction" under a particular statute is "consistent with the Fifth Amendment" after analyzing only the statute's *reasonableness*, not its narrowness.[14] *Devas Multimedia Priv. Ltd. v. Antrix Corp.*, No. 20-36024, 2026 WL 2330570, at *7–8 (9th Cir. Aug. 12, 2026).

But the statute before us *is* "suitably limited" to effecting the political branches' "'delicate judgments' on matters of foreign affairs," and so "whatever the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts, [the statute] does not transgress them." *Fuld*, 606 U.S. at

[14] I address reasonableness below. *See infra* § IV.A.2. I note here that, in *Devas*, we did not hold that the Fifth Amendment requires an exercise of jurisdiction to satisfy a reasonableness test. *See* 2026 WL 2330570, at *7. Instead, we observed that, in *Fuld*, the Supreme Court "held that the [statute] 'easily' satisfied any reasonableness requirement under the Fourteenth Amendment without deciding whether such an inquiry is constitutionally compelled in the context of the Fifth Amendment." *Id.* (quoting *Fuld*, 606 U.S. at 23–24).

Case: 22-55685, 09/08/2026, ID: 12957150, DktEntry: 80, Page 144 of 152



19–20. For the reasons discussed above, our binding precedent in *$1.67 Million* has already recognized that, just as with the statute at issue in *Fuld*, an "important foreign policy concern[]," *id.* at 18, lies behind § 1355(b)(2). *See supra* § III.B. And as I have explained, § 1355(b)(2) is suitably limited to effectuating the political branches' expressed foreign policy goal. So § 1355(b)(2) falls comfortably within any due process guardrails applicable under the Fifth Amendment.

**2**

This conclusion does not change even if the Fifth Amendment requires reasonableness. As the majority notes, "*Fuld* expressly declined to decide whether a 'reasonableness' test applies in personal jurisdiction cases under the Fifth Amendment's Due Process Clause." Majority Op. at 24 n.7 (citing *Fuld*, 606 U.S. at 23–24); *accord Devas Multimedia*, 2026 WL 2330570, at *7. The Court did not reach this issue because, even assuming that a reasonableness analysis applies under the Fifth Amendment, the statute at issue "easily comport[ed] with the factors" under the test. *Fuld*, 606 U.S. at 23–25. The Court identified those factors as "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Id.* at 23–24 (quoting *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 113 (1987)); *see also Devas Multimedia*, 2026 WL 2330570, at *7–8 (applying the same three factors). Based on those factors, the Court determined that the statute at issue would survive any applicable reasonableness review. *Id.* at 23–25.

Like the statute in *Fuld*, § 1355(b)(2) "ticks all three boxes." *See* 606 U.S. at 24. So even assuming the reasonableness test applies, exercising personal jurisdiction

under § 1355(b)(2) is reasonable, both facially and as applied here.

In *Fuld*, the Supreme Court found that "[f]or largely the same reasons" why "there is a close connection between the [jurisdictional statute]'s predicate conduct and the United States, it follows that the forum sovereign has a substantial interest in adjudicating the dispute." *Id.* at 24. So too here. The United States, as both plaintiff and forum sovereign, "has a substantial interest in adjudicating" forfeitures of extraterritorial property under § 1355(b)(2). *See id.* Such property must have been used in or derived from a crime *against the United States*, or belong to a terrorist who is perpetrating or planning an attack *against* or *from within the United States*. *See* 18 U.S.C. § 981(a)(1); 21 U.S.C. § 881(a); *see also supra* § III.B & n.10. And in the usual case, requiring claimants to defend in a federal district court their rights to property used in such a way against or within the United States does not unduly burden them.

Indeed, exercising personal jurisdiction is eminently reasonable on the facts here. The government alleges that Nasri's "acts or omissions giving rise to the forfeiture occurred" in the Southern District of California, 28 U.S.C. § 1355(b)(1)(A), and constituted offenses against the United States, *see* 18 U.S.C. § 981(a)(1)(C). And Nasri would not be especially burdened by having to litigate this dispute in federal district court. He cannot "complain of any lack of notice," *Fuld*, 606 U.S. at 24, because he received actual notice of the action, *see supra* § I; *infra* § IV.B. And he does not "contend that litigating th[is] case[] in the United States would force [him] to bear an unfair or unmanageable burden." *Fuld*, 606 U.S. at 24. Thus, the exercise of jurisdiction here under § 1355(b)(2) easily satisfies any reasonableness test applicable under the Fifth Amendment.

Case: 22-55685, 01/08/2026, ID: 12957150, DktEntry: 80, Page 146 of 152



* * *

Whatever the outer bounds of the Fifth Amendment's limits on personal jurisdiction, § 1355 falls well within them. So when § 1355's provisions conflict with "traditional in rem principles," Majority Op. at 16, tradition and not the statute gives way. As the D.C. Circuit has noted, under *The Brig Ann*'s traditional rule, a court "[w]ithout possession of the property" had "no power to enforce its decree." *United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426, 429–30 (D.C. Cir. 2022) (quoting *The Brig Ann*, 13 U.S. at 291). But as the court continued:

> Congress altered this traditional rule in 1992. Now, if property located in a foreign country is subject to forfeiture under United States law, the federal government may bring a forfeiture action in [the appropriate] district court" pursuant to § 1355(b)(2). The district court thus may acquire *in rem* jurisdiction even if a forfeiture order would have no practical effect without cooperation by the foreign jurisdiction where the property is located.

*Id.* at 430; *see also PetroSaudi Oil*, 70 F.4th at 1210 ("28 U.S.C. § 1355 relaxed this requirement."). Because Congress has displaced the general law rule, contrary to the majority's holding, the constitutionality of in rem

jurisdiction under § 1355(b)(2) does *not* turn on the traditional requirement of actual or constructive control.[15]

In short, § 1355 displaces the historic general law rule requiring actual or constructive control for in rem jurisdiction in federal civil actions to forfeit extraterritorial res. And § 1355(b)(2) operates well within any constitutional due process guardrails. *See Fuld*, 606 U.S. 19–24. Thus, we must apply it. The majority instead strikes it down.

**B**

Of course, the Fifth Amendment's Due Process Clause does not require only that courts have jurisdiction when they issue judgments. It also requires "notice and an opportunity to be heard." *James Daniel Good Real Prop.*, 510 U.S. at 46. The majority argues that "[n]otice is particularly important in an in rem suit because it is an action 'against the world' to determine title to the property." Majority Op. at 19. "When property is seized for an in rem action," the majority continues, "theoretically anyone who claims an interest in the property will realize that someone else is currently possessing the property until the question of title is resolved." *Id.* at 19-20. In my view, however, these concerns are not only legally unfounded but also inexplicable on the facts here.

It is true that when the United States moves to civilly forfeit property, a court must "adjudicate the rights of the government to the property as against the whole world." *PetroSaudi*, 70 F.4th at 1210 (quoting *United States v. 51*

[15] This requirement might persist for personal jurisdiction rooted in state law. But, as discussed, the Fourteenth Amendment "placed no new limits on federal personal jurisdiction." Sachs, *supra*, at 1722.

*Pieces of Real Prop., Roswell, N.M.*, 17 F.3d 1306, 1309 (10th Cir. 1994)). In this context, if an "owner-claimant" comes forward, he acts as "neither defendant nor plaintiff, but an intervenor who seeks to defend his or her right to the property against the government's claim." *United States v. One 1985 Mercedes*, 917 F.2d 415, 419 (9th Cir. 1990). And such "owner-claimants" could come from anywhere, with or without any direct ties to the district. Because submitting a claim might amount to an admission of criminal liability, however, no owner-claimants might come forward in any given case.

But that does not bar the government from seeking civil forfeiture. Rather, as the majority acknowledges, once the United States moves to forfeit property, "proper notice requires personal notice to known claimants and publication to the world." Majority Op. at 20 (citing Fed. R. Civ. P. Supp. R. G(4)).

Here, the United States provided such notice. The government avers that, after filing a civil complaint against the funds in Liechtenstein, it "timely published notice and provided direct notice of this civil forfeiture action to all persons who reasonably appear to be a potential claimant." As a potential claimant, Nasri does not contest that he received the notice. Nor could he. Nasri received the notice and, within two months of the initiation of the forfeiture action, Nasri filed a notice of claim to the property. Soon thereafter, Nasri's attorney entered an appearance.

Under our precedent and the most elementary principles of due process, nothing more was required. *See United States v. Ritchie*, 342 F.3d 903, 911 (2003) (finding notice satisfactory when government sends potential forfeiture claimants "personal notice letters" and, if the "letters are

returned undelivered," "make[s] reasonable additional efforts to provide personal notice"). There simply cannot be a violation of due process in the air. *See In re Drexel Burnham Lambert Grp. Inc.*, 995 F.2d 1138, 1144 (2d Cir. 1993) (explaining that "adjudicatory process" must be "*appropriate to the nature of a given case*" (emphasis added)). And here, Nasri received both actual notice *and* an actual opportunity to be heard. On these facts, whether the res is under the actual or constructive control of the district court, or is located in San Diego, the District of Columbia, Liechtenstein, or elsewhere, cannot possibly be relevant to whether *Nasri* had notice of the proceeding and an opportunity to be heard. Under the well-established rule that "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional," the majority should not exercise "[t]he delicate power of pronouncing an Act of Congress unconstitutional . . . with references to hypothetical cases" of other potential claimants. *United States v. Raines*, 362 U.S. 17, 21–22 (1960). Indeed, citing this "self-imposed rule[] of restraint," we have held in the forfeiture context that a litigant's "receipt of actual notice deprives him of standing" to challenge a "statutory notice procedure [a]s inadequate under the [F]ifth [A]mendment with respect to supposed third parties who receive no actual notice of the seizure and impending forfeiture." *Wiren v. Eide*, 542 F.2d 757, 762 (9th Cir. 1976).

All agree that "[n]otice does not . . . exempt courts from complying with the fundamental in rem jurisdiction requirements." Majority Op. at 20. But as I have explained, this forfeiture action violates no such requirements.

Whatever due process limits apply under the Fifth Amendment, none are violated by 28 U.S.C. § 1355(b)(2)'s application here.

## V

In authoring concurrences on Article III jurisdiction, I believe my colleagues confuse a jurisdictional standing requirement—redressability—with a wholly practical concern—enforceability. Both of my colleagues suggest that a plaintiff lacks Article III standing to sue when a federal court exercises in rem jurisdiction over property outside of its constructive control. They essentially agree that redressability requires the district court to "have control or constructive control over the assets." Desai Op. at 73; *accord* Bybee Op. at 29–49. They diverge primarily over what criteria suffice to demonstrate constructive control.

Judge Desai advances the position that the putative requirement of constructive control may be satisfied "based on cooperation and assurances from a foreign government." Desai Op. at 74. I disagree that constructive control is required for a district court to exercise jurisdiction over civil forfeiture suits initiated under 28 U.S.C. § 1355. But even if it were, the record shows sufficient assurances of cooperation by the government of Liechtenstein to satisfy the requirements for redressability as described by Judge Desai. At the request of the United States, Liechtenstein issued a restraining order freezing the funds. And Liechtenstein has entered into a treaty with the United States under which each nation pledged to "assist the other to the extent permitted by law" in recovering forfeited assets, including "the recognition of a forfeiture judgment." Treaty Between the United States of America and the Principality of Liechtenstein on Mutual Legal Assistance in Criminal

Case: 22-55685, 01/08/2026, ID: 12957162, DktEntry: 83, Page 126 of 127



Matters, art. XVII, LI-U.S., July 8, 2002, T.I.A.S. No. 03-801. Lichenstein's actual cooperation and its treaty commitment surely amount to "cooperation and assurances from a foreign government," which should satisfy Judge Desai's mistaken theory of redressability. Desai Op. at 74.

Espousing a stricter view, Judge Bybee argues that a forfeiture action is justiciable only when "the executive branch has *seized or exercised* control over the property." Bybee Op. at 34 (emphasis added). He argues that the ability of foreign courts to ignore domestic judgments from the United States calls the entire exercise of in rem jurisdiction over foreign assets into question, "given the lack of judicial mechanisms" for enforcing such judgments. *Id.* at 49. In support of this claim, he points to three instances when foreign courts failed to honor civil forfeiture judgments issued by U.S. courts. *See id.* at 43–44.

But redressability does not require certainty that a court be able to enforce its judgment. To the contrary, "[c]ourts often adjudicate disputes where the practical impact of any decision is not assured," including "cases against foreign nations, whose choices to respect final rulings are not guaranteed." *Chafin v. Chafin*, 568 U.S. 165, 175–76 (2013) (collecting cases). Indeed, the statement that U.S. courts lack Article III jurisdiction to render *any* judgment which they lack the power to enforce is sweeping. Taken at face value, U.S. courts would lack the power to render any judgment requiring enforcement by any other court. As one major consequence, the whole system of private international law would be rendered void. And because federal courts "have an independent duty to examine our subject matter jurisdiction," *In re Emery*, 317 F.3d 1064, 1068 (9th Cir. 2003) (per curiam), we would need to analyze our power to enforce a judgment in every case, even

unprompted by the parties. The law does not require these strange results. Federal courts routinely render judgments requiring enforcement in a State other than the forum State; and until this case, no one has suggested that Article III jurisdiction exists only when courts afford each other's judgments full faith and credit. I believe Judge Bybee therefore errs by conflating redressability with enforceability.

In any event, Judge Bybee's theory of redressability fails on its own terms. The heart of his argument is that the government will be unable practically to enforce any civil forfeiture judgment it obtains in this suit. But neither party disputes the willingness of Liechtenstein to abide by our judgment. Plus, by obtaining such a judgment, the government gains another tool with which to negotiate with Liechtenstein. So even under Judge Bybee's theory, which I believe conflates redressability with enforceability, I fail to understand why that added leverage does not itself address enforceability in a practical sense, thereby satisfying Judge Bybee's conception of redressability.

## VI

The majority decides that application of 28 U.S.C. § 1355(b)(2) violates the Due Process Clause of the Fifth Amendment whenever the district court lacks actual or constructive control over the res. By doing so, the majority overrides the political branches' delicate judgments in the realm of foreign affairs. Practically, the majority interferes with the government's ability to fight crime, including organized crime, at home and abroad. Worse still, the majority does so in contravention of binding circuit and Supreme Court precedent, and in violation of the party presentation principle. Thus, I respectfully dissent.